In the United States District Court
For the Northern District of Illinois
Eastern Division

DIGISOUND-WIE, INC.,

       Plaintiff,

    v.

BESTAR TECHNOLOGIES, INC., et al.,

       Defendants.

07 CV 6535

Judge Lindberg

Magistrate Judge Mason

# Plaintiff's Response to Certain Defendants' Motion To Dismiss Counts II-VIII of Complaint

## 1. Count III Alleges Violation of Illinois Trade Secrets Act

Defendants ignore FED.R.CIV.P. 8(a)'s pleading requirements in arguing that Count III alleges trade secret misappropriation only under superseded Illinois common law and not the Illinois Trade Secret Act ("ITSA"). Rule 8(a) does not require pleading what law was violated. *Albiero v. City of Kankakee*, 122 F.3d 417, 419 (7th Cir. 1997) ("Having specified the wrong done to him, a plaintiff may substitute one legal theory for another without altering the complaint."); *Connecticut Gen. Life Ins. Co. v. Universal Ins. Co.*, 838 F.2d 612, 622 (1st Cir. 1988) (unnecessary to set out claim's legal theory). Because Count III does not expressly refer to common law misappropriation, and only statutory misappropriation exists, it must be construed as alleging a claim for statutory misappropriation.[1]

## 2. Motion Mischaracterizes Complaint to Fit Preemption Argument

Defendants ignore much of the Complaint's factual allegations in arguing that Counts II, VI, and VII are preempted by ITSA. Those counts are not based on misappropriation of trade

---

[1] Unlike Digisound-WIE's complaint, the one in *Automed Techs. v. Eller,* 160 F. Supp. 2d 915, 921 (N.D. Ill. 2001), included separate misappropriation counts under the Illinois Trade Secrets Act and Illinois common law, thus requiring dismissal of the latter.

secrets. Paragraphs 13-15 of the Complaint allege that while the de Youngs and Florian Greiling worked for Digisound-WIE or its parent, and before they formed BeStar Technologies, they "agreed on a plan" to (a) cause Digisound-WIE not to have parts to supply its customers and (b) exploit that shortage by selling parts they took from Digisound-WIE's inventory to the same customers. Those paragraphs further allege that while still working for Digisound-WIE and its parent, those defendants carried out their plan by intentionally not placing orders with the joint venture for Digisound-WIE's inventory and taking parts that had recently arrived at Digisound-WIE and selling them to Digisound-WIE's customers.

Because the claims for breach of fiduciary duty and tortious interference are based on allegations that are not solely dependent on trade secret misappropriation, ITSA does not preempt them. 765 ILCS 1065/8(b) (ITSA does not affect or displace other civil remedies that are not based upon misappropriation of trade secrets); *Patriot Homes, Inc. v. Forest River Housing, Inc.*, 489 F. Supp. 2d 865, 871 (N.D. Ind. 2007) (theft/conversion claims not preempted where defendants allegedly took tangible items that could not be said to have immaterial intrinsic value; *Lucini Italia Co. v. Grappolini,* 231 F. Supp. 2d 764, 770 (N.D. Ill. 2002) (declining to dismiss breach of fiduciary duty claim that consultant used position of trust to contract for his own interests); *Automed Techs.,* 160 F. Supp. 2d at 922 (allowing breach of fiduciary duty claim to proceed to the extent it was based on soliciting former co-employees to compete against former employer); *Paint Brush Corp. v. Neu,* 1999 SD 120, 599 N.W.2d 384, 393 (S.D. 1999) (breach of duty of loyalty claim based on evidence that defendant took steps to compete with employer while still employed not preempted).

### 3. Motion Mischaracterizes Civil Conspiracy Allegations

The Complaint alleges extensive wrongdoing by defendants pursuant to an agreement formed and carried out *before* they formed together as shareholders of BeStar Technologies. The

heart of those allegations are in ¶¶ 13-15 of the Complaint. As stated in part 1 of this Response, those paragraphs allege that while they worked for Digisound-WIE or its parent, and before they formed BeStar Technologies, Florian Greiling and the de Youngs agreed on and carried out a plan to cause Digisound-WIE to run short of parts to supply its customers and to take advantage of that shortage after they left Digisound-WIE and its parent, which they did by selling to the same customers parts they took from Digisound-WIE's inventory.    Those allegations are more than sufficient under FED.R.CIV.P. 8(a) to state a civil conspiracy claim, leaving defendants' assertion that the intra-corporate doctrine precludes conspiracy liability an affirmative defense, at best, that depends on the evidence as to when the defendants conspired. *See M&R Printing Equip., Inc. v. Anatol Equip. Mfg. Co.*, 321 F. Supp. 2d 949, 952 (N.D. Ill. 2004).

Because the Complaint alleges that the individual defendants formed and at least partly carried out an agreement to commit torts against Digisound-WIE before forming their competing company, the intra-corporate doctrine cannot apply. *See Knorr Brake Corp. v. Harbil, Inc.*, 738 F.2d 223, 230 n. 10 (7th Cir. 1984). The doctrine also does not apply because the corporation the defendants formed as part of the conspiracy cannot immunize them from conspiracy liability.

## 4. Count IV Alleges Civil Claim Under Computer Fraud and Abuse Act

Paragraph 26 of the Complaint alleges defendants violated § 1030(a)(2)(C) of the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030(a)(2)(C). Contrary to defendants argument, courts in the Northern District have repeatedly ruled that civil actions under CFAA are not limited to violations of § 1030(a)(5)(B). In *Charles Schwab & Co. v. Carter*, No. 04 C 7071, 2005 WL 351929 (N.D. Ill. Feb. 11, 2005), for example, the court held that § 1030(g) does not limit civil action to violations of § 1030(a)(5)(B), but instead requires the complaint to allege that the plaintiff suffered one of the factors listed in § 1030(a)(5)(B)(i)-(v). *Id.* at *3 ("Section

3

1030(g) unambiguously creates a cause of action under the CFAA not restricted to Section

1030(a)(5)(B)(i)-(v).").  It explained that none of the subsections includes any *action* that is

prohibited, but rather the subsection lists possible harmful *results* of violations of other parts of

the statute. *Id.*

The factors listed include "loss to one or more persons during any 1-year

period...aggregating at least $5,000 in value." *Id.*, citing 18 U.S.C. §1030(a)(5)(B)(i).

Paragraphs 17 and 26 of the Complaint also allege that the defendants exceeded their

authorization in accessing Digisound-WIE's computers and wrongfully destroyed the data stored

on them.  Paragraph 20 alleges that as a result of those activities Digisound-WIE "suffered lost

sales and injury to its customer relations in an amount in excess of $75,000."  Accordingly,

Digisound-WIE has properly alleged a civil cause of action under the CFAA. *See id.*; *see also*

*C.H. Robinson Worldwide, Inc. v. Command Transportation, LLC*, No. 05 C 3401, 2005 WL

3077998, at *3 (N.D. Ill. Nov. 16, 2005) (plaintiff's allegation that it "suffered damages as a

result of [defendants'] actions in an amount to be determined at trial" sufficient to allege a claim

under 18 U.S.C. §1030(a)(5)(B)(i)).

## 5.  Count V Alleges Violation of Lanham Act

Count V is not required to allege that Digisound-WIE manufactured  the goods or that the

goods bore a trademark.  The Northern District has stated that a violation of the Lanham Act has

three elements:  (1) "[defendants] used a false designation of origin...in connection with goods

or services; (2) that such goods or services entered interstate commerce; and (3) that [plaintiff]

believes it is likely to be damaged as a result of the misrepresentation." *Do It Best Corp. v.*

*Passport Software, Inc.*, No. 01 C 7674, 2004 WL 1660814, at *16 (N.D. Ill. July 23, 2004).

The elements do not include that plaintiff be the actual manufacturer.  Instead, as the defendants'

own case discusses, the question is who does the consumer believe the manufacturer to be and

4

whether the plaintiff stands behind the finished product. *See Bretford Mfg., Inc. v. Smith System Mfg. Corp.,* 419 F.3d 576, 581 (7th Cir. 2005) ("[a]s far as [the consumer] was concerned, the table's 'origin' was [defendant], *no matter who made any component or subassembly.*") (emphasis added).

Count V is also not required to allege a trademark because its Lanham Act "palming off" claim is distinct from a Lanham Act trademark infringement claim. *See Waldman Publishing Corp. v. Landoll, Inc.,* 43 F.3d 775, 781 (2nd Cir. 1994); see also *Dodd v. Fort Smith Special School Dist. No. 100,* 666 F. Supp. 1278 (W.D. Ark. 1987) (although plaintiffs had not registered with the Copyright Office and, therefore, had no copyright claim, they had a valid Lanham Act claim for false designation of origin). The Seventh Circuit has also made clear that a plaintiff need not allege a trademark to assert a claim under the Lanham Act. In *Dunn v. Gull,* 990 F.2d 348 (7th Cir. 1993), the court stated "Section 43(a) [of the Lanham Act] offers a broader range of protection than that offered to registered marks, but the same general principles govern consideration of the factors qualifying both registered and *unregistered marks* for protection." *Id.* at 351 (citing *Two Pesos v. Taco Cabana,* 505 U.S. 763, 768 (1992)); *see also Central Mfg. Co. v. Brett,* No. 04 C 3049, 2005 WL 2445898, *8 (N.D. Ill. Sept. 30, 2005).

Paragraph 19 of the Complaint alleges that the defendants "offered to supply Digisound parts to [Digisound-WIE's customers,] claiming to be able to provide them directly from the manufacturer," while ¶ 27 alleges defendants offered and sold products in interstate commerce by misrepresenting them as Digisound's, met the specifications of approved Digisound parts, and were backed by Digisound's product warranties," resulting in Digisound-WIE suffering "lost sales and injury to its customer relations…" In the light most favorable to Digisound-WIE, the

allegations are sufficient to allege that defendants offered and sold parts that the consumers would believe Digisound-WIE stood behind.

DIGISOUND-WIE, INC.

By: _s/ Arthur Sternberg_____
     One of Its Attorneys

Arthur Sternberg
Thompson Coburn LLP dba Thompson Coburn Fagel Haber
55 E. Monroe, 40th Floor
Chicago, IL 60603
(312) 580-2235

4641559_2

**Westlaw.**

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 351929 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

**H**CharlesSchwab & Co., Inc. v. Carter
N.D.Ill.,2005.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
**CHARLESSCHWAB** & CO., INC., Plaintiff,
v.
Brian D. CARTER, Acorn Advisory Management,
L.L.C., and Acorn Advisory Capital, L.P.,
Defendants.
**No. 04 C 7071.**

Feb. 11, 2005.

Darrell J. Graham, Eric D. Brandfonbrener, Jonathan
R. Buck, Perkins Coie LLC, Chicago, IL, for
Plaintiff.
Peter Vincent Baugher, Arthur J. Howe, Anna S.
Eisner, Schopf & Weiss, Chicago, IL, for
Defendants.

*MEMORANDUM OPINION AND ORDER*
ST. EVE, J.
**\*1** Plaintiff Charles Schwab & Co., Inc. ("Schwab")
commenced this action against Defendants Brian D.
Carter ("Carter"), Acorn Advisory Management,
L.L.C. and Acorn Advisory Capital (collectively
"Acorn"), alleging violations of title 18, United
States Code, Sections 1030(a)(2)(A), (a)(2)(C), and
1030(a)(4) of the Computer Fraud and Abuse Act
("CFAA"), and various state law claims. Before the
Court is Defendants' motion to dismiss the CFAA
claim in Count VI pursuant to Federal Rules of Civil
Procedure 12(b)(6). The Court denies this motion for
the reasons discussed below.

BACKGROUND

Schwab alleges in its Second Amended Verified
Complaint ("SAVC") that Defendants engaged in a
plan to wrongfully copy Schwab's proprietary
financial modeling computer software and
accompanying files. Specifically, Schwab contends
that Acorn induced Carter, an employee of Schwab,
to copy computer information, resign from Schwab,
and take up employment with Acorn, delivering the
copied information to Acorn.

I. The Parties

Plaintiff Schwab is a California corporation. (SAVC
at ¶ 17.) Schwab formerly had a business division,
Schwab Soundview Capital Markets' Investment
Analytics Division ("IA"), for which Carter worked.
(*Id.* at ¶¶ 2-3.)Schwab closed that division on
November 1, 2004, and either transferred or laid off
all employees. (*Id.*) Defendant Carter is a former
employee of Schwab, where he worked as the
Director of Information Technology for IA. (*Id.* at ¶
1.) He resigned from Schwab on October 22, 2004,
and began working with Acorn. (*Id.* at ¶¶ 11-12.)

II. Relationship between Schwab, Carter, and Acorn

Carter worked as Director of Information Technology
for IA, a division of Schwab. (*Id.* at ¶ 2.) IA provided
analytical research to institutional clients, including
Acorn. (*Id.*) In September 2004, Schwab announced
that it intended to close IA. (*Id .* at ¶ 4.) Upon
learning such information, Acorn made an offer to
purchase the business unit and acquire IA's software
and a number of employees, including Carter. (*Id.* at
¶ 5.) Schwab turned down that offer because it
wanted to protect its business modeling software. (*Id.*
at ¶ 6.) After Schwab rejected Acorn's offer, Acorn
offered employment to Carter and several analysts
from IA. (*Id.* at ¶ 7.) The analysts declined the offer,
but Carter accepted it. (*Id.* at ¶¶ 7-8.)

III. Carter's Actions at the Behest of Acorn

Schwab alleges that on the weekend prior to October
18, 2004, Carter accessed approximately 15,000 of its
computer files. (*Id.* at ¶ 8.) Schwab had furnished
Carter with access to proprietary information, but
required that Carter agree to keep such information
confidential. (*Id.* at ¶¶ 26-27.)Further, Schwab
alleges that it restricts access to information on a
"need-to-know" basis, and that Carter had no reason
to access this information for the purposes of his
employment at Schwab. (*Id.* at ¶¶ 8, 26.)

**\*2** On October 18, 2004, Carter e-mailed confidential
information to Acorn concerning data sources that IA
used in its research. (*Id.* at ¶ 8.) On October 21, 2004,
Carter arrived at Schwab with a laptop computer
capable of burning large amounts of information onto
DVDs. (*Id.* at ¶ 9.) Schwab alleges that Carter, acting

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 2
Not Reported in F.Supp.2d, 2005 WL 351929 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

at the direction or on behalf of Acorn, used the computer to copy Schwab's proprietary business models. (*Id.*) On October 22, 2004, Carter resigned from Schwab. (*Id.* at ¶ 11.)Schwab alleges that Acorn paid Carter a considerable amount of money to leave Schwab prior to receiving his severance payment, and to deliver Schwab's proprietary business information to Acorn. (*Id.* at ¶ 12.)Finally, Schwab alleges that Defendants' actions caused Schwab to incur costs of at least $5,000 during a one-year period.(*Id.* at ¶ 79.)

## LEGAL STANDARD

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the legal sufficiency of a complaint, not the merits of the case. *Triad Assoc., Inc. v. Chicago Hous. Auth.,* 892 F.2d 583, 586 (7th Cir.1989). The Court will only grant a motion to dismiss if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."*Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). When reviewing a motion to dismiss, the Court is restricted to reviewing the pleadings, which consist of the complaint, any attached exhibits, and the supporting briefs. *See Thompson v. Illinois Dept. of Prof'l Regulation,* 300 F.3d 750, 753 (7th Cir.2002). In making its determination, the Court must assume the truth of the facts alleged in the pleadings, construe the allegations liberally, and view them in the light most favorable to the plaintiff. *Jet, Inc. v. Shell Oil Co.,* 381 F.3d 627, 629 (7th Cir.2004).

## ANALYSIS

## I. Language of the Statute

The CFAA is primarily a criminal statute, but it also creates a private cause of action in Section 1030(g).*Four Seasons Hotels and Resorts BV v. Consorcio Barr, S.A.,* 267 F.Supp.2d 1268, 1321 (S.D.Fla.2003).Section 1030(g)provides, in relevant part:

Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. A civil action for a violation of this section may be brought only if the conduct involves one of the factors set forth in clause (i), (ii), (iii), (iv), or (v) of subsection

(a)(5)(B).

18 U.S.C. § 1030(g). Defendants claim that this section creates a civil cause of action only for violations of Section 1030(a)(5)(B)(i)-(v). Because Schwab alleges a violation of Sections 1030(a)(2)(A), (a)(2)(C), and (a)(4), but not specifically Section (a)(5)(B), Defendants argue that Schwab has failed to state a claim upon which relief can be granted. The Court disagrees based on the plain language of the statute.

**\*3** "The cardinal rule of statutory interpretation is that courts must first look to the language of the statute and assume that its plain meaning accurately expresses the legislative purpose."*United States v. Miscellaneous Firearms, Explosives, Destructive Devices and Ammunitions,* 376 F.3d 709, 712 (7th Cir.2004) (quotation and citation omitted).Section 1030(g) does not limit private causes of action to violations of (a)(5)(B), but rather requires that a plaintiff suffer one of the factors listed in (a)(5)(B)(i)-(v) to state a claim under the statute. Sections 1030(a)(5)(B)(i)-(v) list five possible harms that a party might suffer as a result of conduct forbidden by the CFAA. None of the subsections includes any action or behavior that is prohibited. Instead, the subsection lists possible harmful results of violations of other parts of the statute.

In fact, Section 1030(g) defines that a civil action may be established when a "violation of this section" results in any of the "factors" listed in Section 1030(a)(5)(B)(i)-(v). "This section" refers to Section 1030. See *I.M.S. Inquiry Mgmt. Sys., Ltd. v. Berkshire Info. Sys., Inc.,* 307 F.Supp.2d 521, 526 (S.D.N.Y.2004) ("Section 1030(g) affords a civil action for any CFAA violation"); *Four Seasons,* 267 F.Supp.2d at 1322 (recognizing claim under Section 1030(a)(5)(A)). The factors listed in Section 1030(a)(5)(B)(i)-(v) include "loss to one or more persons during any 1-year period ... aggregating at least $5,000 in value."*See*18 U.S.C. § 1030(a)(5)(B)(i).

Here, Schwab alleges that Acorn induced Carter to copy computer information, resign from Schwab, and take up employment with Acorn, delivering the copied information to Acorn. Schwab also alleges that it incurred costs of at least $5,000 during a one-year period. As such, Schwab has properly alleged a civil cause of action under the CFAA.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                   Page 3
Not Reported in F.Supp.2d, 2005 WL 351929 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

## II. Purpose of the CFAA

Despite the plain meaning of the statute, Defendants assert that the CFAA is only an anti-hacking statute that was not meant to create a federal private cause of action for misappropriation of confidential information or trade secrets. When possible, the Court determines Congressional intent from the unambiguous language of the statute. *See Miscellaneous Firearms, 376 F.3d at 712.* As discussed above, the language of Section 1030(g) unambiguously creates a cause of action under the CFFA not restricted to Section 1030(a)(5)(B)(i)-(v). "Where the meaning of a statute is unambiguous, our sole task is to apply it straightforwardly to the facts at issue without referring to legislative history or other devices." *United States v. Jones, 372 F.3d 910, 913 n. 2* (7th Cir.2004). Accordingly, the Court need not delve into the Congressional record as Defendants suggest.

Further, although Defendants argue that the statute should be narrowly construed as an "anti-hacking" statute, they do not explain why Carter's unauthorized access to Schwab's confidential information on its computer system and distribution of this information is not "hacking." Indeed, several district courts have recognized that damage caused by unauthorized access or access in excess of authorization to a computer system may be redressed under the CFAA. For instance, Chief Judge Charles Kocoras recognized that a plaintiff stated a claim under the CFAA when it alleged that the defendant had exceeded his authorized access and acquired trade secrets that were later used to the detriment of the plaintiff. *See George S. May Int'l Co. v. Hostetler, No. 04 C 1606, 2004 WL 1197395, \*3 (N.D.Ill. May 28, 2004).* In *Four Seasons Hotel,* the Southern District of Florida acknowledged a claim under the CFAA when a licensee accessed the plaintiff's computer system without authorization. *See 267 F.Supp.2d at 1323-4.* In addition, a district court in the Western District of Washington determined that a former employer properly stated a claim under the CFAA when it alleged that a former employee had sent e-mails including trade secrets and proprietary information to a competitor while still employed by the plaintiff. *See Shurgard Storage Ctrs., Inc. v. Safeguard Self Storage, Inc.,* 119 F.Supp.2d 1121, 1124 (W.D.Wash.2000); *see also Pacific Aerospace & Electronics, Inc. v. Taylor,* 295 F.Supp.2d 1188, 1195 (E.D.Wash.2003) ("Caselaw supports an

employer's use of the CFAA's Civil Remedies to sue former employees and their new companies who seek a competitive edge through wrongful use of information from the former employer's computer system"). In sum, these cases further support the Court's conclusion that Schwab has properly alleged a civil cause of action under Section 1030(g).

## III. Rule of Lenity

\*4 Finally, Defendants contend that the Court should apply the rule of lenity, and construe any ambiguity in the language of the statute in their favor. The rule of lenity dictates that when a statute's language is "grievously" ambiguous, the court should construe the statute in favor of the accused. *Chapman v. United States,* 500 U.S. 453, 462-463, 111 S.Ct. 1919, 1926, 114 L.Ed.2d 524 (1991). Because the Court concludes that there is no ambiguity in the language of the statute, the rule of lenity does not apply.

## CONCLUSION

For these reasons, the Court denies Defendants' motion to dismiss Count VI.

N.D.Ill.,2005.
Charles Schwab & Co., Inc. v. Carter
Not Reported in F.Supp.2d, 2005 WL 351929 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3077998 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

▷C.H. Robinson Worldwide, Inc. v. Command
Transp., LLC.
N.D.Ill.,2005.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
**C.H. ROBINSONWORLDWIDE, INC.**, Plaintiff,
v.
COMMAND TRANSPORTATION, LLC, Paul
Loeb, and Eric Harrison, Defendants.
**No. 05 C 3401.**

Nov. 16, 2005.

Michael Dale Wexler, J. Scott Humphrey, Seyfarth
Shaw LLP, Chicago, IL, for Plaintiff.
Stephen Fedo, William John Tarnow, Neal, Gerber &
Eisenberg, Mitchell L. Marinello, Joseph S. Nacca,
Novack and Macey, LLP, Chicago, IL, for
Defendants.

*MEMORANDUM OPINION AND ORDER*
ST. EVE., J.
**\*1** Plaintiff C.H. Robinson Worldwide, Inc.
("C.H.Robinson") filed the present eight-count First
Amended Complaint against Defendants Command
Transportation, LLC ("Command"), Paul Loeb, and
Eric Harrison. C.H. Robinson alleges that Loeb and
Harrison violated the Computer Fraud and Abuse
Act, 18 U.S.C. § 1030*et seq.* ("CFAA"). C.H.
Robinson also alleges state law claims of breach of
contract, misappropriation of trade secrets, unfair
competition, conversion, fraud, conspiracy, and a
constructive trust claim pursuant to the Court's
supplemental jurisdiction. *See*28 U.S.C. § 1367.
Before the Court is Defendants' Motion to Dismiss
C.H. Robinson's First Amended Complaint pursuant
to Federal Rule of Civil Procedure 12(b)(6).[FN1] As
discussed below, the Court grants in part and denies
in part Defendants' Motion to Dismiss.

> FN1. Pursuant to Federal Rule of Civil
> Procedure 10(c), Defendant Eric Harrison
> adopted the arguments set forth by
> Defendants Command Transportation and
> Paul Loeb in their Memorandum in Support
> of their Motion to Dismiss. (R. 27-1.)

*BACKGROUND*[FN2]

> FN2. As required under Rule 12(b)(6), the
> Court presumes the allegations in the
> complaint are true.

Plaintiff C.H. Robinson is a Delaware corporation
with its principal place of business in Eden Prairie,
Minnesota. (R. 15-1; First Am. Compl. ¶ 1.) C.H.
Robinson is in the business of providing commercial
logistics services, and in December 1999, purchased
substantially all of the assets of American
Backhaulers ("Backhaulers"), another logistics
company. (*Id.* ¶¶ 1-2, 25.)C.H. Robinson's purchase
of Backhaulers' assets included, among other things,
(1) the exclusive acquisition of Express, a proprietary
software program (the "Express software"), (2) the
execution of non-competition, non-solicitation, and
confidentiality agreements by Backhaulers'
employees, (3) Backhaulers' know-how, and (4)
Backhaulers' intellectual property rights. (*Id.* ¶¶ 2,
26.)

Defendant Command Transportation, LLC, is a
Delaware limited liability company with its principal
place of business in Skokie, Illinois. (*Id.* ¶ 3.)
Command is a competitor of C.H. Robinson and is in
the business of freight brokerage services. (*Id.*) Also,
Command conducts business under the assumed
names of DND Express and DND Logistics and was
previously known as Command Logistics Systems,
LLC. (*Id.*)

Defendant Paul Loeb, an individual residing at 223
Linden Park Place, Highland Park, Illinois, is the
previous owner of Backhaulers. (*Id.* ¶ 4.) C.H.
Robinson conditioned its purchase of Backhaulers'
assets "upon Loeb ... signing and complying with a
non-compete, non-solicitation, and confidentiality
agreement."(*Id.* ¶ 27.)That agreement precluded Loeb
from (1) "competing with C.H. Robinson," (2)
"soliciting or inducing C.H. Robinson's employees to
leave for a ... period of time," (3) "utilizing or
disclosing proprietary information of C.H.
Robinson," (4) taking any C.H. Robinson property,
(5) disclosing any "trade secrets, know-how, [or]
other proprietary documents and information related
to the business," and (6) "using any such information
for [his] own benefit or the benefit of any third party
so long as such information is not in the public

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3077998 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

domain."(*Id.* ¶¶ 27, 29.)Loeb worked at C.H. Robinson from December 1999 until his voluntarily departure on September 30, 2002. During that time, Loeb had exposure to C.H. Robinson's confidential and proprietary information. (*Id.* ¶¶ 27, 57.)Presently, Loeb is affiliated with Command. (*Id.* ¶ 4.)

**\*2** Defendant Eric Harrison, an individual residing at 715 Astor Lane, Wheeling, Illinois, is a former employee of Backhaulers and was a key developer of the Express software. (*Id.* ¶ 5.) After C.H. Robinson purchased Backhaulers' assets in December 1999, Harrison moved to Minnesota and became C.H. Robinson's Director of Technology. (*Id.* ¶¶ 5, 33.)Harrison implemented and further developed the Express software across all of C.H. Robinson's business, at which time he had exposure to confidential and proprietary information, including the Express software source code, object code, and functionality. (*Id.* ¶¶ 5, 33-34, 57.)In April 2002, Harrison voluntarily left C.H. Robinson, at which time he entered into an agreement with C.H. Robinson that contained non-competition, non-solicitation, confidentiality, and invention assignment provisions. (*Id.* ¶ 5.) Harrison is now associated with Command as a software developer. (*Id.* ¶ 51.)According to C.H. Robinson, Loeb and Harrison, now employees of Command, have recently developed a new software program, Slingshot, "which is identical to C.H. Robinson's Express software."(*Id.* at ¶ 52.)

*LEGAL STANDARD*

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the legal sufficiency of a complaint, not the merits of the case. *Triad Assoc., Inc. v. Chicago Housing Auth.,* 892 F.2d 583, 586 (7th Cir.1989). The Court will only grant a motion to dismiss if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."*Centers v. Mortgage, Inc.,* 398 F.3d 930, 933 (7th Cir.2005) (quoting *Coney v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)). In making its determination, the Court must assume the truth of the facts alleged in the pleadings, construe the allegations liberally, and view them in the light most favorable to the plaintiff.*Centers,* 398 F.3d at 333.

*ANALYSIS*

**I. Computer Fraud & Abuse Act Claim-Count VIII**

> FN3. On June 13, 2005, the Court dismissed C.H. Robinson's initial Complaint based on its failure to properly allege diversity jurisdiction. *See* 28 U.S.C. § 1332. In its First Amended Complaint, C.H. Robinson included a claim under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.* that confers federal question subject matter jurisdiction on the Court. *See* 28 U.S.C. § 1331. The Court will address this count first in order to ensure that the Court has subject matter jurisdiction over the remaining counts.

C.H. Robinson alleges that Loeb and Harrison violated Sections 1030(a)(2)(C), 1030(a)(4), and 1030(a)(5)(A)(iii) of the Computer Fraud and Abuse Act ("CFAA"). Defendants argue that C.H. Robinson has failed to state a claim under the CFAA because C.H. Robinson (1) did not properly allege the requisite damage or loss as those terms are defined by the CFAA, and (2) did not allege that Loeb and Harrison unlawfully accessed C.H. Robinson's computer system.

**A. Loss or Damage**

First, Defendants argue that C.H. Robinson failed to properly allege that it suffered the requisite damage or loss as those terms are defined by the CFAA.Section 1030(g) provides, in relevant part, that "[a]ny person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief," and "[a] civil action for a violation of this section may be brought only if the conduct involves one of the factors set forth in clause (i), (ii), (iii), (iv), or (v) of subsection (a)(5)(B)."*See* 18 U.S.C. § 1030(g). Thus, a party bringing a civil action under the CFAA must allege both: (1) a violation of one of the subsections of Section 1030; and (2) one of the listed factors in Section 1030(a)(5)(B)(i)-(v).*See Charles Schwab & Co., Inc. v. Carter,* No. 04 C 7071, 2005 WL 351929, at *3 (N.D.Ill. Feb.11, 2005). The factors in Sections 1030(a)(5)(B)(i)-(v) do not address prohibited conduct, but instead list specific forms of "damage" or "loss" that are "possible harmful results of violations of other parts of the statute."*Id.*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3077998 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Page 3

**\*3** Here, C.H. Robinson alleges that it "suffered damages as a result of Harrison's and Loeb's actions in an amount to be determined at trial."(R. 15-1, First Am. Compl. ¶ 103.) Viewing the allegations in the First Amended Complaint in a light most favorable to C.H. Robinson, C.H. Robinson is claiming "loss to one or more persons during any 1-year period ... aggregating at least $5,000 in value."See Section 1030(a)(5)(B)(i). C.H. Robinson's allegations of loss consist of (1) the loss in value of trade secrets such as the Express software and other proprietary and confidential information that was not previously known to the public, and (2) the loss of competitive advantage. (R. 15-1, First Am. Compl. ¶¶ 58, 59.)

In a similar matter where a plaintiff alleged wrongful copying of proprietary financial modeling computer software, the Court discussed damages under the CFAA:
Chief Judge Charles Kocoras recognized that a plaintiff stated a claim under the CFAA when it alleged that the defendant had exceeded his authorized access and acquired trade secrets that were later used to the detriment of the plaintiff. In addition, a district court in the Western District of Washington determined that a former employer properly stated a claim under the CFAA when it alleged that a former employee had sent e-mails including trade secrets and proprietary information to a competitor while still employed by the plaintiff.

*Charles Schwab & Co., Inc.,* 2005 WL 351929, at \*3 (citations omitted). Similarly, "[c]aselaw supports an employer's use of the CFAA's Civil Remedies to sue former employees and their new companies who seek a competitive edge through wrongful use of information from the former employer's computer system."*Id.* (quoting *Pacific Aerospace & Elec., Inc. v. Taylor,* 295 F.Supp.2d 1188, 1195 (E.D.Wash.2003)). C.H. Robinson has properly alleged "loss" under the CFAA based on its allegations of the loss in value of trade secrets and loss of competitive edge.

Meanwhile, Defendants did not develop their cursory argument that *Nexans Wires S.A. v. Sark-USA, Inc.,* 319 F.Supp.2d 468, 476-78 (S.D.N.Y.2004) should control. Defendants' attempt at developing this argument in their Reply Brief does not save the day because when a defendant fails to raise or develop an issue until reply, he waives the argument because the plaintiff has had no chance to respond. *See Kelso v.*

*Bayer Corp.,* 398 F.3d 640, 643 (7th Cir.2005) (citation omitted). Accordingly, Defendants' argument concerning C.H. Robinson's "loss" fails.

### B. Unlawful Access

Second, Defendants contend that C.H. Robinson has not alleged unlawful access of its computers as required under Sections 1030(a)(2)(C), 1030(a)(4), and 1030(a)(5)(A)(iii) of the CFAA. More specifically, Defendants argue that C.H. Robinson fails to allege that Loeb or Harrison accessed C.H. Robinson's protected computer system to steal the trade secret information at issue. Plaintiff argues that it properly stated a CFAA cause of action by alleging that Loeb and Harrison intentionally exceeded their authorized access when they accessed C.H. Robinson's protected network to acquire the Express software for the benefit of themselves and Command.

**\*4** The Court turns to the federal notice pleading standards under Federal Rule of Civil Procedure 8(a)(2). In alleging its claim under the CFAA, C.H. Robinson incorporates by reference all allegations from paragraphs 1 through 63, including the allegations of Loeb's and Harrison's inappropriate use of C.H. Robinson's proprietary information and software code in developing Slingshot. (R. 15-1, First Am. Compl. ¶¶ 53-57.) It further alleges that Loeb and Harrison did not have authorization to access C.H. Robinson's "computer systems, computerized information, access software, access source code, access object code, or continue to possess C.H. Robinson electronic files and data for their personal gain."(*Id.* ¶ 101.)C.H. Robinson alleges that Loeb and Harrison violated sections of the CFAA through these actions. (*Id.* ¶ 102.)These allegations satisfy the liberal notice pleading standards of Rule 8(a).*See Gale v. Hyde Park Bank,* 384 F.3d 451, 453 (7th Cir.2004) ( "All a complaint need do is narrate a claim for relief.")

Defendants nonetheless assert that C.H. Robinson failed to allege that Loeb or Harrison unlawfully accessed a protected computer to obtain information involving an interstate or foreign communication as required under Section 1030(a)(2)(C) because C.H. Robinson did not suggest that Loeb or Harrison intercepted interstate communications. Defendants, however, ignore relevant language from Section 1030(a)(2)(C) that prohibits a person from unlawfully accessing a computer to "obtain information from any protected computer *if the conduct involved an*

Not Reported in F.Supp.2d                                    Page 4
Not Reported in F.Supp.2d, 2005 WL 3077998 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

*interstate or foreign commerce."*18 U.S.C. § 1030(a)(2)(C) (emphasis added). The plain language of this statute indicates that the conduct of unlawfully accessing a computer, and not the obtained information, must involve interstate of foreign commerce. *See Charles Schwab & Co., Inc. v. Carter,* 2005 WL 2369815, at *8 (N.D.Ill. Sep.27, 2005) (downloading substantial volumes of files from plaintiff's computers involved interstate commerce because plaintiff maintained interstate computer network). Here, C.H. Robinson alleges that its "computer system is a protected computer and network which is used across state lines in interstate commerce."(R. 15-1, First Am. Compl. ¶ 100.) Viewing the allegations in a light most favorable to C.H. Robinson, it is reasonable to infer that Defendants' conduct involved interstate commerce.

Finally, Defendants contend that C.H. Robinson failed to allege with the particularity required by Federal Rule of Civil Procedure 9(b) that Loeb or Harrison accessed a protected computer "knowingly and with intent to defraud."Under Rule 9(b), "intent, knowledge and other condition of mind of a person may be averred generally."Fed.R.Civ.P. 9(b). The Rule's particularity requirements do not apply to intent allegations. Defendants' motion to dismiss Count VIII is denied.

## II. Breach of Contract-Count I

**\*5** Defendants contend that C.H. Robinson did not properly allege that Loeb and Harrison breached their non-competition agreements and asset purchase agreements. Citing Illinois law, Defendants specifically argue that C.H. Robinson failed to indicate the essential elements of a contract and the exact contracts at issue. It is well-established, however, that the Federal Rules of Civil Procedure-not state procedural rules-govern diversity actions and state law claims brought in federal court through supplemental jurisdiction.*Fidelity Nat. Title Ins. Co. of New York v. Intercounty Nat. Title Ins. Co.,* 412 F.3d 745, 750 (7th Cir.2005); *Houben v. Telular Corp.,* 309 F.3d 1028, 1032-36 (7th Cir.2002). As previously noted, under the liberal federal notice pleading standard, a complaint need only state "a short and plain statement of the claim showing that the pleader is entitled to relief."Fed.R.Civ.P. 8(a)(2). This statement must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."*Conley v. Gibson,* 355 U.S. at 47;*see also Shah v. Inter-Cont'l Hotel Chicago Operating*

*Corp.,* 314 F.3d 278, 282 (7th Cir.2002).

In its First Amended Complaint, C.H. Robinson identifies which contracts are at issue. (*See* R. 15-1, First Am. Compl. ¶¶ 27-31, 65.) Further, C.H. Robinson alleges how Loeb and Harrison breached these agreements, by listing six different actions, including utilizing or disclosing the Express software.(*Id.* ¶ 67.)As such, C.H. Robinson has given Defendants notice of its breach of contract claim and the grounds upon which it rests. Accordingly, the Court denies Defendants' motion to dismiss Count I of the First Amended Complaint.

## III. Illinois Trade Secrets Act-Count II

As a threshold matter, Defendants contend that C.H. Robinson, as a Delaware corporation with its principal place of business in Minnesota, did not properly allege why the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065, *et seq.,* should apply under Count II. Under the *Erie* doctrine "a federal court is not authorized to apply a different substantive law in a diversity case from the law that a state court would apply were the case being litigated in a state court," and thus Illinois law is the source for choice-of-law rules under the circumstances. *FDIC v. Wabick,* 335 F.3d 620, 624-25 (7th Cir.2003) (*Erie* doctrine applies to non-diversity cases where state law supplies the rule of decision). Under Illinois trade secrets law, courts must apply the law of the state where the alleged wrong took place or where the benefit was obtained, which is typically the defendant's principal place of business. *See Mergenthaler Linotype Co. v. Leonard,* 66 Ill.App.3d 789, 803, 23 Ill.Dec. 352, 383 N.E.2d 1379 (Ill.App.Ct.1978); *see also Salton, Inc. v. Philips Domestic Appliances & Personal Care B.V.,* 391 F.3d 871, 879 (7th Cir.2004). Because Command's principal place of business is in Illinois and Defendants received the benefits of Harrison and Loeb's alleged misappropriation of C.H. Robinson's trade secrets in Illinois, Illinois law applies.

**\*6** Next, Defendants contend that Count II does not identify what C.H. Robinson claims is a trade secret. In its First Amended Complaint, C.H. Robinson alleges how Loeb and Harrison unlawfully acquired C.H. Robinson's trade secrets, describes the trade secrets in sufficient detail, and explains how Defendants are using the trade secrets. (R. 15-1, First Am. Compl. ¶¶ 38-63, 70-76.) Further, despite Defendants' contention, litigants are not required to

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3077998 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

disclose details when alleging the misappropriation of a trade secret "for the simple reason that such a requirement would result in public disclosure of the purported trade secret."*Automed Techs., Inc. v. Eller, 160 F.Supp.2d 915, 920-21 (N.D.Ill.2001)* (citation omitted). Plaintiff has satisfied its pleading requirements for Count II, and the Court denies Defendants' motion to dismiss Count II.

## IV. Preemption Under Illinois Trade Secrets Act-Counts III through VII

Next, Defendants contend that the ITSA preempts C.H. Robinson's common law claims of unfair competition, conversion, fraud, conspiracy, and constructive trust.[FN4] They argue that Section 8 of the ITSA preempts all common law claims if they are arguably based, in whole or in part, on allegations of misappropriation of trade secrets. *See*765 ILCS 1065/8; *see also PepsiCo, Inc. v. Redmond, 54 F.3d 1262, 1269* (7th Cir.1995) ("ITSA abolishes any common law remedies or authority contrary to its own terms").Section 1065/8(a) states that the "Act is intended to displace conflicting tort, restitutionary, unfair competition, and other laws of this State providing civil remedies for misappropriation of a trade secret."*McDonald's Corp. v. American Motorists Ins. Co., 321 Ill.App.3d 972, 986, 255 Ill.Dec. 67, 748 N.E.2d 771 (Ill.App.Ct.2001)*. By its plain terms, the ITSA preempts claims "only when they rest on conduct that is said to misappropriate trade secrets."*Hecny Transp., Inc. v. Chu, --- F.3d ----, ----, 2005 WL 2842081, at *2 (7th Cir. Oct.31, 2005)*. In other words, preemption "does not apply to duties imposed by law that are not dependent upon the existence of competitively significant secret information."*Id.* The Court thus reviews the claims that Defendants challenge to determine whether they are dependent on the misappropriation of a trade secret. *See Thomas & Betts Corp. v. Panduit Corp., 108 F.Supp.2d 968, 972 (N.D.Ill.2000)*; *see, e.g., McDonald's Corp., 321 Ill.App.3d at 986, 255 Ill.Dec. 67, 748 N.E.2d 771*.

> FN4. Whether the ITSA preempts C.H. Robinson's constructive trust claim is not at issue, because under Illinois law a constructive trust is not a separate cause of action, but rather an equitable remedy. *See Eychaner v. Gross, 202 Ill.2d 228, 274, 269 Ill.Dec. 80, 779 N.E.2d 1115 (2002)*. Indeed, C.H. Robinson admits that it is seeking a constructive trust for remedial purposes, and

thus the Court need not dismiss Count VII. *See, e.g., Chicago Park District v. Kenroy, Inc., 107 Ill.App.3d 222, 224-25, 63 Ill.Dec. 134, 437 N.E.2d 783 (Ill.App.Ct.1982)*.

### A. Unfair Competition-Count III

Under its unfair competition claim, C.H. Robinson alleges that "Defendants are unfairly competing in the market place by utilizing C.H. Robinson's confidential information in the marketplace, soliciting and or hiring C.H. Robinson employees, soliciting C.H. Robinson's employees for employment to gain access to C.H. Robinson's confidential information, soliciting confidential information from C.H. Robinson employees, and/or utilizing C.H. Robinson's property or proprietary software."(R. 15-1, First Am. Compl. ¶ 79.)

*7 C.H. Robinson's unfair competition allegations fall squarely within the ITSA's preemption clause because the claim is premised on its confidential information and proprietary software. *See Thomas & Betts Corp., 108 F.Supp.2d at 973* (unfair competition allegations simply described how defendants used plaintiff's confidential information). In other words, the unfair competition claim is "dependent upon the existence of competitively significant secret information."*Hecny Transp., Inc. v. Chu, 2005 WL 2842081, at *2*. In fact, in alleging its claim under the ITSA, C.H. Robinson unequivocally states that "[t]he proprietary business, software, and customer information of C.H. Robinson constitute trade secrets."(R. 15-1, First Am. Compl. ¶ 70.) Although C.H. Robinson argues that the unfair competition claim is premised on Defendants' illegal solicitation and hiring of C.H. Robinson's employees, C.H. Robinson cannot ignore its allegations that the unlawful use of its trade secrets underscores its claim. Therefore, the ITSA preempts C.H. Robinson's unfair competition claim and the Court grants Defendants' motion to dismiss Count III with prejudice.

### B. Conversion-IV

Next, C.H. Robinson alleges that "Defendants individually or in concert with another removed from C.H. Robinson or retained its property (software and/or information) without authorization, and converted it to their own use."(R. 15-1, First Am. Compl. ¶ 83.) Due to C.H. Robinson's bare-boned allegation, it is unclear if the "information" or

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 3077998 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

"software" Defendants allegedly converted were trade secrets, and the Court cannot determine whether the ITSA preempts this claim. On that same note, due to these nebulous allegations, C.H. Robinson has not fulfilled the federal notice pleading standard because the allegations do not "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."*Conley v. Gibson,* 355 U.S. at 47;*see also Conner v. Illinois Dep't of Natural Res.,* 413 F.3d 675, 679 (7th Cir.2005) ( "pleading is still vitally important to inform the opposing party of the grounds upon which a claim rests"). As such, the Court grants Defendants' motion to dismiss Count IV without prejudice and grants C.H. Robinson leave to amend this claim.

### C. Fraud-Count V

In Count V, C.H. Robinson alleges that "Defendants individually or in concert with one another falsely represented to C.H. Robinson that it was exclusively purchasing Express, that the agreements entered into with Harrison and Loeb were being honored and/or that C.H. Robinson's property had been returned upon Harrison's and Loeb's termination of employment."(R. 15-1, First Am. Compl. ¶ 89.) C.H. Robinson further alleges that Defendants' misrepresentations resulted in the loss of monies and goodwill concerning the Express software. (*Id.* ¶ 90.)

Again, the Express software is C.H. Robinson's proprietary software and is a basis for C.H. Robinson's Illinois Trade Secret Act claim. Because C.H. Robinson's fraud claim rests on conduct that is, in essence, the misappropriating of trade secrets, the ITSA preempts this claim. See *Hecny Transp., Inc. v. Chu,* 2005 WL 2842081, at *2. The Court grants Defendants' motion to dismiss Count V with prejudice.

### D. Conspiracy-Count VI

*8 C.H. Robinson also alleges a common law conspiracy claim. In Count VI, C.H. Robinson states that certain individuals had a "meeting of the minds to improperly compete with C.H. Robinson, acquire C.H. Robinson's proprietary software and information, utilize or disclose CH. Robinson's software, property, confidential information or trade secrets information, not allow C.H. Robinson to realize the benefit of its bargains with Harrison and/or Loeb and waste revenues of C.H.

Robinson."(R. 15-1, First Am. Compl. ¶ 93.) Because C.H. Robinson unequivocally alleges that these individuals conspired to acquire its proprietary software, confidential information, and trade secrets, the ITSA preempts this conspiracy claim. Hence, the Court grants Defendants' motion to dismiss Count VI with prejudice.

### CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Defendants' motion to dismiss. The Court dismisses Plaintiff's common law claims under Counts III, V, and VI with prejudice. The Court dismisses Count V without prejudice. Plaintiff has until December 6, 2005 to file a Second Amended Complaint.

N.D.Ill.,2005.
C.H. Robinson Worldwide, Inc. v. Command Transp., LLC
Not Reported in F.Supp.2d, 2005 WL 3077998 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                        Page 1
Not Reported in F.Supp.2d, 2004 WL 1660814 (N.D.Ill.), 2004 Copr.L.Dec. P 28,844
**(Cite as: Not Reported in F.Supp.2d)**

**H**Do It Best Corp. v. Passport Software, Inc.
N.D.Ill.,2004.

United States District Court,N.D. Illinois, Eastern
Division.
**DOITBEST** CORPORATION, Plaintiff,
v.
PASSPORT SOFTWARE, INC. Defendant,
PASSPORT SOFTWARE, INC. Counter-Plaintiff,
v.
**DOITBEST** CORPORATION f/k/a Hardware
Wholesalers, Inc., and Thomas Burroughs, Counter-
Defendants.
**No. 01 C 7674.**

July 23, 2004.

Marc Steven Silver, Barnes & Thornburg, Chicago,
IL, for Plaintiff.
Robert J. Emery, Law Offices of Robert Emery,
Glenview, IL, for Defendant.
Daniel Paul Albers, Jonathan Paul Froemel, Barnes &
Thornburg, Amy Lovell Wilson, Chicago, IL, for
Plaintiff/Counter-Defendant.
Donald L. Johnson, Johnson Law Firm, Forrest L.
Ingram, Julie Ann Boynton, Martin B. Tucker,
Forrest L. Ingram, P.C., Chicago, IL, for
Defendant/Counter-Claimant.
D Randall Brown, Barnes & Thornburg, Fort Wayne,
IN, Robert C. Heist, R. Connor & Associates, P.C.,
Chicago, IL, for Counter-Defendant.

*MEMORANDUM OPINION AND ORDER*
PALLMEYER, J.
**\*1** Plaintiff Do it Best Corp. ("DIB") is a member-
owned cooperative that distributes hardware, lumber
and building materials to approximately 4,500
member retailers worldwide. In 1989, DIB entered
into a software licensing agreement with Defendant
Passport Software, Inc. ("PSI"), a licensed reseller of
certain point-of-sale software owned by RealWorld
Corp. ("RealWorld"). In September 2000, a dispute
arose concerning DIB's alleged misuse of the
software. On October 4, 2001, DIB filed this lawsuit
seeking a declaration that it did not breach, and is not
in default under, the 1989 agreement. PSI responded
with several counterclaims, which it has amended
several times, alleging breach of contract, trade secret
misappropriation under the Illinois Trade Secrets Act,

765 ILCS 1065/1*et seq.* ("ITSA"), civil conspiracy,
copyright infringement under the Copyright Act of
1976, 17 U.S.C. § 101*et seq.,* fraud, false designation
of origin under § 43(a) of the Lanham Act, 15 U.S.C.
§ 1125(a), and tortious interference with contract
against DIB. PSI has also named Thomas Burroughs
("Burroughs"), DIB's former corporate counsel, as an
additional counter-defendant, charging Mr.
Burroughs with contributory copyright infringement
under the Copyright Act. PSI seeks permanent
injunctive relief as well as damages in excess of $60
million against DIB and $1.8 million against Mr.
Burroughs. DIB moves to dismiss PSI's fraud, false
designation of origin, and tortious interference with
contract counterclaims; Burroughs moves to dismiss
PSI's contributory copyright infringement claim. For
the reasons set forth below, DIB's motions are
granted in part and denied in part, and Burroughs's
motion is denied.

*FACTUAL BACKGROUND*FN1

> FN1. The facts presented in this section
> were compiled from Passport's Third
> Amended Counterclaims and Additional
> Claims, filed on October 30, 2003, as well
> as its amended fraud counterclaim against
> DIB and its amended contributory copyright
> infringement counterclaim against Thomas
> Burroughs, both of which were filed on
> February 9, 2004. For purposes of the latter
> two amended counterclaims, the court
> considers only the facts set forth in the
> February 2004 amended counts. *See Kelley
> v. Crosfield Catalysts,* 135 F.3d 1202, 1204-
> 05 (7th Cir.1998) ("It is well-established
> that an amended pleading supersedes the
> original pleading; facts not incorporated into
> the amended pleading are considered *functus
> officio*" ) (citations omitted).

According to the Third Amended Counterclaims
("TAC"), on or about March 22, 1984, RealWorld
and PSI entered into a Master Distributor Agreement
("MDA") granting PSI rights to reproduce, distribute,
and enhance certain point-of-sale accounting
software owned by RealWorld FN2 (the "Accounting
Suite"). (TAC ¶¶ 6-8.)This agreement was
supplemented by a Master Value Added Distributor

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 2
Not Reported in F.Supp.2d, 2004 WL 1660814 (N.D.Ill.), 2004 Copr.L.Dec. P 28,844
(Cite as: Not Reported in F.Supp.2d)

Agreement ("MVADA"), executed on July 1, 1988. (*Id.* ¶ 9.) On unspecified dates, PSI "developed many enhancements, modifications, and additions to the Accounting Suite" (the "Enhancements").(*Id.* ¶ 10.)In addition, "PSI created some original software which it also delivered as Enhancements to the enhanced Accounting Suite ... (the 'Original Works') which were integrated into the enhanced Real[ ]World software."(*Id.* ¶ 11 .)PSI owns these Enhancements and Original Works. (*Id.* ¶ 12.)

> FN2. The court notes that in 1999 RealWorld was acquired by Great Plains Software, Inc. ("Great Plains"), which in turn was acquired by Microsoft Corporation in 2000. *See, e.g.,* http://www.dchubbell.com/products.htm; http://www.microsoft.com/presspass/features/2000/Dec00/12-21gp.asp. For simplicity's sake, the court refers to RealWorld and its successors as "RealWorld."

On an unspecified date, DIB [FN3] contacted RealWorld to inquire about purchasing the Accounting Suite for use in DIB's member stores. (*Id.* ¶ 15.)RealWorld referred DIB to PSI, as RealWorld knew PSI had developed Enhancements to the Accounting Suite that satisfied one of DIB's critical system requirements: that multiple terminals have simultaneous access to a single computer system. (*Id.* ¶¶ 14-17.)On January 19, 1989, DIB and PSI executed a Dealer License Agreement (the "License Agreement") for the Accounting Suite and certain Original Works and Enhancements created by PSI (the "Licensed Software").(*Id.* ¶¶ 18, 20-21.)PSI included copyright notices in all such Original Works and Enhancements. (*Id.* ¶¶ 11, 19.)The License Agreement permitted DIB to grant sublicenses to its member retailers within the continental United States, subject to certain conditions not spelled out in PSI's allegations. (*Id.* ¶ 23.)The agreement required DIB to pay a royalty fee to PSI for use of the Licensed Software (whether owned by PSI or RealWorld) based on modules [FN4] distributed to its members. (*Id.* ¶ 22.)Under the agreement, PSI and RealWorld retained all copyright, trade secret, patent, and other intellectual property rights in the Licensed Software. (*Id.* ¶ 24.)Beginning in 1993, PSI "authored computer programs and computer program Enhancements to RealWorld computer programs [ (the "Programs") ] consisting of original material and registered the [Programs] with the U.S. Copyright Office as unpublished textual works with an effective registration date of May 29, 2002."(TAC Count XI ¶ 38.) [FN5]On or about January 14, 1994, five days before the License Agreement was set to expire, DIB and PSI orally agreed to extend operation of the agreement until approximately January 2001. (*Id.* ¶¶ 25-26; Count IX (Amended) Fraud (hereinafter, "Am. Count IX") ¶¶ 19-20.)

> FN3. Until March 16, 1998, Do it Best was known as Hardware Wholesalers, Inc. *See* http://www.doitbestcorp.com/history/. For simplicity's sake, the court refers to Plaintiff as "Do it Best" throughout this opinion.

> FN4. In the context of computing, the Oxford English Dictionary defines a module as "[a]ny of a number of distinct units from which a computer program may be built up, or into which a complex process or activity is analy[z]ed (usually for computer simulation), each of which is complete in itself but bears a definite relationship to the other units."OXFORD ENGLISH DICTIONARY (2d ed.1989).

> FN5. PSI does not explain why it registered the Programs effective May 29, 2002, the significance of these Programs, or what prompted PSI to begin creating the Programs in 1993 (three years after Zoller allegedly told Miller that DIB needed to make its own adjustments to the software). Although PSI does not indicate how the Programs differ from the Enhancements described in paragraph 10 of the TAC and in PSI's trade secret misappropriation counterclaim, the court presumes the Programs constitute a subset of those Enhancements.

**\*2** At some point "[i]n or about 1990," Gary Zoller ("Zoller") of DIB [FN6] told John Miller ("Miller"), President of PSI, by telephone that a module relating to purchase order operations did not suit its business needs. (Am. Count IX ¶ 21.) During that conversation, Zoller claimed "that DIB would not use the purchase order module which PSI had delivered but would create its own purchase order module from scratch."[FN7]Years later, at some point "[i]n or about 1996," Zoller introduced Miller to Jennings at DIB's office and told Miller that Jennings was creating DIB's purchase order module. (*Id.* ¶ 23.)On unspecified dates, PSI alleges, Jim Jennings

Not Reported in F.Supp.2d                                                    Page 3
Not Reported in F.Supp.2d, 2004 WL 1660814 (N.D.Ill.), 2004 Copr.L.Dec. P 28,844
(Cite as: Not Reported in F.Supp.2d)

("Jennings") and Scott Everson ("Everson"), programmers for DIB, wrote DIB's purchase order module using source code that they knew had been copied from PSI original source code and RealWorld source code for which PSI was entitled to royalties. (Am. Count IX ¶¶ 24-25, 27.)[FN8]

> FN6. None of PSI's counterclaims identifies Mr. Zoller's position.

> FN7. Although paragraph 22 does not indicate the date on which Zoller made this statement, the court presumes he uttered this alleged statement on the same date as the statement described in paragraph 21.

> FN8. At least one commentator suggests that the circumstances alleged here are not unusual. *See* Jason Krause, *Code Name: Trouble,* ABA Journal (July 9, 2004) (noting that, according to a recent survey, "75 percent of all coders use blocks of computer code they have appropriated from other software"), *at* http://www.abanet.org/journal/ereport/jy9code.html.

PSI claims that "DIB knew" that Zoller's statements that DIB had created its purchase order on its own was not true. (*Id.* ¶ 26.)Instead, "[a]t the time Zoller made the representation to Miller that DIB was creating its own purchase order module, DIB by its agents Jennings and [Everson] knew DIB had or intended to incorporate source code which belonged to PSI in the various modules ."(*Id.* ¶ 28.)PSI also contends that Zoller's statement that DIB's purchase order module was original "was made with the intent that PSI rely on the statement, be deterred from discovering that DIB had included source code in its purchase order module which was not original and had been delivered so that PSI would not invoice DIB or its members for the use of the PSI and Real []World source code contained in DIB's purchase order module."(*Id.* ¶ 29.)PSI alleges that it relied on Zoller's statements and did not invoice DIB or its members for the use of PSI or Real World source code. (*Id.* ¶ 30.)

PSI does not indicate which of Zoller's alleged statements it is referring to in paragraphs 26, 28, 29 and 30. As the court reads the allegation in paragraph 28 involving "the representation to Miller that DIB

was creating its own purchase order module," that paragraph refers to the allegation in paragraph 23 that in 1996 Zoller told Miller that Jennings was creating DIB's purchase order module. It is unclear whether the claims in paragraphs 26, 29, and 30 refer to Zoller's alleged 1990 statements, his asserted 1996 statement, or other unidentified remarks.

In or about August 2000, PSI alleges, DIB "began scheming to make, use, copy, and distribute [the Programs] for its own and its members['] use without abiding by the terms of the [License Agreement]." (Count X (Amended) Contributory Copyright Infringement (against Thomas Burroughs) (hereinafter, "Am. Count X") ¶ 11.) Also in or about August 2000, a committee of DIB employees (the "Committee"), including corporate counsel Thomas Burroughs, "took acts to determine ownership of the [Programs] and consulted with third parties who advised DIB that it would need to purchase or license PSI's rights to continue to use PSI software."(*Id.* ¶¶ 12-13.)[FN9]On or about August 31, 2000, Karla Wygant, a DIB employee,[FN10] wrote to the Committee that "I have run this software and modified programs with this information a million times and not noticed [the copyright notices]. This definitely throws another wrench in the works."(*Id.* ¶ 14.)[FN11]

> FN9. PSI does not indicate whether ownership of the Programs was in doubt prior to August 2000 nor explain how PSI learned about consultations between the Committee and these unspecified third parties.

> FN10. PSI's counterclaims do not identify Ms. Wygant's position.

> FN11. PSI does not indicate when the Committee ceased its efforts to ascertain ownership of the Programs.

*3 As of 2000, the MVADA [FN12] between PSI and RealWorld, which had been modified several times, provided that PSI had the right to reproduce, distribute, and enhance the RealWorld Accounting Suite through 2010. (TAC Count XII ¶ 38.) In or about August 2000, DIB informed PSI that DIB was interested in purchasing an unlimited license for the Licensed Software. (*Id.* Count VI ¶ 19.) [FN13]In or about September 2000, PSI asked RealWorld "if it

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                      Page 4
Not Reported in F.Supp.2d, 2004 WL 1660814 (N.D.Ill.), 2004 Copr.L.Dec. P 28,844
(Cite as: Not Reported in F.Supp.2d)

could purchase a license from [RealWorld] for sale to [DIB] for unlimited use of the Accounting Suite incorporated into the Licensed Software."PSI did not identify DIB in its initial discussions with RealWorld. (*Id.* Count VI ¶ 20.) PSI alleges that it did not initially disclose DIB's identify to RealWorld "because it had been cut out of a deal by [RealWorld] in which it had invested substantial time and effort."(*Id.* Count VI ¶ 22.) [FN14]After RealWorld and PSI signed an agreement in which RealWorld agreed "not to intervene or interfere with the transaction between PSI and its client," PSI informed RealWorld that DIB was the client for whom PSI wished to purchase unlimited use of the Accounting Suite. (*Id.* Count VI ¶ 21.)

> FN12. As noted, paragraph 9 of the TAC alleges that the MDA was supplemented by the MVADA, executed on July 1, 1988. Count XII, however, does not mention the MVADA, and refers only to the MDA between RealWorld and PSI. Although PSI does not explain this discrepancy, the court presumes that allegations in Count XII that relate to the MDA after 1988 properly refer instead to the MVADA.

> FN13. As noted, according to PSI, at this time the Committee was in the process of ascertaining ownership of the Programs. (Am. Count X ¶¶ 11-13.)

> FN14. PSI does not explain the nature of this alleged deal.

In or about September 15, 2000, RealWorld agreed that "for $200,000.00 PSI could purchase a license for unlimited use of ... the Accounting Suite for sale to DIB."(*Id.* Count VI ¶¶ 20, 23.) On an unspecified date, PSI informed DIB of this agreement and offered to sell to DIB for $1.8 million an unlimited license for a derivative work of customizations and enhancements to the Accounting Suite that PSI had developed (the "Derivative Work").(*Id.* Count VI ¶¶ 24-27.) [FN15]On an unspecified date after PSI made this offer, RealWorld, through one of its distributors, approached DIB directly and offered to sell to DIB an unlimited license to the Accounting Suite for significantly less than PSI had offered. (*Id.* Count VI ¶ 30.) On approximately November 30, 2000, DIB and RealWorld entered into a Source Code Agreement in which RealWorld agreed (1) to deliver to DIB a copy of the Accounting Suite and (2) "to

cooperate in any litigation which would be brought by PSI related to the unlimited license for the Accounting Suite and to indemnify it from PSI's claims."(*Id.* Count VI ¶¶ 35, 38-39, Count XII ¶¶ 40-41.) PSI alleges that DIB entered into this agreement, "in part, in a wrongful attempt to legitimize DIB's use of PSI's copyrighted code without PSI's consent ."(*Id.* Count XII ¶ 41.) PSI and RealWorld maintained good business relations until DIB and RealWorld entered into the Source Code Agreement, which PSI characterizes as "a sham transaction." (*Id.* Count XII ¶ 40.) [FN16]DIB did not in fact install or use the copy of the Accounting Suite that RealWorld had provided; instead, DIB continued to use the Licensed Software it had obtained from PSI.(*Id.* Count VI ¶ 40.) When PSI questioned DIB about its continued use of the Licensed Software, DIB claimed that its Source Code Agreement with RealWorld gave it the right to continue to use PSI's Derivative Work, a claim which PSI contends DIB knew was false. (*Id.* Count VI ¶ 43.) [FN17]

> FN15. PSI does not indicate how this so-called Derivative Work differs, if at all, from the Licensed Software.

> FN16. PSI does not indicate whether its relations with RealWorld deteriorated subsequent to execution of the Source Code Agreement.

> FN17. PSI does not identify the individuals at PSI or DIB who participated in this exchange, nor does PSI state which DIB official knew the representations were false.

*4 In or about September 2000, PSI discovered that DIB had incorporated certain PSI and RealWorld source code into its purchase order module, as described below. (Am. Count IX ¶ 31.) During a telephone conversation on or about October 1, 2000, Burroughs acknowledged to PSI President John Miller that DIB had made, sold, and distributed copies of the purchase order module "without PSI's permission and without PSI's copyright notices."(Am. Count X ¶¶ 15-16.) As of November 2000, with Burroughs's knowledge, DIB had made, sold, and distributed more than 400 copies of the Programs which did include a PSI copyright notice on a "splash screen." (*Id.* ¶¶ 17-18.)[FN18]In or about January 2001, DIB employees, under Burroughs's direction and with his participation, removed PSI's copyright notices from copies of the Programs and replaced them with

Not Reported in F.Supp.2d                                                                 Page 5
Not Reported in F.Supp.2d, 2004 WL 1660814 (N.D.Ill.), 2004 Copr.L.Dec. P 28,844
**(Cite as: Not Reported in F.Supp.2d)**

DIB copyright notices without PSI's knowledge or consent.(*Id.* ¶¶ 19, 21-22; TAC Count XI ¶¶ 41-42, 45.) PSI claims that Burroughs's "personal conduct aided and assisted DIB to make, use, sell and distribute copies of the Programs with PSI's copyright notice removed," although it is not clear whether this allegation refers to Burroughs's participation in removing PSI's copyright notices or some unspecified acts. (Am. Count X ¶ 24.)

> FN18. A "splash screen" is "[a]n initial screen displayed by interactive software, usually containing a logo, version information, author credits and/or a copyright notice."*See* http://foldoc.doc.ic.ac.uk/foldoc/foldoc.cgi?query=splash+screen. The allegations summarized here are puzzling, as they indicate that, though DIB had removed PSI's copyright notices in October 2000, by the following month PSI's copyright notices were once again included in the software DIB distributed to its members.

On or about February 14, 2001, PSI served DIB with a Notice of Default letter alleging that DIB had failed to comply with the terms of the License Agreement. (TAC ¶ 27.)The letter demanded that DIB (1) pay fees, charges, and royalties owed to PSI, (2) report on sublicensing activity for the last six months of 2000, (3) stop using and sublicensing the Licensed Software, (4) certify in writing that DIB had destroyed all copies of the Licensed Software, (5) stop using all enhancements and features subject to the terms of the License Agreement and federal copyright law, (6) destroy all software containing enhancements and features, pursuant to the License Agreement, and (7) assign all sublicenses to PSI within 30 days. (*Id.* ¶ 28.)As a result of DIB's failure to comply with these demands within 30 days, PSI alleges the parties' oral agreement was terminated on March 14, 2001. (*Id.* ¶ 29.)Prior to February 14, 2001, pursuant to the License Agreement, DIB was authorized to use and distribute to its members copies of the Programs. (TAC Count XI ¶ 39.) From February 14, 2001 through the present, however, DIB has made, used, sold, and distributed more than 700 copies of the Programs to its members throughout the United States without PSI's consent or permission, including more than 400 copies to members that had previously received the software that did include PSI's copyright notices. (TAC Count VII ¶ 42; Am. Count X ¶¶ 20, 23; TAC Count XI ¶ 40, 43.) [FN19]

> FN19. PSI does not indicate whether DIB instructed these 400 members to destroy the previously-distributed copies that included PSI's copyright notices.

In or about March 2001, DIB induced RealWorld to terminate the MVADA with PSI, although RealWorld had no legitimate basis for doing so. (*Id.* Count XII ¶¶ 43-44.) PSI alleges that, "[o]n information and belief, DIB sought to have Real [ ]World terminate PSI's M[VA]DA in order to limit or reduce damages which PSI could seek from DIB for DIB's wrongful use of PSI's copyrighted source code which was incorporated into a derivative work which PSI delivered to DIB in or about 1999."(*Id.* Count XII ¶ 45.) [FN20] In or about May 2001, RealWorld did in fact terminate the MVADA. (*Id.* Count XII ¶ 46.) [FN21] As a result of that termination, PSI experienced "interference with existing customers which PSI was serving pursuant to the MVADA, the loss of business opportunities and business expectancies."(*Id.* Count XII ¶ 47 .) On an unspecified date during the discovery process in this action, PSI became aware that DIB had breached the License Agreement by sublicensing several modules containing PSI-created Enhancements and Original Works to its members, presumably with the "splash screen" removed and without compensating PSI.(*Id.* Count I ¶ 35.)

> FN20. PSI does not describe the derivative work that was delivered to DIB in or about 1999 or indicate whether this was the same derivative work described in paragraphs 24 through 27 of Count VI of the TAC. Nor does PSI explain how termination of the PSI/RealWorld MVADA limited damages that PSI might otherwise have been able to recover from DIB.

> FN21. The TAC does not indicate what reasons, if any, RealWorld proffered for terminating the MVADA, or how such termination violated the MVADA, if at all.

*5 PSI's common law fraud counterclaim essentially alleges that DIB fraudulently represented to PSI that it had created the purchase order module independently of any Licensed Software when it had in fact incorporated source code from the Programs. (Am. Count IX ¶¶ 30-31.) The common law tortious interference counterclaim asserts that DIB induced

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 6
Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1660814 (N.D.Ill.), 2004 Copr.L.Dec. P 28,844
(Cite as: Not Reported in F.Supp.2d)

RealWorld to wrongfully terminate its MVADA with PSI. (TAC Count XII ¶ 43, 47.) The false designation of origin counterclaim alleges that DIB violated § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), by removing PSI's copyright notices from portions of the Programs and replacing them with its own such notices. (Id. Count XI ¶¶ 37, 48.) Finally, PSI's contributory copyright infringement counterclaim contends that Burroughs's personal actions assisted DIB in making, using, selling, and distributing copies of the Programs on which PSI's copyright notices had been replaced with DIB's notices. (Am. Count X ¶¶ 22, 24.) As noted above, Defendant DIB moves to dismiss PSI's fraud, false designation of origin, and tortious interference counterclaims; Defendant Burroughs moves to dismiss the contributory copyright infringement counterclaim.

*DISCUSSION*

I. Legal Standard

On a motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6), the court accepts all well-pleaded allegations in a counterclaim as true and draws all reasonable inferences in favor of the plaintiff. *Cozzi Iron & Metal, Inc. v. U.S. Office Equip., Inc.,* 250 F.3d 570, 574 (7th Cir.2001). The court must accept a pleading's factual allegations because "a motion to dismiss tests the legal sufficiency of a pleading."*Szabo v. Bridgeport Machs., Inc.,* 249 F.3d 672, 675 (7th Cir.2001). Dismissal under Rule 12(b)(6) is appropriate only if "it appears beyond doubt that the [nonmoving party] can prove no set of facts in support of his claim which would entitle him to relief."*Lee v. City of Chicago,* 330 F.3d 456, 459 (7th Cir.2003) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

II. Fraud (Amended Count IX)

DIB contends that PSI's fraud counterclaim should be dismissed on three grounds. First, DIB urges that PSI fails to plead its fraud counterclaim with the level of particularity required by FED. R. CIV. P. 9(b). (Motion of Do it Best Corp. to Dismiss Amended Count IX of Passport Software, Inc.'s Third Amended Counterclaims (hereinafter, "Am. Count IX Motion") ¶ 3.) Second, according to DIB, the counterclaim "fails to state more than a breach of contract claim."(Id.) Finally, DIB contends that the fraud counterclaim is preempted by the ITSA. (Motion of

Do it Best Corp. and Thomas Burroughs to Dismiss Counts IX, X, XI and XII of Passport Software, Inc.'s Third Amended Counterclaims (hereinafter, "Counts IX-XII Motion") ¶ 3.) FN22 DIB urges this court to dismiss PSI's fraud counterclaim with prejudice on the ground that PSI has had sufficient time to draft a fraud claim that would survive a 12(b)(6) motion, but has failed to do so. (Am. Count IX Motion ¶ 4.) The court considers each argument in turn.

FN22. DIB also contends that the fraud counterclaim is preempted by § 301(a) of the Copyright Act. The court notes, however, that at least one Court of Appeals, as well as several district courts, have held that § 301 of the Copyright Act does not preempt common law fraud claims. See *Valente-Kritzer Video v. Pinckney,* 881 F.2d 772, 776 (9th Cir.1989); *Cooper v. Sony Music Entm't Inc.,* No. Civ.A. 01-0941, 2002 WL 391693, at *5 (S.D.Tex. Feb.22, 2002); *Tracy v. Skate Key, Inc.,* 697 F.Supp. 748, 751 (S.D.N.Y.1988); *Brignoli v. Balch Hardy & Scheinman, Inc.,* 645 F.Supp. 1201, 1205 (S.D.N.Y.1986); see also H.R. REP. NO. 94-1476 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5748 ("[T]he general laws of defamation and fraud ... remain unaffected as long as the causes of action contain elements ... that are different in kind from copyright infringement"); 1 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 1.01[B][1][3], p. 1-27 (2004) ("[T]he element of misrepresentation or deception ... is no part of a cause of action for copyright infringement. Thus, there is no preemption of the state law of fraud ..."). As the court finds PSI's fraud counterclaim fails to satisfy the requirements of Rule 9(b), does not state more than a breach of contract claim, and is preempted by the ITSA, the court need not determine whether that counterclaim is also preempted by the Copyright Act.

A. Particularity

*6 DIB claims that PSI has not pleaded its fraud claim with the particularity required by Rule 9(b).Rule 9(b) provides that "[i]n all averments of fraud ..., the circumstances constituting fraud ... shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person

Not Reported in F.Supp.2d                                                 Page 7
Not Reported in F.Supp.2d, 2004 WL 1660814 (N.D.Ill.), 2004 Copr.L.Dec. P 28,844
(Cite as: Not Reported in F.Supp.2d)

may be averred generally."While Rule 9(b) does not require PSI to plead facts that if true would show that DIB's alleged misrepresentations were indeed false, it does require PSI to state "the identity of the person making the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the [PSI]."*Uni\*Quality, Inc. v. Infotronx, Inc.,* 974 F.2d 918, 923 (7th Cir.1992) (internal quotation marks and citations omitted). In other words, PSI's pleading must include "the who, what, when, where, and how: the first paragraph of any newspaper story."*DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990). On the other hand, PSI is "not required to go further and allege the facts necessary to show that the alleged fraud was actionable."*Midwest Commerce Banking Co. v. Elkhart City Centre,* 4 F.3d 521, 524 (7th Cir.1993). Allegations that fail to identify the agents who speak for a corporate entity do not satisfy Rule 9(b).*Kriendler v. Chem. Waste Mgmt.,* 877 F.Supp. 1140, 1155 (N.D.Ill.1995).

Before reaching the "newspaper" questions, the court considers a threshold argument: the statute of limitations. DIB contends that it is unable from the year-long time periods alleged (1990 and 1996) to determine whether PSI's counterclaim might be barred by the statute of limitations for fraud claims. (Memorandum of Law in Support of the Motion of Do it Best Corp. to Dismiss Count IX of Passport Software, Inc.'s Third Amended Counterclaims (hereinafter, "Am. Count IX Mem."), at 8.) The court notes that, in Illinois, a party has five years from the date he knew or reasonably should have known that a fraud has been perpetrated upon him to bring a claim for common law fraud. 735 ILCS 5/13-205; *Horbach v. Kaczmarek,* 288 F.3d 969, 977 (7th Cir.2002); *Boyd Mach. & Repair Co. v. American Int'l Homes, Ltd.,* 100 F.Supp.2d 898, 901 (N.D.Ill.2000). PSI alleges that it did not discover that DIB had made fraudulent statements until September 2000, (Am. Count IX ¶ 31), while PSI filed its initial fraud counterclaim on October 30, 2003, within five years of the time it claims to have discovered the fraud. The court concludes that PSI has sufficiently pleaded the relevant date-the date it discovered the alleged fraud-in its fraud counterclaim to survive a motion to dismiss.

Turning next to the questions of "who, what, when, where and how," DIB also claims it cannot determine where or by what method the alleged

misrepresentations were made. (Am. Count IX Mem., at 8.) The court notes that PSI did, in fact, identify the location and mode of transmission of all three alleged statements-the first two were made by telephone, and the third was uttered in person at DIB's office. (Am Count IX ¶¶ 21-23.)

*7 The matters of "who, what, and how" are more troublesome. In its response brief, PSI insists that its fraud counterclaim alleges that "DIB, though its agent Gary Zoller," made three false statements of material fact. (Response of Passport Software in Opposition to the Motion of Do it Best Corp. to Dismiss Passport's Fraud Claim (hereinafter, "Am. Count IX Opp. Mem."), at 3.) [FN23] First, at some point "[i]n or about 1990," Zoller told PSI President John Miller by telephone that DIB would not use the purchase order module that PSI delivered to DIB. (Am. Count IX ¶ 21.) Second, during that conversation, Zoller claimed that DIB would create its own purchase order module "from scratch." (*Id.* ¶ 22.)Third, Zoller told Miller "[i]n or about 1996" that Jennings was the programmer who was creating DIB's purchase order module. (*Id.* ¶ 23.)PSI claims in its response brief that the fraud counterclaim "alleged that at the time the representations were made, DIB knew or believed the statement was false."(Am. Count IX Opp. Mem., at 3-4 (citing Am. Count IX ¶¶ 24-28).) PSI also urges that its fraud counterclaim alleges that "DIB intended to induce PSI to act" and that "PSI alleged that it did act in reliance [on] DIB's representation that it was creating its own purchase order module from scratch ... [t]hat is, PSI did not invoice DIB for the use of source code [for] which it was entitled to license fees."(Am. Count IX Opp. Mem., at 4 (citing Am. Count IX ¶¶ 29-30).)

> FN23. PSI also claims it alleged that Jim Jennings made false statements of material fact. The court notes, however, that the fraud counterclaim contains no allegations that Jennings made any statements whatsoever.

In its reply brief, DIB insists that PSI's allegations have "a gaping hole," in that paragraphs 26, 28, 29, and 30 do not indicate on what date the alleged statements by Zoller were made. (Reply in Support of the Motion of Do it Best Corp. to Dismiss Amended Count IX of Passport Software, Inc.'s Third Amended Counterclaims (hereinafter, "Am. Count IX Reply Mem."), at 7-8.) As discussed above, it is not evident to this court which of Zoller's alleged statements paragraphs 26, 29, and 30 refer to.[FN24]Paragraph 26

Not Reported in F.Supp.2d                                                                    Page 8
Not Reported in F.Supp.2d, 2004 WL 1660814 (N.D.Ill.), 2004 Copr.L.Dec. P 28,844
**(Cite as: Not Reported in F.Supp.2d)**

involves an alleged representation by Zoller "that the purchase order module that [DIB] had created was its own creation"; paragraph 29 to a representation "that DIB's purchase order module was an original work of DIB"; and paragraph 30 to "statements ... that [DIB] had created its own purchase order module."It is unclear whether these claims refer to Zoller's alleged 1990 statements, his alleged 1996 statement, or other unidentified remarks. The court finds therefore that DIB has not sufficiently pleaded "the who, what, and how" of its fraud counterclaim.[FN25]

> FN24. As noted, it is clear that the allegation in paragraph 28, involving "the representation to Miller that DIB was creating its own purchase order module," refers to the allegation in paragraph 23 "that Jennings was creating DIB's purchase order module."

> FN25. As the court finds that the fraud counterclaim does not describe the alleged misstatements with the requisite particularity, the court need not consider DIB's remaining arguments regarding <u>Rule 9(b): (1)</u> that the six-year gap between Zoller's first two allegedly false statements and the third representation "begs the question of what both [DIB] and [PSI] were doing during that six year time frame"; (2) that paragraph 30 does not indicate when PSI relied on Zoller's statement that DIB had created its own purchase order module by not invoicing DIB or its members; and (3) that DIB cannot determine which of Zoller's statements paragraph 27 refers to or whether Zoller knew "at the time of his alleged misrepresentation in Paragraph 27 that [DIB] 'had intended to incorporate source code which belonged to PSI.' " (Am. Count IX Reply Mem., at 8.)

**B. Comparison with Breach of Contract Claim**

In Illinois, to establish common law fraud a plaintiff must prove the following elements: "(1) a false statement of material fact (2) known or believed to be false by the party making it; (3) intent to induce the other party to act [or to refrain from acting]; (4) action [or inaction] by the other party in justifiable reliance on the truth of the statement; and (5) damage to the other party resulting from such reliance."<u>Hefferman v. Board of Trustees of Illinois</u>

<u>Community College Dist. 508,</u> 310 F.3d 522, 525 (7th Cir.2002) (quoting <u>Gerill Corp. v. Jack L. Hargrove Builders, Inc.,</u> 128 Ill.2d 179, 193, 131 Ill.Dec. 155, 538 N.E.2d 530, 536 (1989)); <u>Minor v. Fashion Enters., Inc.,</u> 342 Ill.App.3d 405, 420, 276 Ill.Dec. 652, 794 N.E.2d 902, 916 (1st Dist.2003); <u>Chicago Title & Trust Co. v. First Arlington Nat'l Bank,</u> 118 Ill.App.3d 401, 406, 73 Ill.Dec. 626, 454 N.E.2d 723, 728 (1st Dist.1983) (citing <u>RESTATEMENT (SECOND) OF TORTS § 537 (1977)</u>).

**\*8** DIB contends that PSI's fraud counterclaim amounts to a cause of action for intentional breach of contract, which is not cognizable under Illinois law. *See* <u>Lester v. Resolution Trust Corp.,</u> 994 F.2d 1247, 1253 (7th Cir.1993) (citing <u>Morrow v. L.A. Goldschmidt Assocs., Inc.,</u> 112 Ill.2d 87, 94, 96 Ill.Dec. 939, 492 N.E.2d 181, 183-84 (1986)). DIB points out that PSI alleges that DIB incorporated PSI and Real World source code into DIB's purchase order module but failed to pay required royalties under the License Agreement. (Am. Count IX ¶¶ 14-16, 25, 32.) DIB also notes that all of the damages claimed in PSI's fraud counterclaim-"loss of fees, charges, and royalties from DIB; losses from the unauthorized conversion and use of its property; and attorney fees and costs"-are contained in its breach of contract claim. (*Compare* Am. Count IX ¶ 32 *with* TAC Count I ¶¶ 34, 36.)

In its response brief, PSI insists that its counterclaim asserts that "DIB intentionally misled PSI to believe that the purchase order module which PSI had delivered to DIB was not satisfactory for its business purposes."(Am. Count IX Opp. Mem., at 5.) PSI urges that

DIB's conduct was a part of an intentional scheme to conceal DIB's use of PSI's and Real[ ]World's source code from PSI, to create a work utilizing PSI's and Real[ ]World's source code without paying the appropriate fees or obtaining the appropriate licensing, to engage in unauthorized conversion of PSI's and Real[ ]World's source code to create a derivative work, and to cheat PSI out of its rightful royalties and fees.

(*Id.* at 6, 96 Ill.Dec. 939, 492 N.E.2d 181.) In the court's view, PSI's use of the phrase "intentional scheme" reveals that its fraud counterclaim amounts to a claim for promissory fraud. (Am. Count IX Reply Mem., at 7.) Our Court of Appeals has explained that, in Illinois, " '[p]romissory fraud' is a false representation of intent concerning future

Not Reported in F.Supp.2d                                                           Page 9
Not Reported in F.Supp.2d, 2004 WL 1660814 (N.D.Ill.), 2004 Copr.L.Dec. P 28,844
(Cite as: Not Reported in F.Supp.2d)

conduct, such as a promise to perform a contract when there is no actual intent to do so."*Houben v. Telular Corp.*, 231 F.3d 1066, 1074 (7th Cir.2000) (citation omitted)."As a general rule, promissory fraud is not actionable in Illinois unless the promise is part of a 'scheme' to defraud."*Id.* (emphasis added). In the court's view, PSI's fraud counterclaim does not contain any allegations to support its assertion that "DIB's conduct was a part of an intentional scheme" to defraud PSI. Thus, as a claim for promissory fraud, PSI's claim fails.

Even if PSI's claim is not properly characterized as one for promissory fraud, the court finds PSI has not adequately alleged that it relied on Zoller's misrepresentations and was injured as a result of that reliance, as opposed to being injured by DIB's failure to pay royalties. As noted, PSI alleges that it "relied upon the statements by DIB, through its agent Zoller, that it had created its own purchase order module and did not invoice DIB or its members for the use of PSI or Real[ ]World source code in the purchase order module."(Am. Count IX ¶ 30.) The court agrees with DIB, (Am. Count IX Reply Mem., at 5), that the fact that PSI's alleged reliance consisted solely of its failure to invoice DIB or its members for use of PSI and RealWorld source code demonstrates that PSI's fraud counterclaim alleges no more than that DIB intentionally breached the License Agreement. Indeed, as noted, PSI's fraud counterclaim seeks damages relating only to DIB's breach of the License Agreement. (*Compare* Am. Count IX ¶ 32 *with* TAC Count I ¶¶ 34, 36.)

**\*9** As DIB notes, our Court of Appeals has stated that a party asserting a fraud claim "must show that, had it not been for the fraud, he would have been spared an injury and thus would be better off."*Midwest Commerce*, 4 F.3d at 524-25 (citation omitted). In this case, PSI has not alleged that Zoller's misrepresentations *per se* caused it to forego some non-contractual remedy it would have had absent those statements. Instead, PSI's alleged reliance on DIB's misrepresentations, as well as the injuries PSI allegedly sustained as a result of such reliance, involve PSI's failure to invoice DIB for royalties owed under the License Agreement. PSI does not allege that it would have discovered DIB's alleged breach of the License Agreement any sooner, or invoiced DIB for greater royalty amounts, had Zoller not lied about DIB's actions. Even if it had so alleged, those circumstances might explain PSI's delay in filing its claims against DIB, but would not constitute

an independent claim for relief. As PSI does not allege harm beyond its contractual expectations, the court concludes that PSI's fraud counterclaim fails to state a claim upon which relief can be granted.

### C. Preemption by Illinois Trade Secrets Act

DIB claims that the ITSA preempts PSI's fraud counterclaim on the ground that the fraud counterclaim is predicated on the alleged misappropriation of the same property that gives rise to PSI's trade secret misappropriation claim. (Counts IX-XII Mem., at 13.) Specifically, DIB urges that PSI's fraud counterclaim merely repeats the allegations in PSI's trade secret misappropriation counterclaim, and that the fraud claim is "nothing more than another way of arguing that [DIB] took PSI's allegedly secret information, for which the ITSA is the exclusive remedy."(Reply in Support of Do it Best Corp.'s Motion to Dismiss Counts IX, XI and XII of Passport Software, Inc.'s Third Amended Counterclaims (hereinafter, "Counts IX, XI, XII Reply Mem."), at 13; Counts IX-XII Mem., at 13.)

PSI urges that its fraud counterclaim is "fully independent" of its trade secret misappropriation counterclaim for two reasons. First, PSI insists that its fraud counterclaim "seeks to recover damages from DIB for its fraudulent misrepresentations related to payment due under the License Agreement."(Counts IX-XII Opp. Mem., at 12.) Second, PSI claims that "at the time the initial fraudulent representation was made regarding the purchase order module, none of PSI['s] trade secrets which it is enforcing in this litigation existed[; t]hose trade secrets arose later in the relationship between PSI and DIB." (*Id.*) The court presumes that the phrase "the initial fraudulent representation" refers to Zoller's alleged 1990 statements that DIB would not use the purchase order module that PSI delivered to DIB and that DIB would create its own purchase order module "from scratch." (Am. Count IX ¶¶ 21-22.) The court also presumes that the trade secrets PSI refers to are the Programs, which it allegedly began developing in 1993. PSI cites no factual support for this contention, nor does it cite any authority (and the court found none) to support its implicit argument that a fraud claim is not preempted by the ITSA if the trade secret at issue did not exist when the alleged misrepresentation was made.

**\*10** The ITSA abolished conflicting common law causes of action, except for contractual remedies, for

Not Reported in F.Supp.2d                                                                    Page 10
Not Reported in F.Supp.2d, 2004 WL 1660814 (N.D.Ill.), 2004 Copr.L.Dec. P 28,844
**(Cite as: Not Reported in F.Supp.2d)**

misappropriation of trade secrets. 765 ILCS 1065/8; *PepsiCo, Inc. v. Redmond,* 54 F.3d 1262, 1271 (7th Cir.1995) (citations omitted). To state a claim for misappropriation of trade secrets under the ITSA, a claimant must show that (1) its trade secret (2) was misappropriated and (3) was used in the opposing party's business. *Learning Curve Toys, Inc. v. PlayWood Toys, Inc.,* 342 F.3d 714, 721 (7th Cir.2003) (citations omitted). In *Thomas & Betts Corp. v. Panduit Corp.,* 108 F.Supp.2d 968, 974 (N.D.Ill.2000), plaintiff alleged, *inter alia,* that its former employee and his current employer fraudulently misrepresented and concealed that they took and used plaintiff's computers, disks, and documents containing confidential information. In granting summary judgment to defendants on plaintiff's fraud claim, the court found that the fraud allegations merely restated plaintiff's claim for misappropriation of trade secrets. *Id.* As the ITSA defines misappropriation as an acquisition by improper means, including by misrepresentation, the court found, the ITSA preempted plaintiff's fraud claim. *Id.* (citing 765 ILCS 1065/2(a)).

PSI's misappropriation counterclaim alleges that the Original Works and Enhancements constitute trade secrets of PSI pursuant to the ITSA. (TAC Count II ¶ 41.) As noted, PSI's common law fraud counterclaim alleges that DIB fraudulently misrepresented to PSI that it had created the purchase order module independently of any Licensed Software when it had in fact incorporated source code from the Programs, for which PSI was entitled to royalties. (Am. Count IX ¶¶ 21-30.) [FN26] As in *Thomas & Betts,* this court finds that PSI's fraud counterclaim merely restates its trade secret misappropriation claim. As noted, both claims are premised on DIB's alleged misappropriation and use of certain Enhancements that PSI had created. The court finds that PSI's fraud counterclaim is premised on an acquisition by misrepresentation, and therefore is preempted by the ITSA.

> FN26. As noted, the court presumes the Programs constitute a subset of those Enhancements described in PSI's trade secret misappropriation counterclaim.

### D. Undue Delay

DIB argues that the fraud counterclaim should be dismissed with prejudice at this point, as PSI "has exercised undue delay, and has had more than a

sufficient amount of time to adequately plead a cause of action."(Am. Count IX Mem., at 8-9.) In support, DIB cites a single unreported district court opinion, *Oasis Indus., Inc. v. G.K.L. Corp.,* No. 92 C 4814, 1996 U.S. Dist. LEXIS 15233, at *15-16 (N.D.Ill. Oct. 9, 1996), where Magistrate Judge Guzman recommended that the court decline to permit a further amended pleading where defendants had enjoyed "several opportunities to amend their pleadings during the course of four years of discovery."PSI responds that "the parties have only been engaged in active discovery since June of 2003.Further, PSI claims "it has been greatly hindered because of the inability of multiple DIB deponents to recall relevant events and the late delivery of 60,000 incomplete documents to PSI...." (Counts IX-XII Opp. Mem., at 6 n. 2.) The court notes that PSI initially filed its fraud counterclaim on October 30, 2003, and amended it once, on February 9, 2004. Despite DIB's alleged noncompliance with discovery, PSI has in fact filed several previous counterclaims. The court declines at this time to bar any further amendments, but notes it has difficulty in understanding how PSI might plead a fraud counterclaim that will not be vulnerable to the legal defenses DIB has raised in this motion.

### III. Contributory Copyright Infringement (Count X)

**\*11** Thomas Burroughs urges that PSI's counterclaim against him should be dismissed on the grounds that (1) PSI does not sufficiently plead a predicate act of copyright infringement, and (2) PSI fails to specifically allege that Burroughs "directed, supervised and/or participated in the removal of any copyright notices or that his conduct aided and assisted DIB to make, use, sell and distribute copies of the [Programs] with PSI's copyright notice removed."(Thomas Burroughs'[s] Motion to Dismiss Count X (Amended) of Counter-Plaintiff ['s] Third Amended Counterclaims ¶ 5.) PSI responds that its counterclaim satisfies the notice pleading requirements of Rule 8(a). (Response of Passport Software, Inc. in Opposition to the Motion to Dismiss of Thomas Burroughs (hereinafter, "Am. Count X Opp. Mem."), at 2-3.) In fact, unlike its fraud counterclaim, PSI's contributory copyright infringement counterclaim need contain only "a short and plain statement of the claim showing that the pleader is entitled to relief."FED. R. CIV. P. 8(a)(2). Such a statement need merely "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."*Swierkiewicz v. Sorema*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 11
Not Reported in F.Supp.2d, 2004 WL 1660814 (N.D.Ill.), 2004 Copr.L.Dec. P 28,844
(Cite as: Not Reported in F.Supp.2d)

*N. A.*, 534 U.S. 506, 507, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (citation omitted). A party need not plead either facts or law under Rule 8(a).*Johnson v. Wattenbarger, 361 F.3d 991, 994 (7th Cir.2004)* (citations omitted).

A contributory infringer is one who "was in a position to control the use of copyrighted works by others and had authorized the use without permission from the copyright owner."*Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 418, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984). A party may be held jointly and severally liable for infringement if he has knowledge of the infringing activity and directly participates in the infringing activity or induces, causes, or materially contributes to the infringing conduct of another. *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir.1971); *Microsoft Corp. v. Logical Choice Computers, Inc.*, No. 99 C 1300, 2001 WL 58950, at *10 (N.D.Ill. Jan.22, 2001); *Microsoft Corp. v. Grey Computer*, 910 F.Supp. 1077, 1090 (D.Md.1995). Our Court of Appeals has explained that a copyright holder may sue a contributor to copyright infringement in effect as an aider and abettor. *In re Aimster Copyright Litig.*, 334 F.3d 643, 645-46 (7th Cir.2003)."[O]ne thinks of a contributory infringer as someone who benefits directly from the infringement that he encourages."*Id.* at 654.The court in *Dangler v. Imperial Mach. Co.*, 11 F.2d 945, 947 (7th Cir.1926), held that "in the absence of some special showing, the managing officers of a corporation are not liable for the infringements of such corporation, though committed under their general direction."The *Dangler* court explained that an officer is held jointly liable with the company when he "acts willfully and knowingly-that is, when he personally participates in the manufacture or sale of the infringing article (acts other than as an officer), or when he uses the corporation as an instrument to carry out his own willful and deliberate infringements, or when he knowingly uses an irresponsible corporation with the purpose of avoiding personal liability."*Id.* One district court has explained that "despite its vintage, *Dangler* remains the law of this Circuit."*Syscon, Inc. v. Vehicle Valuation Servs., Inc.*, 274 F.Supp.2d 975 (N.D.Ill.2003) (citing *Kohler Co. v. Kohler Int'l, Ltd.*, 196 F.Supp.2d 690, 694 (N.D.Ill.2002); *The Drink Group, Inc. v. Gulfstream Communications, Inc.*, 7 F.Supp.2d 1009, 1010 (N.D.Ill.1998)).

**\*12** In order to establish contributory infringement, a party must establish a predicate act of direct infringement. *See A & M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1013 n. 2 (9th Cir.2001) ("Secondary liability for copyright infringement does not exist in the absence of direct infringement by a third party") (citation omitted); 3 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT (hereinafter, "NIMMER") § 12.04[A][3][a], p. 12-91 (2004) ("[T]he rule should generally prevail that third party liability, as its name implies, may exist only when direct liability, i.e., infringement, is present"). Copyright infringement is actionable under § 501(a) of the Copyright Act, which provides that "[a]nyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 122 ... is an infringer of the copyright...."17 U.S.C. § 501(a). The exclusive rights of a copyright holder include reproducing, preparing derivative works of, and distributing copies of the copyrighted work. 17 U.S.C. § 106(1)-(3). Thus, PSI must show (1) the existence of a predicate act of infringement, and (2) that Burroughs induced, caused, or materially contributed to the infringing conduct. The court considers each element in turn.

A. Predicate Act of Copyright Infringement

According to Burroughs, PSI's contributory copyright infringement is premised solely on its allegation that in or about January 2001, DIB employees, under Burroughs's direction and with his participation, removed PSI's copyright notices from the Programs' splash screens without PSI's knowledge or consent and replaced them with DIB's copyright notices. (Memorandum of Law in Support of Thomas Burroughs'[s] Motion to Dismiss Count X (Amended) of Counter-Plaintiff['s] Third Amended Counterclaims (hereinafter, "Am. Count X Mem."), at 3.) PSI points to its allegation that Burroughs was a member of the committee of DIB employees that was advised by third parties that DIB needed to purchase or license PSI's rights in order to continue using PSI software. (Am. Count X ¶ ¶ 12-13.) [FN27]It also cites its allegation that Burroughs's "personal conduct aided and assisted DIB to make, use, sell and distribute copies of the Programs with PSI's copyright notice removed."(*Id.* ¶ 24.)Burroughs does not address these allegations.

FN27. PSI's pleadings do not indicate whether Burroughs advised DIB of the potential legal implications of its actions.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                        Page 12
Not Reported in F.Supp.2d, 2004 WL 1660814 (N.D.Ill.), 2004 Copr.L.Dec. P 28,844
(Cite as: Not Reported in F.Supp.2d)

Burroughs claims that removal of copyright notices, without more, does not constitute an act of copyright infringement, and is only punishable by criminal sanction pursuant to § 506(d) of the Copyright Act, 17 U.S.C. § 506(d), which prescribes a criminal fine of up to $2,500 for removing or altering a notice of copyright from a copy of a copyrighted work with fraudulent intent. (Am. Count X Mem., at 3-4.) At least some authority supports his argument. In *Scarves by Vera, Inc. v. American Handbags, Inc.*, 188 F.Supp. 255, 257 (S.D.N.Y.1960), the court concluded it had no power to enjoin defendant from removing plaintiff's copyright notices. *See also* 4 NIMMER § 15.02, at 12-91 ("[R]emoval or alteration of a copyright notice upon a copyrighted work (whether or not with fraudulent intent) likewise does not give rise to civil liability for copyright infringement"). Burroughs also notes that the right to place or remove a copyright notice is not enumerated as a protected act in § 106 of the Copyright Act. (Am. Count X Mem., at 4 .) In addition, Burroughs cites *Donald Frederick Evans & Assocs., Inc. v. Continental Homes, Inc.*, 785 F.2d 897, 913 (11th Cir.1986), in which the court stated that "permitting private plaintiffs to seek relief under section 506 is inconsistent with the overall scheme of the legislation...." Burroughs fails to cite the remainder of the court's statement, however: "private parties have adequate means available by which to seek relief under other provisions of the Act which will yield more appropriate relief."*Id.*

*13 Burroughs also cites *Cinema Concepts Theatre Serv. Co. v. Filmack Studios*, No. 89 C 0024, 1989 WL 55092, at *2 (N.D.Ill. May 17, 1989), but as the court reads that case, it addressed state law claims. Plaintiff in *Cinema Concepts* alleged, *inter alia*, that defendant misappropriated its property and engaged in unfair competition by removing its copyright notice from its films without its consent or authorization. In dismissing these state law claims, the court noted that plaintiff sought to recover for injuries allegedly sustained as a result of the removal of the copyright notice, not for the subsequent acts of reproduction. *Id.* Defendant's removal of the notice allegedly "facilitat[ed] the copying of plaintiff's copyrighted films" and allowed customers to purchase films from defendant that they otherwise would not purchase, but removal of the notices did not itself injure the plaintiffs. Accordingly, the removal claims were preempted by § 301 of the Copyright Act.*Id.* at *3. As in *Cinema Concepts,* PSI was injured not by deletion of its copyright notices,

but by the alleged misuse of its copyrighted work.

Removal of copyright notices may not, standing alone, be actionable under the Copyright Act, but PSI's claims against Mr. Burroughs will survive a 12(b)(6) motion if they sufficiently allege Burroughs's participation in actions that do constitute copyright infringement. At least one Circuit Court of Appeals has found that removal and replacement of a copyright notice can constitute evidence of copyright infringement. *Superior Form Builders, Inc. v. Dan Chase Taxidermy Supply Co., Inc.*, 74 F.3d 488, 497 (4th Cir.1996) ("[T]he most telling evidence of willful infringement in this case is [individual defendant's] underhanded purchase of [copyrighted animal mannequins] using pseudonyms, his removal of [plaintiff's] copyright notice from those forms, and his attachment of his own copyright notice"). In this case, PSI alleges that Burroughs's participation in removing and replacing PSI's copyright notices aided and abetted DIB in infringing PSI's copyright. The court turns, then, to consider whether these acts of participation are sufficient to satisfy the notice pleading requirements of Rule 8(a).

### B. Burroughs's Alleged Contribution to Copyright Infringement

Burroughs contends that PSI has not alleged sufficient facts regarding Burroughs's contribution to allegedly infringing acts to support its claim that Burroughs aided and abetted the alleged infringement. (Am. Count X Mem., at 5.) Specifically, Burroughs urges that PSI does not allege that he knew DIB intended to infringe PSI's copyright, that he induced, caused, or materially contributed to the making, using, selling, or distributing of PSI software, or that he participated in making, using, selling, or distributing copyrighted works. (*Id.* at 9-10; Thomas Burroughs'[s] Reply Brief in Support of His Motion to Dismiss Count X (Amended) of Counter-Plaintiff['s] Third Amended Counterclaims, at 7.) To support these contentions, Burroughs cites several district court decisions. (Am. Count X Mem., at 5-6.)

*14 In *Cable News Network, L.P. v. GoSMS.com, Inc.*, No. 00 Civ. 4812(LMM), 2000 WL 1678039, at *6 (S.D.N.Y. Nov.6, 2000), plaintiffs alleged that defendant's manager and director, by virtue of their positions and shareholdings, controlled the affairs of defendant and were personally involved in the alleged infringing conduct. Absent allegations of acts

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                  Page 13
Not Reported in F.Supp.2d, 2004 WL 1660814 (N.D.Ill.), 2004 Copr.L.Dec. P 28,844
(Cite as: Not Reported in F.Supp.2d)

of infringement, supervision, or control over the direct infringers, or contribution to the infringement, the court concluded that plaintiffs' allegations were "insufficient to plead either direct copyright or trademark infringement or either contributory infringement or vicarious liability."*Id.* The court explained that copyright infringement claims require "allegations of acts of infringement, supervision or control over the direct infringers, or contribution to the infringement."*Id.* (citing *Carell v. The Shubert Org., Inc.,* 104 F.Supp.2d 236, 271 (S.D.N.Y.2000)). Although PSI does not address this case, the court finds it distinguishable. As noted, PSI has alleged that Burroughs knew, through his membership on a DIB committee, that DIB needed to purchase or license PSI's rights to avoid infringing PSI's copyright, and that Burroughs acknowledged to Miller that, without PSI's permission, DIB had made, sold, and distributed copies of the purchase order module from which copyright notices had been removed. Despite this knowledge, Burroughs allegedly directed and participated in removing PSI copyright notices and replacing them with DIB notices. (Am. Count X ¶¶ 12-13, 15-16, 19, 21-22.)

In *DEV Industries, Inc. v. Rockwell Graphic Systems, Inc.,* No. 91 C 7197, 1992 WL 100908, at *1, *3 (N.D.Ill. May 4, 1992), plaintiff alleged that individual officers of defendant corporation had been engaged in a "complex and integrated scheme to eliminate [plaintiff] as a competitor and to drive it out of business," that they were "the moving, conscious, and dominant force" behind corporate defendant's unfair trade practices, and that they knew about and/or encouraged corporate defendant's allegedly offending conduct. In dismissing claims against the individual defendants, the court found that plaintiff's allegations were insufficient as plaintiff failed to identify any specific activity based upon personal knowledge or wrongdoing, as opposed to their membership in the broader organizational structure. *Id.* at *3 (citing *Cinema Concepts,* 1989 WL 55092). Here, in contrast, PSI has alleged, albeit in conclusory fashion, that Burroughs knew about DIB's alleged infringement and that he directed and participated in acts that furthered DIB's allegedly infringing conduct.

In *The Drink Group, Inc. v. Gulfstream Communications, Inc.,* 7 F.Supp.2d 1009 (N.D.Ill.1998), Plaintiff sought to hold corporate officers individually liable for trademark infringement on the ground that they were "a principal of and a driving force behind" the allegedly infringing conduct. The court dismissed these claims, citing *Dangler* and *Hoover Group, Inc. v. Custom Metalcraft, Inc.,* 84 F.3d 1408, 1411 (Fed.Cir.1996), in which the court explained that "when a person in a control position causes the corporation to commit a civil wrong, imposition of personal liability requires consideration of the nature of the wrong, the culpability of the act, and whether the person acted in his/her personal interest or that of the corporation."In *Drink Group,* plaintiff failed to allege any acts of wrongdoing by the defendant officers. *Id.* at 1010-11.The mere fact that these individuals had formed a corporation that allegedly infringed was insufficient, absent any allegations of improper motivation. *Id.* at 1011.In other words, the court found that "[p]laintiff's averments fall woefully short of the 'special showing' requirement in *Dangler."Id.* Similarly, in *Cinema Concepts,* 1989 WL 55092, at *2, the court dismissed a claim for contributory copyright infringement on the ground that there were no factual allegations to establish that the individual defendants supervised, influenced, or otherwise knowingly participated in the alleged infringement, or that either defendant derived financial benefit from it.

**\*15** To support its contention that its counterclaim does adequately allege Burroughs's participation in infringing activities, PSI relies chiefly on *Syscon,* in which defendants engaged plaintiff to develop a customized software program. 274 F.Supp.2d 975. The relationship ended before plaintiff completed the software, and defendants engaged a third party to complete the program using the source code that plaintiff had already developed. *Id.* Plaintiff sought to hold Neil Blitstein, president of defendant corporation, personally liable for the alleged acts of copyright infringement on the source code. *Id.* In moving to dismiss the claim against him, Blitstein argued that plaintiff had not alleged that he acted in an individual capacity, as opposed to his capacity as the corporation's president. *Id.* at 975-76.The court declined to dismiss the claim, however, noting that the complaint included numerous specific allegations that Blitstein had personally directed and participated in allegedly infringing activity, and had personally authorized that activity. *Id.* at 977.[FN28]

> FN28. The allegations concerning Blitstein's conduct were considerably more detailed than those before this court. Specifically, the complaint alleged that Blitstein had provided third parties with copies of the

Not Reported in F.Supp.2d                                                                                                    Page 14
Not Reported in F.Supp.2d, 2004 WL 1660814 (N.D.Ill.), 2004 Copr.L.Dec. P 28,844
(Cite as: Not Reported in F.Supp.2d)

software; was in a position to control the Copyrighted Software; had authorized the copying, modification and use of the Copyrighted Software; had "induced and/or materially contributed to the infringing conduct of the other defendants"; had personally directed and authorized the unlawful conduct; had personally profited from the acts of copyright infringement; had used, distributed, sold, offered for sale, displayed, advertised, and promoted, without plaintiff's consent, the Copyrighted Software; had "personally directed and participated in the copying of the source code and authorized its dissemination and use for making additional copies and/or derivative works"; and had acted willfully and with knowledge of plaintiff's copyrights. *Syscon,* 274 F.Supp.2d at 976-77.

PSI also points to *Peaceable Planet, Inc. v. TY, Inc.,* 185 F.Supp.2d 893, 894-95, 896-97 (N.D.Ill.2002), in which plaintiff alleged that H. Ty Warner, the founder, president, CEO, and sole shareholder of defendant corporation, was liable for infringement. The court noted that the complaint alleged the Warner was responsible for overseeing the development, marketing, and sales of the infringing items; personally participated in the design of the infringing items; approved and authorized the corporation's actions; and personally promoted the sales of the infringing items. *Id.* at 896-897. These allegations were adequate, in the court's view, to survive a 12(b)(6) motion, as they supported the inference that Warner personally participated in the manufacture or sale of the infringing article. *Id.* at 897.

Burroughs notes that, unlike the individual defendants in *Syscon* and *Peaceable Planet,* he was not an officer of DIB. As the court reads these cases, status as an officer of a corporation that has allegedly infringed a copyright, without more, is not a basis for liability as a contributory infringer; instead, the alleged contributory infringer must have acted "willfully or knowingly" or must have "personally participated" in the alleged infringement. None of these cases suggests, however, that one *must be* an officer in order to be held liable as a contributory infringer.[FN29]

> FN29. Burroughs cites three other cases, but the court finds them distinguishable as the

courts did not address the pleading requirements for a contributory copyright infringement claim. *See Assessment Techs. v. WIREdata, Inc.,* 350 F.3d 640, 644 (7th Cir.2003); *Microsoft Corp. v. V3 Solutions, Inc.,* No. 01 C 4693, 2003 WL 22038593 (N.D.Ill. Aug.28, 2003); *Apple Computer, Inc. v. Microsoft Corp.,* 821 F.Supp. 616, 625 (N.D.Cal.1993), *aff'd,* 35 F.3d 1435 (9th Cir.1994).

The court notes that PSI did allege that Burroughs acted "willfully and knowingly" by "personally participat[ing] in the manufacture or sale of the infringing article." In the court's view, a requirement that, at the pleading stage, PSI must make a further "special showing" of participation in copyright infringement would go beyond the requirements of Rule 8(a)(2). The court notes that *Dangler* apparently involved a judgment on the merits, rather than a motion to dismiss. *See* 11 F.2d at 945 (citing *Maxim Mfg. Co. v. Imperial Mach. Co.,* 286 F. 79 (7th Cir.1923)). Indeed, the *Dangler* decision did not involve application of Rules 8 or 12(b)(6), as the Federal Rules of Civil Procedure were adopted 14 years after *Dangler* was decided. Thus, *Dangler* arguably sets forth an evidentiary standard, rather than a heightened pleading requirement for contributory copyright infringement claims. Notably, in *Mid America Title Co. v. Kirk,* 991 F.2d 417, 421 (7th Cir.1993), our Court of Appeals rejected defendant's contention claim of copyright infringement requires heightened specificity. Such a requirement, the court explained, would be akin to Rule 9(b). *Id.* Instead, the court explained, "[c]omplaints for copyright infringement simply alleging present ownership by plaintiff, registration in compliance with the applicable statute, and infringement by defendant, have been held sufficient under the rules." *Id.* at 421 n. 8 (quoting 5 CHARLES A. WRIGHT & ARTHUR A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1237, at 283 (1990)) (quotations marks omitted).

**\*16** In light of *Kirk* and *Aimster,* 334 F.3d at 645-46, the court concludes that PSI's claim for contributory copyright infringement requires no more than the following three allegations: (1) that PSI owned a valid copyright; (2) that it registered in compliance with the applicable statute; and (3) that Burroughs aided and abetted DIB's infringement. In the court's view, PSI has satisfied these requirements. PSI alleges that PSI owned a valid, registered copyright.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 15
Not Reported in F.Supp.2d, 2004 WL 1660814 (N.D.Ill.), 2004 Copr.L.Dec. P 28,844
**(Cite as: Not Reported in F.Supp.2d)**

Further, PSI claims that (1) Burroughs was a member of the committee of DIB employees that was told by third parties that DIB needed to purchase or license PSI's rights to continue to use PSI software, (2) Burroughs acknowledged to Miller that, without PSI's permission, DIB had made, sold, and distributed copies of the purchase order module from which copyright notices had been removed, (3) Burroughs directed and participated in the removal of PSI's copyright notices without PSI's knowledge or consent, and (4) Burroughs's "personal conduct aided and assisted DIB to make, use, sell and distribute copies of the Programs with PSI's copyright notice removed."(*Id.* ¶¶ 12-13; 15-16, 19, 21-22, 24.) Mr. Burroughs is, of course, invited to raise any defenses to PSI's claim, such as evidence of his belief that deleting PSI's copyright notice was appropriate for some reason or a lack of evidence that he was aware of DIB's infringement, in a motion for summary judgment. His 12(b)(6) motion is denied.

### IV. False Designation of Origin (Count XI)

DIB contends that the Copyright Act takes precedence over PSI's false designation of origin counterclaim, as PSI's copyright infringement and false designation of origin claims "are effectively the same." (Counts IX-XII Mem., at 12.) In its false designation of origin counterclaim, PSI alleges that DIB violated § 43(a) of the Lanham Act, <u>15 U.S.C. § 1125(a)</u>, by removing PSI's copyright notices from portions of the Programs and replacing them with its own such notices. (TAC Count XI ¶¶ 37, 48.) To prevail, PSI must prove the following three elements: "(1) that [DIB] used a false designation of origin ... in connection with goods or services; (2) that such goods or services entered interstate commerce; and (3) that [PSI] ... believes [it] is likely to be damaged as a result of the misrepresentation."<u>*Kennedy v. Nat'l Juvenile Detention Ass'n,* 187 F.3d 690, 695-96 (7th Cir.1999)</u> (citation omitted). Put more simply, PSI may prevail if it establishes "(1) that it has a protectible trademark, and (2) a likelihood of confusion as to the origin of [DIB's] product."<u>*Ty, Inc. v. Jones Group, Inc.,* 237 F.3d 891, 897 (7th Cir.2001)</u> (quotation marks and citation omitted).

The Copyright Act does not preempt the Lanham Act, or vice versa, and therefore a party may recover under both statutes. *See, e.g.,* <u>*Alameda Films SA de CV v. Authors Rights Restoration Corp.,* 331 F.3d 472, 482-83 (5th Cir.2003)</u>; <u>*Nintendo of Am., Inc. v. Dragon Pac. Int'l,* 40 F.3d 1007 (9th Cir.1994)</u>. As

Professor Nimmer explains, the Copyright Act "does not in any manner repeal or otherwise affect other federal statutes that may in some degree overlap with the Copyright Act.... Nonetheless, courts have limited application of the Lanham Act so as not to encroach on copyright interests." 1 NIMMER § 1.01[D], p. 1-66.6 (2004). The Second Circuit has found that, "as a matter of law, a false copyright notice alone cannot constitute a false designation of origin within the meaning of 43(a) of the Lanham Act."<u>*Lipton v. Nature Co.,* 71 F.3d 464, 473 (2d Cir.1995)</u>. Several district courts, however, have disagreed with the *Lipton* court's conclusion that the act of placing a copyright notice on an infringing product cannot be a false designation of origin under section 43(a).<u>*Montgomery v. Noga,* 168 F.3d 1282, 1298 (11th Cir.1999)</u> (collecting cases).

**\*17** Although neither party so characterizes it, the court observes that PSI's false designation of origin counterclaim amounts to a "reverse passing off" claim, in which a producer misrepresents someone else's goods or services as its own. <u>*Dastar Corp. v. Twentieth Century Fox Film Corp.,* 539 U.S. 23, 27 n. 1, 123 S.Ct. 2041, 156 L.Ed.2d 18 (2003)</u> (citation omitted). Such claims often merely involve removing the owner's mark from a product, adding the infringer's own mark, and selling the product without altering it in any other way. <u>*Montgomery,* 168 F.3d at 1299 n. 27</u>. In *Dastar,* plaintiff Twentieth Century Fox Film Corporation ("Fox"), the owner of a copyright on "Crusade in Europe," a television series about World War II, allowed the copyright to expire, leaving the series in the public domain. <u>539 U.S. at 25-26</u>. Subsequently, plaintiffs SFM Entertainment ("SFM") and New Line Home Video, Inc. ("New Line"), in turn, acquired from Fox the exclusive rights to manufacture and distribute videos of the series. <u>*Id.* at 26</u>.When defendant Dastar Corp. released a video set based on the series, without mentioning the Crusade television series, plaintiffs Fox, SFM, and New Line sued *inter alia* under § 43(a), claiming false designation of origin. <u>*Id.* at 26-27</u>.The Court explained that the phrase "origin of goods" in § 43(a) "refers to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods."<u>*Id.* at 37</u>.To hold otherwise, the Court explained, "would be akin to finding that § 43(a) created a species of perpetual patent and copyright, which Congress may not do."*Id.* Had defendant bought some of plaintiffs' videotapes and "merely repackaged them as its own,"

Not Reported in F.Supp.2d                                                                    Page 16
Not Reported in F.Supp.2d, 2004 WL 1660814 (N.D.Ill.), 2004 Copr.L.Dec. P 28,844
**(Cite as: Not Reported in F.Supp.2d)**

the Court would have sustained plaintiffs' false designation of origin claim. *Id.* at 31.As defendant had accurately identified itself as the manufacturer of the videos, however, the Court found that no false designation of origin had occurred. *Id.*

DIB urges that PSI's copyright infringement and false designation of origin counterclaims are predicated on the same wrongful act, i.e ., replacement of PSI's copyright notices with DIB's notices. (Counts IX-XII Mem., at 12-13.) In light of *Dastar,* however, the fact that Copyright and Lanham Act claims are predicated on the same wrongful act is not fatal to PSI's Lanham Act claim. In this case, PSI alleges that DIB employees removed PSI's copyright notices from the Programs' splash screens without PSI's knowledge or consent and replaced them with its own copyright notices. (TAC Count XI ¶¶ 41-42, 45.) According to PSI, since February 14, 2001, DIB has made, used, and distributed copies of the Programs to its members throughout the United States without PSI's consent.(*Id.* Count XI ¶ 40, 43.) Indeed, DIB acknowledges that "PSI does not allege that [DIB] did anything more than replace [its] copyright notice."(Counts IX, XI, XII Reply Mem., at 4 n. 4.) In the court's view, it is possible that PSI could demonstrate that DIB "merely repackaged [the Programs] as its own."*See Dastar,* 539 U.S. at 31.

*\*18* DIB notes that several paragraphs in PSI's Lanham Act claim are nearly identical to the allegations set forth in its copyright infringement claim. (*Compare* Count VII ¶¶ 38-42 *with* Am. Count X ¶¶ 38-41.) DIB points out that several district courts in this circuit have applied the preemption principles for § 301(a) of the Copyright Act to claims brought under § 43(a) of the Lanham Act and found that claims which merely state that a copyright notice was removed must be dismissed. *See Natkin v. Winfrey,* 111 F.Supp.2d 1003, 1013-14 (N.D.Ill.2000) (collecting cases and rejecting Lanham Act claims because "plaintiffs have done nothing more than reallege their copyright claims under the guise of the Lanham Act"). The court notes, however, that these decisions, which are not precedential, predate *Dastar,* which is binding on this court. In light of the principles set forth in *Dastar* and the liberal pleading standards of Rule 8(a)(2), discussed above, and drawing all inferences in favor of PSI, the court declines to dismiss PSI's false designation of origin counterclaim.

**V. Tortious Interference with Contract (Count XII)**

In Count XII of the Third Amended Counterclaim, PSI alleges that DIB tortiously interfered with the MVADA between PSI and RealWorld by inducing RealWorld to terminate that contract. As with the fraud counterclaim, DIB contends that PSI's tortious interference counterclaim should be dismissed on the ground that it is preempted by both the Copyright Act and the ITSA. (Counts IX-XII Motion ¶ 4.) The court considers each argument in turn.

A. Preemption by Copyright Act

The elements of a tortious interference with contract claim are: "(1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by defendant's wrongful conduct; and (5) damages."*Voelker v. Porsche Cars N. Am., Inc.,* 353 F.3d 516, 527-28 (7th Cir.2003) (quoting *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.,* 131 Ill.2d 145, 154-55, 137 Ill.Dec. 19, 545 N.E.2d 672, 676 (1989)). DIB maintains that the Copyright Act preempts PSI's tortious interference counterclaim on the ground that it is equivalent to its copyright infringement counterclaim, as both counterclaims are based on the same alleged wrongful use of PSI's software. (Counts IX-XII Mem., at 9.) DIB notes that PSI alleges in its tortious interference counterclaim that DIB entered into the Source Code Agreement,[FN30]"in part, in a wrongful attempt to legitimize DIB's use of PSI's copyrighted code without PSI's consent ."(TAC Count XII ¶ 41.) The remaining allegations in the counterclaim, DIB contends, "only involve the alleged repercussions of [DIB's] purported copyright infringement."(Counts IX, XI, XII Reply Mem., at 7.) PSI responds that its tortious interference counterclaim is predicated on DIB's alleged inducement to RealWorld to terminate its Master Distributor Agreement with PSI. (Counts IX-XII Opp. Mem., at 7.) As noted, PSI alleges that, in or about March 2001, DIB induced RealWorld to terminate the MVADA with PSI, although RealWorld had no legitimate basis for doing so. (TAC Count XII ¶¶ 43-44.)

> FN30. As noted, PSI alleges that the Source Code Agreement between RealWorld and DIB provided that RealWorld would (1) deliver to DIB a copy of the Accounting

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 17
Not Reported in F.Supp.2d, 2004 WL 1660814 (N.D.Ill.), 2004 Copr.L.Dec. P 28,844
(Cite as: Not Reported in F.Supp.2d)

Suite and (2) "cooperate in any litigation which would be brought by PSI related to the unlimited license for the Accounting Suite and to indemnify it from PSI's claims."(*Id.* Count VI ¶¶ 35, 38-39, Count XII ¶¶ 40-41.)

**\*19** In *Higher Gear Group, Inc. v. Rockenbach Chevrolet Sales, Inc.,* 223 F.Supp.2d 953, 956 (N.D.Ill.2002), plaintiff, which developed and sold software to automobile dealerships, had developed computer software and agreed to license it to defendant Rockenbach Chevrolet Sales, Inc. ("Rockenbach"), an automobile dealership, on the condition that Rockenbach not re-license or sell the software to third parties and not copy or create derivative works from the software. Plaintiff claimed that Rockenbach breached this agreement by allowing defendant Auto eDirect.Com, Inc. ("Auto eDirect"), which also developed and sold software to automobile dealerships, to view, access, and copy that software. *Id.* Plaintiff also brought a tortious interference with contract claim against Auto eDirect based on Auto eDirect creating software that "closely functioned and resembled [plaintiff's] licensed software."*Id.* at 959.In concluding that the Copyright Act preempted plaintiff's tortious interference claim, the court found that claim was based on Auto eDirect's creation of software that resembled and functioned similarly to plaintiff's licensed software, and thus that the allegations were not qualitatively different from unauthorized copying, the conduct necessary to support a copyright infringement claim. *Id.*

In contrast, PSI's counterclaim is based on DIB's alleged inducement of a licensor of copyrighted material (RealWorld) to breach its contract with PSI, rather than on DIB's creation of allegedly infringing software. In the court's view, DIB's alleged inducement of RealWorld to breach its License Agreement with PSI constitutes an "additional element" that differs in kind from those necessary for the alleged infringement of PSI's underlying copyright. *Balt. Orioles, Inc. v. Major League Baseball Players Ass'n,* 805 F.2d 663, 677 n. 26 (7th Cir.1986). In other words, PSI's tortious interference with contract claim is based on DIB's allegedly inducing RealWorld to terminate its MVADA with PSI, not on DIB's infringement of PSI-owned software. The court notes, further, that PSI alleges all five elements of a tortious interference claim: (1) it had a valid and enforceable contract with RealWorld;

(2) DIB was aware of this contractual relation; (3) DIB intentionally and unjustifiably induced breach of the contract; (4) RealWorld subsequently breached the contract, caused by DIB's wrongful conduct; and (5) PSI sustained damages. *See Voelker,* 353 F.3d at 527-28. The court finds, therefore, that the Copyright Act does not preempt PSI's tortious interference counterclaim.

B. Preemption by Illinois Trade Secrets Act

Finally, DIB claims that the ITSA preempts PSI's tortious interference counterclaim on the ground that it is predicated on the same alleged conversion of information or property that gives rise to its trade secret misappropriation claim. (Counts IX-XII Mem., at 13.) As with its Copyright Act preemption argument, DIB notes that PSI alleges in its tortious interference counterclaim that DIB entered into the November 30, 2000 Source Code Agreement with RealWorld "in part, in a wrongful attempt to legitimize DIB's use of PSI's copyrighted code without PSI's consent."(TAC Count XII ¶ 41.) DIB urges that this allegation merely states that DIB misappropriated PSI's trade secret and that all of the other acts alleged in PSI's tortious interference counterclaim relate back to such misappropriation. (Counts IX, XI, XII Reply Mem., at 11.) In support, DIB notes that in *Thomas & Betts,* 108 F.Supp.2d at 974, the court granted summary judgment to defendants on plaintiff's tortious interference with business relations claim on the basis of preemption under § 8 of the ITSA. The court noted that plaintiff cited the same acts of wrongdoing that comprised its unfair competition allegations and argued that this conduct damaged its relationships with its customers. *Id.*"In other words, [plaintiff] claims that defendants tortiously interfered with [its] relationships with its customers by engaging in a misappropriation of-i.e., unauthorized 'use of (765 ILCS 1065/2(b)(2))-trade secrets and confidential information."*Id.*

**\*20** PSI responds that its tortious interference counterclaim is based on DIB's alleged interference with the MVADA between PSI and RealWorld, not on misappropriation of trade secrets, and that its tortious interference counterclaim "would lie irrespective of whether DIB took PSI's trade secrets."(Counts IX-XII Opp. Mem., at 11-12.) As noted above, unlike plaintiff in *Thomas & Betts,* PSI alleges that DIB interfered with its relationship with a licensor of software (RealWorld), (TAC Count XII ¶ 40), as well as relations with PSI's relations with its

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 18
Not Reported in F.Supp.2d, 2004 WL 1660814 (N.D.Ill.), 2004 Copr.L.Dec. P 28,844
**(Cite as: Not Reported in F.Supp.2d)**

existing customers, rather than on DIB's misappropriation of trade secrets. (*Id.* ¶ 47.)In other words, PSI's ITSA claim is based on DIB's alleged misappropriation of PSI's trade secrets in violation of its License Agreement with PSI, while PSI's tortious interference with contract claim stems from DIB's alleged interference with the MVADA between PSI and RealWorld. As these claims involve two distinct contracts, the court finds that PSI's counterclaim is not preempted by the ITSA.

## *CONCLUSION*

The court grants in part and denies in part the Motion of Do It Best and Thomas Burroughs to Dismiss Counts IX, X, XI, and XII (Doc. No. 121-1). Specifically, the court dismisses PSI's Amended Count IX without prejudice to refiling, but denies the motion to dismiss with respect to Amended Counts X, XI, and XII. The court denies Thomas Burroughs's Motion to Dismiss Amended Count X (Doc. No. 152-1), and grants Do It Best's Motion to Dismiss Amended Count IX (Doc. No. 153-1) without prejudice. Defendants are directed to file answers to Amended Counts X, XI, and XII within 21 days.

N.D.Ill.,2004.
Do It Best Corp. v. Passport Software, Inc.
Not Reported in F.Supp.2d, 2004 WL 1660814 (N.D.Ill.), 2004 Copr.L.Dec. P 28,844

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                          Page 1
Not Reported in F.Supp.2d, 2005 WL 2445898 (N.D.Ill.), 78 U.S.P.Q.2d 1662
(Cite as: Not Reported in F.Supp.2d)

HCentral Mfg. Co. v. Brett
N.D.Ill.,2005.

United States District Court,N.D. Illinois, Eastern
Division.
CENTRAL MFG. CO., Stealth Industries, Inc., and Leo
Stoller Plaintiffs,
v.
George BRETT & Brett Brothers Sports International,
Inc. Defendants.
No. 04 C 3049.

Sept. 30, 2005.

Robert N. Weiner, Jarett and Weiner, Northfield, IL, for
Plaintiff.
James Michael Keyes, Preston Gates & Ellis, LLP,
Spokane, WA, John J. Beribak, Scott D. McKenna, Best,
Vanderlaan & Harrington, Chicago, IL, Marc C. Levy,
Preston Gates & Ellis LLP, Seattle, WA, for Defendants.

MEMORANDUM OPINION AND ORDER
COAR, J.
*1 Before this Court are the parties' cross-motions for
summary judgment on Plaintiffs' claims of trademark
violation, request for preliminary and permanent
injunctions against Defendant, 15 U.S.C. § 1116, Lanham
Act violations, 15 U.S.C. § 1125(a), and Illinois
Deceptive Trade Practices Act, 815 ILCS 510/1et seq. For
the reasons set forth below, Plaintiffs' motion for
summary judgment is denied; and Defendant's motion for
summary judgment is granted. This Court hereby cancels
Plaintiffs' '249 Registration.

I. BACKGROUND

Plaintiff Leo Stoller and his stable of corporate entities
are no strangers to the legal system and are particularly
familiar with the courts in this district. Indeed, as several
judges (including this one) have previously noted, Stoller
appears to be running an industry that produces often
spurious, vexatious, and harassing federal litigation. See,
e.g., S Indus., Inc. v. Stone Age Equip., Inc., 49
U.S.P.Q.2d 1071 (N.D.Ill.1998) (Castillo, J.) (Stoller
spawned "litigation lacking in merit and approaching
harassment"); S Indus., Inc. v. Hobbico, 940 F.Supp. 210,
211 (N.D.Ill.1996) (Shadur, J.) (Stoller "appears to have
entered into a new industry-that of instituting federal
litigation"). Unlike a public corporation, which would be
accountable to its shareholders, Stoller's corporate entities
appear impervious to Stoller's repeated losses in federal
courts in this district and beyond. A search of the court
filing system discloses that Plaintiff and one or more of
his corporate entities have been involved in at least 49
cases in this district alone.FN1Of these, at least 47 purport
to involve trademark infringement. At least 13 of these
cases have been reported in online legal databases such as
LEXIS and Westlaw. No court has ever found
infringement of any trademark allegedly held by Stoller or
his related companies in any reported opinion. In fact,
courts in this district have ordered Stoller or his corporate
entities to pay defendants' attorneys' fees and costs in at
least six reported cases. S Indus., Inc. v. Ecolab Inc., 1999
WL 162785 (N.D.Ill. Mar.16, 1999) (Gottschall, J.); S
Indus., Inc. v. Stone Age Equip., Inc., 12 F.Supp.2d 796,
798-99, 819-20 (N.D.Ill.1998) (Castillo, J.); S Indus., Inc.
v. Centra 2000, Inc., 1998 WL 157067 (N.D.Ill. Mar.31,
1998) (Lindberg, J.), aff'd by249 F.3d 625, 627-29 (7th
Cir.2001); S Indus., Inc. v. Diamond Multimedia Sys.,
Inc., 991 F.Supp. 1012 (N.D.Ill.1998) (Andersen, J.); S
Indus., Inc. v. Diamond Multimedia Sys., Inc., 17
F.Supp.2d 775 (N.D.Ill.1998) (Andersen, J.); S Indus.,
Inc. v. Diamond Multimedia Sys., Inc.,1998 U.S. Dist.
LEXIS 14470 (N.D.Ill. Sept. 10, 1998) (Andersen, J.); S
Indus., Inc. v. Kimberly-Clark Corp.,1996 U.S. Dist.
LEXIS 9567, at *3-*4 (N.D.Ill. July 1, 1996) (Shadur, J.);
S Indus., Inc. v. Hobbico, Inc., 940 F.Supp. 210, 212
(N.D.Ill.1996) (Shadur, J.). The present case bears all the
hallmarks of a typical Leo Stoller trademark infringement
suit.

    FN1. See Appendix I at the end of this opinion.

*2 Stoller's trademark infringement lawsuits typically
arise in the following way. An entity markets a product
that bears some version of the name "Stealth" or has a
description pertaining to "stealth"-like qualities. Plaintiffs
send what Stoller deems a cease-and-desist letter to the
alleged infringer, along with an offer to "license" the
"Stealth" mark. If the alleged infringer refuses to agree to
Plaintiffs' license demands or to cease using "Stealth,"
then Plaintiffs bring a trademark infringement suit.

The sheer number of cases Plaintiffs have filed in this
district raise serious questions about Plaintiffs' and
Plaintiffs' counsel's good faith. In fact, several courts in
this district have noted explicitly that Plaintiffs deal in
meritless claims and bad faith litigation. See, e.g, Stone

Not Reported in F.Supp.2d                                                                                                  Page 2
Not Reported in F.Supp.2d, 2005 WL 2445898 (N.D.Ill.), 78 U.S.P.Q.2d 1662
(Cite as: Not Reported in F.Supp.2d)

*Age Equip.,* 12 F.Supp. at 798.

### Defendants

Plaintiffs' present dispute is with Brett Bros. Sports International, Inc. and George Brett (collectively "Brett Bros."). Brett Bros. is a Washington corporation with its principal place of business in Spokane, Washington. George Brett, a 1999 Baseball Hall of Fame inductee, has been president of the corporation since June 2001. Since 1997, Brett Bros.[FN2] has been manufacturing and selling baseballs, baseball bats, baseball gloves, and other baseball related accessories throughout North America and overseas. Specifically, Brett Bros. manufactures and sells eight different models of wooden baseball bats that are used from Little League Baseball to Major League Baseball and at all levels in between. One of the Brett Bros. most popular bat models is the Stealth baseball bat. Both the Little League Baseball Association and the National Collegiate Athletic Association have recognized the Brett Bros.' Stealth bat as approved equipment. Brett Bros. currently sells its bats, including the Stealth model bat, through retail outlets and directly to consumers over the internet. Brett Bros. registered the domain name <http:// www.brettbats.com> on May 14, 1999, and hosts a website at that domain to advertise and sell its baseball related products, including the Stealth bat. (Def.'s L.R. 56.1(a), Ex. D).

FN2. Brett Bros. was started in April 1997 as Tridiamond Sports, Inc., by Joe Sample and several other individuals. Tridiamond began manufacturing and selling three models of wooden baseball bats, the Mirador, the Stealth, and the Bomber. Tridiamond formed a relationship with former Major League baseball player and Baseball Hall of Fame inductee George Brett, and his brothers Ken, John, and Robert Brett, all of whom have played baseball professionally. The Brett brothers purchased a 50% interest in Tridiamond, after which the company changed its name to Brett Brothers Bat Company. Subsequently, in recognition of the fact that company had expanded to a full line of baseball-related products and had customers around the world, the company changed its name again, to Brett Brothers Sports International, Inc. George Brett is currently the president of Brett Bros., and Joe Sample and Robert Brett are the vice-presidents.

Brett Bros.' first documented sale of its Stealth bat occurred on July 13, 1999, when it sold twelve Stealth bats to Tim Nolan of Pro-Cut in Rockford, Illinois. (Def.'s L.R. 56.1(a), Ex. D; Ex. H). Since 1999, Brett Bros. asserts that it has sold over 25,000 Stealth bats to vendors, distributors, the NCAA, educational institutions, and private individuals through its website, and phone, fax, tradeshow, and third-party sales. (Def.'s L.R. 56.1(a), Ex. D).

### Plaintiffs

Plaintiff Central Manufacturing, Inc. (which also does business as Central Manufacturing Co.) is a Delaware corporation with its principal place of business in Chicago, Illinois. Plaintiff Stealth Industries, Inc. is also a Delaware corporation with its principal place of business in Chicago. Plaintiff Leo D. Stoller is the president and sole shareholder of both Central Manufacturing and Stealth Industries, in addition to several other corporate entities including S Industries, Inc., and Sentra Manufacturing. Central is also the owner of Rentamark.com, a service mark used as a licensing agency through which Plaintiffs enter licensing agreements with third-party entities or corporations for use of their marks on a wide array of products. Plaintiffs assert that Central Manufacturing Company has become the registrant and/or assignee of "33 federally registered Stealth or Stealth formative marks."(Pls.' Summ. J. Br., at 2.) In their summary judgment brief, Plaintiffs contend that "Plaintiffs' use of the mark STEALTH as a trade name, 'house' mark, and service mark began in 1981 and has continued until the present."(Pls.' Summ. J. Br., at 6.) In addition, they provide 51 alleged licensing or settlement agreements between one of Leo Stoller's companies and a third-party for use of the word "Stealth" on products ranging from hand tools to make prosthetic limbs to construction consulting services to track lighting.

### Present Dispute

*3 In their Amended Complaint, Plaintiffs assert that they are "engaged in the business of marketing, promoting, licensing and selling in interstate commerce a broad range of goods...." (Am.Compl., ¶ 7). In addition, Plaintiffs allege that they have been using the word "Stealth" as a trade name and trademark to identify their products and businesses continuously since at least 1982. (Am.Compl.¶ 8). On October 5, 2004, pursuant to Rule 34 of the Federal Rules of Civil Procedure, Brett Bros. issued document production requests to Plaintiffs, requiring them to produce "any and all documents showing the volume of sales for goods (including, but not limited to baseball bats, baseballs, or any other sports equipment) bearing Plaintiffs' alleged mark 'Stealth'." Plaintiffs failed

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                        Page 3
Not Reported in F.Supp.2d, 2005 WL 2445898 (N.D.Ill.), 78 U.S.P.Q.2d 1662
(Cite as: Not Reported in F.Supp.2d)

to respond. On January 4, 2005, this Court entered an order requiring Plaintiffs to comply with all outstanding discovery requests by January 25, 2005. Plaintiffs again failed to comply and did not produce any documents by the deadline. Plaintiff Leo Stoller appeared for his deposition on February 8, 2005, and stated that he possessed invoices for baseball bats, but failed to produce any of those documents then or subsequently. Instead, he produced a softball and a piece of paper he alleged was an advertising flyer for a "Stealth baseball." (Stoller Dep., at 34-35). Stoller testified at his deposition that he has sold baseball bats to Montgomery Wards, Venture, Lucky Jemco, Zayre's, Ames, Service Merchandise, Best Products, Sports Mart, Brown's Sporting Goods, Walmart and Sears stores. Further, he stated that he has invoices for baseball bats from these alleged customers, but did not produce them at his deposition or at any other time. In addition, he alleged he has purchase orders from other customers for "Stealth" baseball bats; he has not produced those purchase orders either at any point in this litigation.

On February 11, 2005, Stoller provided Brett Bros.' counsel with documents he characterized as "sales records," purporting to show that Plaintiffs actually sold baseball bats bearing the mark Stealth. The documents included a "Stealth Brand Baseball Sales" document, consisting of a listing of yearly "sales" figures with no itemization or breakdown; a "Sales Quote Sheet" addressed to Best Products and dated January 15, 1988; a "Sales Quote Sheet" addressed to Venture Stores and dated February 11, 1991; a "Sales Quote Sheet" addressed to F.W. Woolworth and dated January 10, 1994; and a "Sales Quote Sheet" addressed to Montgomery Wards and dated December 3, 1997. These alleged records do not reflect any actual sales of any products, nor any orders for any products. In his deposition, Stoller testified that he "[didn't] know the exact quantity of sales to each [customer]" and that he didn't "know the dollar figure" of any sales. He could not remember when he allegedly sold bats, but testified that he sold approximately $10,000 worth of bats, a figure "that comes from [his] memory." (Stoller Dep., at 197-99, 211-13).

*4 On February 23, 2005, at a document inspection, Stoller produced a printout of a spreadsheet which he claimed showed sales some of Plaintiffs' Stealth-branded products between 1988 and 2003. Stoller contends that the spreadsheet does not reflect the sales of its alleged licensees' "Stealth" products during that time period. The sales spreadsheet shows that baseball bats were not included in the list of sporting goods bearing the mark "Stealth" and purportedly sold by Plaintiffs during the period from 1988 to 2003.

Plaintiffs' Trademark Registrations

On August 29, 1984, Stoller, then doing business as Sentra Sporting Goods U.S.A. Co., filed Registration No. 1,332,378 ("the '378 Registration") with the United States Patent and Trademark Office (the "US PTO") for "Sporting goods, specifically, tennis rackets, golf clubs, tennis balls, basketballs, baseballs, soccer balls, golf balls, cross bows, tennis racket strings and shuttle cocks." The '378 Registration does not include baseball bats. On February 9, 2001, Plaintiff Central Manufacturing filed Registration No. 2,892,249 ("the '249 Registration") with the U.S. PTO for "Baseball, softball, T-ball bats." The '249 Registration lists a first use date of the Stealth mark for baseball bats as January 3, 2001.

Alleged License Agreement With Easton

In their Amended Complaint, Plaintiffs contend that they licensed the '378 Registration to Jas. D. Easton, a wholesaler of sporting equipment, including baseball-related equipment. Plaintiffs produced what they allege is a "Stealth Trademark License Agreement" ("the Easton Agreement"), entered into by RENTAMARK.COM, as the licensor, and Jas. D. Easton, as the licensee, on June 3, 2003. Stoller contends that RENTAMARK.COM is a service mark, Registration No. 2,371,075, owned by Central Mfg. Co.[FN3] Neither RENTAMARK.COM nor Jas. D. Easton is a Plaintiff in this action. Furthermore, none of the named Plaintiffs in the instant case were included as parties to the Easton Agreement. Stoller, however, maintains that Central Mfg. Co., as the alleged owner of the service mark Rentamark.com, was a party to the Easton Agreement, but has failed to produce evidence that supports his characterization of the relationship between Central Mfg. and Rentamark.com.

> FN3. Plaintiffs included a declaration by Leo Stoller in their responsive L.R. 56.1(b) materials, to which a copy of the Rentamark.com registration was allegedly attached. No such attachment was included with the materials filed before this Court.

Plaintiffs state that they learned of Defendants' allegedly infringing use of the Stealth mark on baseball bats in early 2004 and brought the instant suit. Presently before this Court are both Plaintiffs' and Defendants' motions for summary judgment.

II. STANDARD OF REVIEW

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                          Page 4
Not Reported in F.Supp.2d, 2005 WL 2445898 (N.D.Ill.), 78 U.S.P.Q.2d 1662
(Cite as: Not Reported in F.Supp.2d)

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."FED.R.CIV.P. 56(c); *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Lucas v. Chicago Transit Auth., 367 F.3d 714, 720* (7th Cir.2004). A genuine issue of material fact exists for trial when, in viewing the record and all reasonable inference drawn from it in a light most favorable to the non-movant, a reasonable jury could return a verdict for the non-movant. *Anderson, 477 U.S. at 248.* The movant bears the burden of establishing that there is no genuine issue of material fact remaining in dispute. *Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931* (7th Cir.1995). If the movant meets this burden, the non-movant then must set forth specific facts that demonstrate the existence of a genuine issue for trial.FED.R.CIV.P. 56(e); *Celotex, 477 U.S. at 324.* Rule 56(c) mandates the entry of summary judgment against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial."*Celotex, 477 U.S. at 322.* A mere scintilla of evidence in support of the non-movant's position is not sufficient to defeat a summary judgment motion. Rather, the non-movant must provide evidence that would enable a reasonable jury to find in favor of the non-movant. *Anderson, 477 U.S. at 250.*

*5 On cross-motions for summary judgment, the traditional standards for summary judgment apply and each movant must individually satisfy the Rule 56 requirements. *Blum v. Fisher and Fisher, Attys. at Law, 961 F.Supp. 1218, 1222 (N.D.Ill.1997).* Thus the Court will consider the merits of each cross-motion separately and draw all reasonable inferences and resolve all factual uncertainties in favor of the non-movant.

Before analyzing any of the arguments, this Court must remind the parties that statements of fact are exactly what the name suggests: statements of *fact*, not argument. Throughout their Local Rule 56.1 filings of "fact," both parties engage in extensive and highly improper legal argument. Although strongly tempted to strike all the pleadings and order the parties to submit filings that accord with the rules and the local rules of this District, this Court, in its discretion, will simply disregard all the inappropriate legal arguments raised in the statements of fact. *See Malec v. Sanford, 191 F.R.D. 581 (N.D.Ill.2000)*

(setting forth clearly and concisely the pleading requirements under Rule 56 and Local Rule 56.1).

## III. ANALYSIS

### A. Defendants' Motion for Summary Judgment

Defendants move for summary judgment because they allege that Plaintiffs [FN4] cannot produce evidence to support their claim that they have senior user trademark rights in the world "Stealth" on baseballs or baseball bats. Even if Plaintiffs do have a trademark on "Stealth" for baseball goods, Defendants contend that Plaintiffs abandoned the mark with no intent to resume use or, if this Court does not find the mark abandoned, that there is no likelihood of confusion between Plaintiffs' usage and Defendants' products. Finally, Defendants seek cancellation of Plaintiffs' '249 Registration on the ground that Brett Bros, undisputedly had prior use of the mark "Stealth" for baseball bats.

> FN4. This Court notes that Plaintiffs provide only a conclusory statement of standing for each named Plaintiff. With respect to plaintiff Stealth Industries, Inc., standing is not clearly established. For the purposes of these summary judgment motions only, this Court will assume that the three plaintiffs have standing. This Court makes no finding as to standing at this time, however.

#### 1. Federal Trademark Claims

In a trademark infringement action, "the plaintiff must demonstrate: (1) the validity of its trademark; and (2) the infringement of that mark."*Platinum Home Mortgage Corp. v. Platinum Fin'l Group, Inc., 149 F.3d 722, 726* (7th Cir.1998).

##### a. Validity of Plaintiff's Trademark

A trademark registration "is admissible into evidence to establish registrant's rights on a prima facie basis but ... an opposing party may prove any legal or equitable defense ... which might have been asserted if the mark had not been registered."*Union Carbide Corp. v. Ever-Ready, Inc., 531 F.2d 366, 378* (7th Cir.1976). Defendant Brett Bros. claims that Plaintiffs do not own the mark "Stealth" for baseball goods because Plaintiffs cannot show actual use of the mark in connection with an established, presently existing, and ongoing business. *Zazú Designs v. L'Oréal, S.A., 979 F.2d 499, 503* (7th Cir.1992) ("By

Not Reported in F.Supp.2d                                                                                         Page 5
Not Reported in F.Supp.2d, 2005 WL 2445898 (N.D.Ill.), 78 U.S.P.Q.2d 1662
(Cite as: Not Reported in F.Supp.2d)

insisting that firms use marks to obtain rights in them, the law prevents entrepreneurs from resreving brand names in order to make their rivals' marketing more costly.") Defendants point to Plaintiffs' unsupported assertions or unauthenticated evidence of small amounts of sales, the lack of invoices or receipts that would evidence business transactions to demonstrate that Plaintiffs do not own "Stealth" for baseball bats or baseballs. *See S Indus., Inc. v. JL Audio, Inc.,* 29 F.Supp.2d 878, 887 (N.D.Ill.1998). Plaintiffs, by contrast, offer a copy of an Easton Sports catalog, which it contends demonstrates that its alleged licensee was active in the baseball market. In addition, Plaintiffs provide "Sales Quote Sheets" dating from 1988, 1991, 1994, and 1997. Finally, Plaintiffs provide a baseball and an alleged advertising flyer. The law, however, is clear that "mere advertising and documentary use of a notation apart from the goods do not constitute technical trademark use."*Powermatics, Inc. v. Globe Roofing Prods. Co.,* 52 C.C.P.A. 950, 341 F.2d 127, 130 (C.C.P.A.1965); *see also Avakoff v. S. Pac. Co.,* 765 F.2d 1097, 1098 (Fed.Cir.1985). Other than testimonial evidence, Plaintiffs have failed entirely to provide admissible evidence that they offered "Stealth" baseball items in the market at any time. Plaintiffs produced a table of "Stealth Brand Baseball Sales" between 1996 and 2003, but could provide absolutely no information to justify the lump sum "sales" figures listed. There is no way for this Court to know that this alleged sales sheet bears any relation to reality and is not simply something Plaintiffs generated on a home computer for the purposes of this litigation. This spreadsheet is conclusory and, in any event, makes no attempt to itemize sales by product description or type. Without documentation to show to whom the alleged sales were made or whether the goods involved were in fact "Stealth" brand, it is not valid evidence. The alleged "Sales Quote Sheets" Plaintiffs claim they provided to various corporations between 1988 and 1997 are likewise inadmissible. They purport to be a list of various Stealth products with corresponding prices. There is absolutely no evidence that these products ever existed except as lines on a piece of promotional paper or that any of these corporations ordered even one item from Plaintiffs. Moreover, these "Sales Quote Sheets" fail to rise above "mere advertising of a product" and are insufficient to establish continuous use. *Avakoff,* 765 F.2d at 1098. In short, Plaintiffs have failed completely to support their claim that they actually used the "Stealth" mark in connection with an established, presently existing, and ongoing business prior to Brett Bros. use of the word "Stealth" on baseball bats in 1999. This Court therefore finds that Plaintiffs do not own the mark "Stealth" for baseballs or baseball bats.

### 2. Trademark Abandonment

*6 Defendants allege that even if Plaintiffs once owned "Stealth" for use with baseball related goods, they abandoned the mark after two decades of non-use with no intent to resume use of the mark for any legitimate commercial purpose. Under the Lanham Act, a mark will be deemed abandoned when its use is discontinued with an intent not to resume use. 15 U.S.C. § 1127. When not explicitly stated, the intent not to resume use can be inferred from the circumstances of the case. Specifically, three consecutive years of nonuse serves as prima facie evidence of abandonment. 15 U.S.C. § 1127. The statutory language clarifies that " 'use' of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark."*Id.* Under the Lanham Act, Plaintiffs would have to be able to show that they did not discontinue use of the mark for three or more consecutive years. Plaintiffs fail utterly in this regard. In fact, Plaintiffs did not produce any invoices, purchase orders, cancelled checks, bank statements, or any other indicia of a commercial transaction involving the sale of even one "Stealth" baseball-related product.[FN5]

> FN5. Plaintiffs contend that Defendants' failure to oppose Plaintiffs' prior similar registrations of the word "Stealth" for other purposes-a practice of dubious validity in itself-means that Plaintiff should prevail even if Defendants establish abandonment. Plaintiffs attempt to base this argument on *Morehouse Manufacturing Corp. v. J. Strickland & Co.,* 56 C.C.P.A. 946, 407 F.2d 881 (C.C.P.A.1969). The prior registration or *Morehouse* defense is inapplicable here, as Defendants note, because it is an equitable defense "to the effect that if the opposer can not be further injured because there already exists an injurious registration, [then] the opposer can not object to an additional registration that does not add to the injury."*O-M Bread, Inc. v. U.S. Olympic Comm. .,* 65 F.3d 933, 938 (Fed.Cir.1995). Here, Plaintiffs do not seek to register a mark nor Defendants to oppose a registration. Instead, Defendants seek to demonstrate that Plaintiffs have abandoned.

At his deposition, Plaintiff Leo D. Stoller testified that he had sold baseball bats to at least three retailers [FN6] and had purchase orders reflecting those sales. He could not remember the quantity of bats sold, the dollar amount of the sales, or when the sales occurred, but stated that he sold about $10,000 worth of bats between 1989 and 2003.

Not Reported in F.Supp.2d                                                                                                Page 6
Not Reported in F.Supp.2d, 2005 WL 2445898 (N.D.Ill.), 78 U.S.P.Q.2d 1662
(Cite as: Not Reported in F.Supp.2d)

He did not produce the alleged purchase orders at any time in this litigation.[FN7] After his deposition, Stoller produced four "Sales Quote Sheets" which purport to show "quotes" for various "Stealth" products to Best, Venture, Woolworth, and Montgomery Ward for approximately $900 each. But as previously noted, "quotes" do not suffice as evidence of sales or "bona fide use of [a] mark made in the ordinary course of trade." 15 U.S.C. § 1127. Moreover, these quote sheets contradict Stoller's deposition testimony. The quoted amounts only amount to $3,321.60 worth of bat sales, instead of the $10,000 claimed in Stoller's deposition. Plaintiffs' quote sheets also reflect $376.49 in baseball sales between 1988 and 2003, but the "baseball sales sheets" claim $101,489 worth of "Stealth" baseball sales in the same time period. Finally, the "baseball sales sheet" makes absolutely no mention of baseball *bat* sales. In fact, given the near total dearth of documentary evidence supporting Plaintiffs' contentions of mark usage, it is far more reasonable to find that Plaintiffs' actions amount to, at best, an attempt "merely to reserve a right in the mark" for baseless, harassing litigation such as this. This Court finds that Plaintiffs abandoned the "Stealth" mark with respect to baseballs before Defendants began to use it on baseball bats in 1999.

> FN6. The retailers Stoller identified were Montgomery Wards, Venture, and Best Products, all of which have subsequently ceased operations.

> FN7. The failure to produce documents comes as little surprise. In his deposition testimony, Stoller recounted that when he has no set practice for handling purchase orders or invoices. Sometimes he generates them, sometimes he does not. Stoller also testified that he had no record maintenance policy. He stated that he maintained records in banker boxes in his office but did not know how many years' worth of records he had. Stoller Dep. at 174-79.

### 3. Likelihood of Confusion

Defendants assert that even if Plaintiffs own a "Stealth" mark for use with baseball bats, there is no likelihood of confusion between Defendants' products and Plaintiffs' products. Thus, Defendants contend that judgment should be entered in their favor.

### B. Plaintiffs' Motion for Summary Judgment

### 1. Trademark Infringement

*7 Plaintiffs assert that because they registered the '378 Registration [FN8] on April 23, 1985, and re-registered it on March 18, 1993, they have priority of use of the mark "Stealth" for sporting goods, including baseballs and baseball bats. Specifically, Plaintiffs contend they are the senior user of the mark for all baseball related products. Further, Plaintiffs claim that "nine of the 33 STEALTH trademarks [Stoller] owns cover sporting goods products that closely relate to Defendants' use of STEALTH with baseball bats."(Pls.' Summ. J. br., at 7). Plaintiffs filed an application for a trademark on baseball bats on February 9, 2001, providing a date of first use of January 3, 2001. The U.S. PTO granted that application as the '249 Registration, which Plaintiffs registered on October 12, 2004, well after Plaintiffs filed the instant case. The Lanham Act permits the registration of trademarks and the enforcement of registered marks. 15 U.S.C. § 1051 *et seq.* To show infringement, Plaintiffs must show that they (1) registered a trademark; (2) which Defendants used in commerce without Plaintiffs' consent; and (3) which created a likelihood of confusion as a result. *See S Indus., Inc. v. GMI Holdings, Inc.,* 1998 WL 67627, *3 (N.D.Ill. Jan.30, 1998).*

> FN8. The '378 Registration encompasses "sporting goods, specifically, tennis rackets, golf clubs, tennis balls, basketballs, baseballs, soccer balls, golf balls, cross bows, tennis racket strings and shuttlecocks."

It is undisputed that Plaintiffs acquired a registration for the use of the word "Stealth" with respect to baseballs in 1985 through the '378 Registration. It is equally clear that Plaintiffs did not acquire a registration for the use of the word "Stealth" with respect to baseball *bats* until October 2004. In addition, Plaintiffs have registered the word "Stealth" for use with a virtual cornucopia of unrelated items, including microwave absorbing automobile paint, lawn sprinklers, window locks, automotive tires, comic books, leather wallets and handbags, hunters' scent camouflage, and orthodontic devices. (Pls.' Summ. J. Br., at 1; Ex. CL1.)

This Court cannot find that Defendants' use of the word "Stealth" with respect to baseball bats violates section 1114 of the Lanham Act. 15 U.S.C. § 1114. Defendants began selling bats through their website in 1999. Plaintiffs did not register the "Stealth" mark for use on baseball bats until October 2004, after more than four years had elapsed. Thus, Defendants' use of "Stealth" on its baseball bats in 1999 could not infringe Plaintiffs' mark under §

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 7
Not Reported in F.Supp.2d, 2005 WL 2445898 (N.D.Ill.), 78 U.S.P.Q.2d 1662
(Cite as: Not Reported in F.Supp.2d)

1114.

Plaintiffs contend that baseball bats are so "closely related" to baseballs that Defendants' use of the word "Stealth" on bats infringes Plaintiffs' mark for baseballs. "Modern trademark law prohibits use of a senior user's mark not only on products that are in direct competition with those of the senior use but also on products that are considered 'closely related' to the senior user's."*Sands, Taylor & Wood Co. v. Quaker Oats Co.,* 978 F.2d 947, 958 (7th Cir.1992), *cert. denied,*507 U.S. 1042, 113 S.Ct. 1879, 123 L.Ed.2d 497 (1993). A "closely related" product is one which could "reasonably be thought by the buying public" to come from the same source or an affiliated source with the owner of the trademark. *Id.* Plaintiffs assert that baseballs and baseball bats are closely related under this definition. The problem with Plaintiffs' argument is that it assumes that they are the senior user for baseballs. This Court finds otherwise.

**\*8** In addition, Plaintiffs have provided no evidence that the public believes that the Defendants' products are manufactured by or otherwise affiliated with the Plaintiffs. The only evidence Plaintiffs offer is unsupported testimony by Leo D. Stoller, president of Central Manufacturing Co., that he has received queries from unidentified members of the public who thought Defendants' baseball products were affiliated with Plaintiffs. As with previous Stoller lawsuits, Plaintiffs provide no documentary evidence to support these assertions or even to demonstrate that such queries took place. *See S Indus., Inc. v. GMI Holdings, Inc.,* No. 96 C 2232, 1998 WL 67627, at \*4 (N.D.Ill. Jan.30, 1998). Plaintiffs fail to produce any sworn testimony from consumers confused about the origin of Defendants' baseball products. Defendants, by contrast, produced sworn statements from several people with longstanding involvement in the sport of baseball as coaches, former players, trainers, and baseball goods representatives, all of whom state that they had never heard of Plaintiffs or Plaintiffs' alleged products. (Nolan Decl., Hostetler Decl., Brett Decl.; Rice Decl.)

Ownership of a trademark is not based solely on registration. Goods also must be used in commerce, meaning that the mark must be affixed to goods, containers, or documents associated with the good, and when the goods are sold or transported in commerce. 15 U.S.C. § 1127. None of Plaintiffs "evidence" establishes that any goods were actually sold or transported in commerce. In fact, it is unclear whether Plaintiffs make any products. It is not clear whether the baseball featured in Plaintiffs flyer is even for sale by Plaintiffs or whether

any baseballs were ever sold.

2. False Designation of Origin and Unfair Competition

Plaintiffs also allege that Defendants violated Section 1125(a) of the Lanham Act by using the "Stealth" mark in false designation of their origin. 15 U.S.C. § 1125(a).Section 1125(a) sweeps more broadly than § 1114, which applies only to registered marks. Under Section 1125(a), Plaintiffs who believe that another person's use of the same mark will cause a likelihood of confusion about the origin of the good may bring a civil action against that person. 15 U.S.C. § 1125(a)(1). To prevail, Plaintiffs must show that they have (1) prior ownership rights in the mark; and (2) that Defendants' use of the mark creates a likelihood of confusion, deception or mistake. *Dunn v. Gull,* 990 F.2d 348, 351 (7th Cir.1993).

a. Ownership Rights

A party acquires a protectable right in a trademark only through the use of that mark in connection with its product. *Zazú Designs v. L'Oréal S.A.,* 979 F.2d 499, 503 (7th Cir.1992). The law insists that "firms use marks to obtain rights in them," thereby preventing "entrepreneurs" or scam artists "from reserving brand names in order to make their rivals' marketing more costly."*Zazú Designs,* 979 F.2d at 503 (citing *Blue Bell, Inc. v. Farah Mfg. Co.,* 508 F.2d 1260, 1264-65 (5th Cir.1975)). Plaintiffs supply a copy of the 2004/2005 Easton Sports catalog to show that they-or their licensee-used the mark in commerce. The only date on the catalog, however, is 2004-2005, which is *after* Defendants admit they began selling Stealth baseball bats. In addition, the Easton catalog is not admissible for multiple reasons, not the least of which are that there is no evidence showing that it was ever sent out to potential customers or that it ever resulted in the sales of even a single bat. Marketing and promotional materials alone are insufficient to constitute trademark use. *Powermatics, Inc.,* 341 F.2d at 130. Plaintiffs also provide an advertising flyer for a STEALTH baseball. This flyer likewise fails to support Plaintiffs' contentions. The flyer provides information on how to contact Plaintiffs for licensing opportunities but does not list sales information like price. The flyer is dated 2003, well after Defendants began selling their products. Like the Easton catalog, the flyer completely lacks any indication about how many baseballs were sold or, indeed, if any were sold at all. Although registration, coupled with slight sales, establishes an exclusive right in the mark against junior users, *S Indus., Inc. v. Space Age Technologies,* 1999 WL 495484, at \*5 (N.D.Ill. June 30, 1999) (citing *Zazú Designs,* 979 F.2d at 503), Plaintiffs have provided

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                           Page 8
Not Reported in F.Supp.2d, 2005 WL 2445898 (N.D.Ill.), 78 U.S.P.Q.2d 1662
(Cite as: Not Reported in F.Supp.2d)

absolutely no credible evidence of baseball product sales to establish their exclusive right in the Stealth mark for baseballs, much less for baseball bats. Thus, Plaintiffs cannot rely on their trademark registrations to establish ownership of the mark with respect to baseball related products.

**\*9** At the common law, "use" means sales to members of the public of a product with the mark in question affixed or attached. *Zazú Designs,* 979 F.2d at 503. Plaintiffs provide a flyer that purports to advertise a Stealth baseball. The flyer indicates how an interested customer could contact Plaintiffs to obtain additional information. There is nothing on the flyer to indicate how to obtain the product or where to see the entire product line (if any); rather the flyer tells consumers how they can learn about Stealth licensing opportunities if they use the contact information. Plaintiffs claim they began selling baseball related products "since at least as early as 1981."(Pls.' Summ. J. Br., at 1.) Yet Plaintiffs provide no documentary evidence of their use of the mark in commerce at any time. Instead, they provide a list of 33 alleged Stealth federal trademark registrations and an assertion that "Plaintiffs' use of the mark STEALTH as a trade name, 'house' mark, and service mark began in 1981 and has continued until the present."(Pls.' Summ. J. Br., at 6.) In addition, they provide 51 alleged licensing or settlement agreements between one of Leo Stoller's companies and a third-party for use of the word "Stealth" on products ranging from hand tools to make prosthetic limbs to construction consulting services to track lighting. Only one of these licensing agreements deals with baseball related products; it purports to be a licensing agreement between Rentamark.com and Jas. D. Easton, Inc. for use of "Stealth" on hockey sticks, hockey shafts, hockey blades, baseball bats, and softball bats, dated May 28, 2003. In support of their motion for summary judgment, Plaintiffs fail utterly to provide any evidence of sales of baseball bats or of any other product. Minimal marketing targeted at a small audience is insufficient to "link the [ ] mark with [the] product in the minds of consumers" or to put other producers on notice of the mark. *Id.* Plaintiffs' flyer does not provide any information about what makes their baseball unique or why a consumer should associate it with Central Manufacturing Co. In fact, Central Manufacturing is not even mentioned on the flyer.

### 3. Likelihood of Confusion

To prevail on a claim of trademark infringement, Plaintiffs must demonstrate a likelihood, not merely a possibility of confusion. *August Storck K.G. v. Nabisco,*

*Inc.,* 59 F.3d 616, 619 (7th Cir.1995). The Seventh Circuit uses a seven-factor test for analyzing likelihood of confusion: (1) similarity between the marks; (2) similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be exercised by consumers; (5) the strength of the plaintiff's mark; (6) actual confusion, if any; and (7) the defendant's intent to "palm-off" its product as originating from or being affiliated with plaintiff. *Rust Env't & Infrastructure, Inc. v. Teunissen,* 131 F.3d 1210, 1216 (7th Cir.1997). No single factor is dispositive.

**\*10** Plaintiffs urge this Court to grant summary judgment in their favor because the '378 Registration, which does not include baseball bats, is a "strong" mark and is sufficiently related to baseball bats to cause a likelihood of confusion. Defendants contend that Plaintiffs have produced no evidence of continuous and bona fide use of the "Stealth" mark prior to Defendants' use or any facts that support the likelihood of confusion argument. But the law does not go so far. "[A firm's] right to use [a mark] only extends as far as the goods noted in the registration." *S Indus., Inc. v. GMI, Inc.,* 1998 WL 67627, at \*3 (N.D.Ill. Jan.30, 1998) (citing *Quill Nat'l Spring Water, Ltd. v. Quill Corp.,* 1994 WL 559237, at \*2 (N.D.Ill. Oct.7, 1994). Plaintiffs allege three different types of confusion: source confusion; sponsorship confusion; and reverse confusion.[FN9]

> FN9. As in previous cases involving Stoller, the reverse confusion and sponsorship confusion claims appear as conclusory statements in Plaintiffs' pleadings and lack any support. They merit no discussion apart from the likelihood of confusion analysis relating to source confusion. *See S Indus., Inc.,* 12 F.Supp.2d at 813 & n. 28.

"Because a trademark is an identifier rather than a property 'right,' the use of a competitor's mark that does not cause confusion as to source is permissible." *Knaack Mfg. Co. v. Rally Accessories, Inc.,* 955 F.Supp. 991, 999 (N.D.Ill. Mar.3, 1997) (citing *Libman Co. v. Vining Indus., Inc.,* 69 F.3d 1360, 1362 (7th Cir.1995)). Although likelihood of confusion is normally a question of fact, it is appropriate to dispose of it at the summary judgment stage if no reasonable fact finder could find in favor of Plaintiffs. *Door Sys., Inc. v. Pro-Line Door Sys., Inc.,* 83 F.3d 169, 173 (7th Cir.1996); *see also S Indus., Inc. v. Stone Age Equip., Inc.,* 12 F.Supp.2d 796, 813 (N.D.Ill.1998).

### a. Similarity of Marks

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 9
Not Reported in F.Supp.2d, 2005 WL 2445898 (N.D.Ill.), 78 U.S.P.Q.2d 1662
(Cite as: Not Reported in F.Supp.2d)

Similarity of marks is determined by looking at similarity in sound, appearance, meaning, and connotation between the name in question and the trademark. _Knaack Mfg. Co., 955 F.Supp. at 1000_. Here, both parties undisputedly use the mark "Stealth." Thus, sound similarity is met. With respect to appearance, Plaintiffs provided a specimen of a "Stealth" bat sold by their alleged licensee, Easton Sports; Defendants provided printouts from their website with photographs of their "Stealth" bats. Based on this evidence, the marks appear different in several ways. The Easton product features "Easton" in large capital block letters on one side of the bat and "Stealth" in large capital block letters on the other side. The words appear in white, with black and gray outlines creating a shadow or three-dimensional effect. The design conveys equally the words "Easton" and "Stealth." By contrast, the Brett Bros. bat has "Brett" printed in large font on both sides of the bat; the "B" of "Brett" has three horizontal lines along its left side, just as the "B" in the company name on the website does. The word "Stealth" appears in significantly smaller letters and a different font. The emphasis is on the word "Brett," conveying that this is a Brett Bros. bat. In addition, George Brett's signature appears directly beneath the name "Stealth," furthering differentiating the mark from the Easton product. The marks also have different connotations. Brett Bros. sells not simply its baseball bats but also its association with George Brett, a Baseball Hall of Fame member. Easton, by contrast, simply uses the mark on a number of products like any one of several other model names, including baseball, t-ball, and softball bats, shoes, pads, mitts, and gloves. Brett Bros. uses it only on bats. These factors militate against finding likelihood of confusion. _See S Indus., Inc., 12 F.Supp.2d at 814_.

### b. Similarity of Products and Area and Manner of Concurrent Use

**\*11** Goods are related if consumers would use them in conjunction with each other. _Knaack, 955 F.Supp. at 1000_. The test for similarity of products asks "whether the products are the kind the public attributes to a single source."_Id._ (citation omitted). Courts examine competitiveness and relatedness in making this determination.

Unlike most of Plaintiffs' previous lawsuits, the products at issue in this case are competitive and related. As Plaintiffs note in their pleadings, baseballs and baseball bats are intimately related in the public mind. But closer examination reveals some key differences in the products. The Easton bat is a metal alloy, as are many of the Easton products. Defendants' bat, however, is wood. Moreover, Defendants' emphasize the fact that they make wood bats as a key factor in their success and a crucial element of their business strategy. Although the difference between a metal alloy bat and a wood bat might not be widely known to the general population, baseball players know the characteristics of each type. Furthermore, only wooden bats are used in Major League Baseball. On balance, the similarity of products analysis favors Plaintiffs only slightly, if at all.

The Court must also consider the area and manner of concurrent use. If the products are sold in the same place and next to one another, or in the same department, then there may be a likelihood of confusion. _Packman v. Chicago Tribune Co., 267 F.3d 628, 646_ (7th Cir.2001). Defendants market their products directly to the consumer through their website; they also have a network of retailers in 48 states across the country who sell their products. Plaintiffs provided an excerpt from an Easton catalog, which contains no order form for direct purchase, but rather provides a list of "Easton Representatives" and their geographic sales areas. Plaintiffs produced no evidence of other sales avenues. The Defendants' website gives price information for their products; specifically, the Stealth bat retails for $49 directly from Brett Bros. There is no information about the price of Plaintiffs' products before this Court. There is almost no likelihood that a customer purchasing a bat through the Brett Bros. website would think that he or she was purchasing a bat from Easton or from Plaintiffs. _Knaack Mfg. Co., 955 F.Supp. at 1001_ ("Knaack has failed to prove that even one of its distributors carried any Rally car covers.... The clear inference from this proof is that there is no overlap in distribution, which also minimizes any possibility of confusion."). Plaintiffs provide no evidence that any retailer sells both parties' goods. Further, neither party has encountered the other in promoting and marketing their products at trade shows or through specialty publications. The evidence suggests that the parties use different venues for their marketing and publicity: Defendants attend specialty baseball trade shows and have retail relationships with sporting good and baseball supply retailers, whereas Plaintiffs simply refer in conclusory fashion to "trade shows." In sum, the evidence before this Court shows no overlapping distribution channels or evidence of direct competition between Plaintiffs and Defendants.

### c. Degree of Care Exercised by Consumers

**\*12** "[W]here consumers are sophisticated, deliberative buyers, confusion is less likely."_Rust Env't, 131 F.3d at_

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 10
Not Reported in F.Supp.2d, 2005 WL 2445898 (N.D.Ill.), 78 U.S.P.Q.2d 1662
(Cite as: Not Reported in F.Supp.2d)

1217. There are multiple baseball bats available to consumers. Defendants are well-known in the baseball equipment field. George Brett, as a member of the Baseball Hall of Fame, was a highly-accomplished baseball player. Other baseball players are likely to accord his product significant deference. Defendants' "Stealth" bat has a suggested retail price of $49, which is sufficiently costly that consumers will exercise care in making a purchase. *See Nike, Inc. v. Just Did It Enters.*, 6 F.3d 12225, 1230 (7th Cir.1993). Plaintiffs fail to provide valid pricing information about their bats or about the price of the allegedly-licensed Easton bats.

### d. Strength of Plaintiffs' Mark

Plaintiffs contend that they have a "strong" mark and that this should support a finding of likelihood of confusion. Trademark "strength" measures the likelihood that a consumer will view a mark as identifying the source of that good. *Knaack Mfg., 955 F.Supp. at 1001.* "Only strong marks are entitled to protection against infringement by non-competing goods."*Telemed Corp. v. Tel-Med Inc.,* 588 F.2d 213, 219 (7th Cir.1978). A strong mark has fame, uniqueness, and volume of usage that give it an edge in the marketplace. *Id.* Plaintiffs bear the burden of demonstrating the strength of their mark.*Knaack, 955 F.Supp. at 1001.* Plaintiffs contend that their mark is strong because it is arbitrary (as opposed to generic), available to be licensed on "virtually any product," and protected by Plaintiffs' "strong policing policy." (Pls.' Summ. J. Br., at 11.) Plaintiffs have used this argument in prior cases and courts have declined repeatedly to find that Platiniffs' mark is strong. *See, e.g., S Indus., Inc. v. JL Audio, Inc.,* 29 F.Supp.2d 878 (N.D.Ill.1998); *S Indus., Inc. v. GMI Holdings, Inc.,* No. 96 C 2232, 1998 WL 67627 (N.D.Ill. Jan.30, 1998). In the absence of credible evidence showing the strength of Plaintiffs' mark, this Court also finds that the mark is weak.

### e. Actual Confusion

Although proof of actual confusion is not required to demonstrate likelihood of confusion, "courts often view evidence of actual confusion as the best evidence of actual confusion."*JL Audio, Inc.,* 29 F.Supp.2d at 893 (citing *Union Carbide Corp. v. Ever-Ready Inc.,* 531 F.2d 366, 383 (7th Cir.1976).*But see Nike,* 6 F.3d at 1231 (stating that "it is certainly proper for the trial judge to infer from the absence of actual confusion that there was also no likelihood of confusion"). "Isolated instances" of actual confusion "have been held insufficient to sustain a finding of likelihood of confusion."*Union Carbide,* 531

F.2d at 383. Plaintiffs do not provide evidence of any instances of actual confusion. This Court concludes that the alleged concurrent use of the mark by the parties since at least 1999 without any incidents of actual confusion strongly weighs against finding any likelihood of confusion.*Stone Age Equip., Inc.,* 12 F.Supp.2d at 818.

### f. Intent to "Palm-Off"

**\*13** The intent to "palm off" is defined as "trying to get sales from a competitor by making consumers think that they are dealing with that competitor, when actually they are buying from the passer off."*Stone Age Equip., Inc.,* 12 F.Supp.2d at 819 (citation omitted); *see also Sands, Taylor & Wood Co. v. Quaker Oats Co.,* 978 F.2d 947, 959 (7th Cir.1992). There is no evidence that Defendants intended to "palm off" their baseball bats as those of Plaintiffs or their licensees. To suggest otherwise is patently frivolous.

The application of the seven factor test for the likelihood of confusion weighs overwhelmingly in Defendants' favor. This is, therefore, a case in which "the evidence is so one-side that there can be no doubt about how the question should be answered."*Door Sys.,* 83 F.3d at 171. Because all of Plaintiffs' Lanham Act claims require a likelihood of confusion, this Court denies summary judgment to Plaintiffs. Summary judgment is granted to Defendants on all Lanham Act claims instead.

### C. Illinois Law Deceptive Trade Practices Claim

Claims brought under the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1*et seq.,* are resolved in the same manner as Lanham Act claims. *D 56, Inc. v. Berry's Inc.,* 955 F.Supp. 908, 920 (N.D.Ill.1997). To prevail, Plaintiffs would have to be able to show that they had a protectable mark and that Defendants' use thereof was likely to cause confusion.*Thompson v. Spring-Green Lawn Care Corp.,* 126 Ill.App.3d 99, 81 Ill.Dec. 202, 466 N.E.2d 1004, 1010 (Ill.App.Ct.1984). For the reasons stated above, this Court denies summary judgment to Plaintiffs on Count III and grants summary judgment to Defendants.

### D. Defendants Entitled to Attorneys' Fees and Costs

Under both the Lanham Act and the Illinois Consumer Fraud and Deceptive Business Practice Act, the court may award attorneys' fees to "prevailing parties." *See*15 U.S.C. § 1117(a); 815 ILCS 505/10a(c); *see also Tri-G, Inc. v. Burke, Bosselman and Weaver,* 353 Ill.App.3d 197, 288

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2445898 (N.D.Ill.), 78 U.S.P.Q.2d 1662
(Cite as: Not Reported in F.Supp.2d)

Ill.Dec. 580, 817 N.E.2d 1230, 1256-57 (Ill.2004). Under the Lanham Act, the case must be "exceptional," while Illinois courts and the Seventh Circuit have construed the Illinois Consumer Act to allow fees when "special circumstances" exist. See *Door Sys., Inc. v. Pro-Line Door Sys.*, 126 F.3d 1028, 1030-32 (7th Cir.1997). Under *Door Systems,* a prevailing defendant must show that plaintiff's suit was "oppressive," meaning that it had elements of abuse of process. *Id.* at 1031-32.As an example, the *Door Systems* court stated that "a suit can be oppressive because of lack of merit and cost of defending even though the plaintiff honestly though mistakenly believes that he has a good case and is not trying merely to extract a settlement based on the suit's nuisance value."*Id.* at 1032 (citations omitted). The standard is "malicious, fradulent, deliberate or willful conduct."*Id.* at 1031 (internal quotations and citations omitted). Here, Plaintiffs' conduct clearly rises to the level of "oppressive." Plaintiffs offered irrelevant, questionable, and seemingly fantastical documents; inconsistent, uncorroborated, or arguably false testimony from Leo Stoller; and a cascade of so-called license or settlement agreements for unrelated products and unrelated marks. In fact, Plaintiffs failed to produce evidence that Plaintiffs or any of their related companies made a single Stealth baseball bat at any time. Further, the enormous range in license fees listed in the alleged license agreements (from $10 to $25,000) strongly suggests what several courts in this district have suspected: that Plaintiffs engage in a pattern and practice of harassing legitimate actors for the purpose of extracting a settlement amount. The judicial system is not to be used as a aid in such deliberate, malicious, and fraudulent conduct.

*14 In addition, Plaintiffs brought the instant suit before they acquired a federal trademark registration for baseball bats. In what can be at best described as artless and more likely as deliberately obfuscatory tactics, Plaintiffs repeatedly attempted to misdirect the court to federal marks or registrations not at issue in this case and so-called license agreements totally unrelated to Defendants' products. Quantity of filings in cases before this Court rarely equate to quality; it is far more common that the reverse is true. Leo Stoller and his companies present paradigmatic examples of litigants in the business of bringing oppressive litigation designed to extract settlement. As such, this Court awards Defendants' attorneys' fees and defense costs under both the Lanham Act and the Illinois Consumer Fraud and Deceptive Business Practices Act.

E. Cancellation of Plaintiffs' '249 Trademark Registration

Courts have the authority to order the cancellation of a trademark registration when warranted pursuant to Section 37 of the Lanham Act. 15 U.S.C. § 1119 ("In any action involving a registered mark the court may ... order the cancelation (*sic* ) of registrations...."). The net effect of Section 37 is to give federal courts concurrent power with the U.S. PTO to conduct cancellation proceedings. 5 MCCARTHY ON TRADEMARKS & UNFAIR COMPETITION § 30:109 (4th ed.2005) (collecting cases). The court may cancel a trademark in an action where the mark's validity is placed in issue. See *Dymo Indus., Inc. v. Tapeprinter, Inc.*, 326 F.2d 141 (9th Cir.1964). Although parties are encouraged to act quickly to protect their valid rights, courts have permitted defendants in trademark infringement suits to seek cancellation despite their failure first to petition the U.S. PTO to cancel. See, e.g., *Informix Software, Inc. v. Oracle Corp.*, 927 F.Supp. 1283 (N.D.Cal.1996).

Defendants argue that the '249 registration is ripe for cancellation because it is less than five years old, 15 U.S.C. § 1064(1), and because it "[c]onsists of or comprises a mark which so resembles ... a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1052(d). Here, it is undisputed that Brett Bros. has been using "Stealth" on its baseball bats for approximately six years, which predates any claimed use by Stoller or his predecessor-in-interest by two years. In addition, the '249 Registration claims "baseball, softball, and t-ball bats," which are identical to the goods Brett Bros. manufactures and sells under the mark. Plaintiffs, predictably, disagree vehemently with Defendants. In support of their registration, Plaintiffs raise the *Morehouse* equitable defense and argue, in disjointed fashion, that Defendants acquiesced to the '249 Registration by not opposing it before the U.S. PTO. But this misstates the law. See *Informix*, 927 F.Supp. 1283. Defendants' failure to oppose Plaintiffs' application for registration of "Stealth" mark for baseball bats does not preclude Defendants' from petitioning for cancellation of the '249 Registration. See *Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366 (1st Cir.1980). This Court finds that Defendants have demonstrated sufficient likelihood of confusion to justify cancelling the '249 Registration.

Conclusion

*15 For the foregoing reasons, this Court DENIES Plaintiffs' motion for summary judgment in its entirety and GRANTS Defendants' motion for summary

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 12
Not Reported in F.Supp.2d, 2005 WL 2445898 (N.D.Ill.), 78 U.S.P.Q.2d 1662
**(Cite as: Not Reported in F.Supp.2d)**

judgment. Defendants are ordered to submit a petition for attorneys' fees and a bill of costs by October 31, 2005. Defendants' request that this Court cancel Plaintiffs' Trademark Registration No. 2,892,249 is GRANTED. The Clerk shall certify this order to the Commissioner for entry upon the records of the United States Patent and Trademark Office. All other pending motions are moot and hereby terminated. This case is closed.

Appendix I

Northern District of Illinois Cases involving Leo Stoller and the "Stealth" Mark

| Case Number | Case Name | Subject Matter |
|---|---|---|
| 88-C-3722 | Slazengers Ltd. v. Stoller et al. | Trademark Infringement |
| 88-C-7215 | Skierkewiecz, et al. v. Gonzalez, et al. | Non-Trademark Infringement |
| 92-C-5622 | Stoller v. Carbaugh et al. | Trademark Infringement |
| 95-C-1634 | Stealth Indus. Inc. v. Victor Stanzel Co., et al. | Trademark Infringement |
| 95-C-2650 | Stealth Indus. Inc. v. Grace Childrens Prods. et al. | Trademark Infringement |
| 95-C-2651 | Stealth Indus. Inc. v. Zebco Inc., et al. | Trademark Infringement |
| 95-C-4509 | Stealth Indus. Inc. v. All Amer. Prod. Inc., et al. | Trademark Infringement |
| 95-C-5788 | Stealth Indus. Inc. | Trademark Infringement |

Not Reported in F.Supp.2d                                                    Page 13
Not Reported in F.Supp.2d, 2005 WL 2445898 (N.D.Ill.), 78 U.S.P.Q.2d 1662
**(Cite as: Not Reported in F.Supp.2d)**

|  |  |  |
|---|---|---|
|  | v. Oceanic USA | t |
| 96-C-1035 | S Indus. Inc. v. Amer Soccer Co., Inc. | Trademark Infringemen t |
| 96-C-1138 | S Indus. Inc. v. Netti Export Corp., et al. | Trademark Infringemen t |
| 96-C-1218 | S Indus. Inc. v. Bard Wyers Sports, et al. | Trademark Infringemen t |
| 96-C-1264 | S Indus. Inc. v. HHA Sports, et al. | Trademark Infringemen t |
| 96-C-1325 | S Indus. Inc. v. ERO Indus. Inc., et al. | Trademark Infringemen t |
| 96-C-1776 | S Indus. Inc. v. Fit Bearings, et al. | Trademark Infringemen t |
| 96-C-2037 | S Indus. Inc. v. World of Weapons, et al. | Trademark Infringemen t |
| 96-C-2038 | S Indus. Inc. v. Pelican Pro Inc., et al. | Trademark Infringemen t |
| 96-C-2166 | S Indus. Inc. v. Wonderwan d, et al. | Trademark Infringemen t |
| 96-C-2231 | S Indus. Inc. v. Lane, et al. | Trademark Infringemen t |
| 96-C-2232 | S Indus. Inc. v. GMI Prof. Access Syst., et al. | Trademark Infringemen t |
| 96-C-3389 | S Indus. Inc. v. Diamond Multimedia, et al. | Trademark Infringemen t |

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                              Page 14
Not Reported in F.Supp.2d, 2005 WL 2445898 (N.D.Ill.), 78 U.S.P.Q.2d 1662
**(Cite as: Not Reported in F.Supp.2d)**

| | | |
|---|---|---|
| 96-C-3524 | S Indus. Inc. v. Centra 2000 Inc., et al. | Trademark Infringement |
| 96-C-3525 | S Indus. Inc. v. NAAN Irrigation Syst., et al. | Trademark Infringement |
| 96-C-3592 | S Indus. Inc. v. Nat'l Baseball Hall of Fame | Trademark Infringement |
| 96-C-3593 | S Indus. Inc. v. Funline Mdse Co., Inc., et al. | Trademark Infringement |
| 96-C-3916 | S Indus. Inc. v. Kimberly-Clark Corp., et al. | Trademark Infringement |
| 96-C-4140 | S Indus. Inc. v. Ecolab Inc. | Trademark Infringement |
| 96-C-4141 | S Indus. Inc. v. Tru-Fit Mkg. Corp. | Trademark Infringement |
| 96-C-4149 | S Indus. Inc. v. Mitsushiba Int'l Inc., et al. | Trademark Infringement |
| 96-C-4434 | S Indus. Inc. v. Brodix Inc., et al. | Trademark Infringement |
| 96-C-4659 | S Indus. Inc. v. JL Audio Inc., et al. | Trademark Infringement |
| 96-C-4951 | S Indus. Inc. v. Stone Age Equip. Inc., et al. | Trademark Infringement |
| 96-C-6047 | S Indus. Inc. v. Tournament Grade, et al. | Trademark Infringement |

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2445898 (N.D.Ill.), 78 U.S.P.Q.2d 1662
(Cite as: Not Reported in F.Supp.2d)

| 96-C-6507 | S Indus. Inc. v. Photostealth Fabric | Trademark Infringement |
| 96-C-6509 | S Indus. Inc. v. Hobbico Inc., et al. | Trademark Infringement |
| 96-C-6538 | S Indus. Inc. v. E-Force Sports, et al. | Trademark Infringement |
| 97-C-1817 | S Indus. Inc. v. Hobbico Inc., et al. | Trademark Infringement |
| 97-C-2787 | S Indus. Inc. v. Space-Age Tech, et al. | Trademark Infringement |
| 97-C-3702 | S Indus. Inc. v. Sunshine Golf | Trademark Infringement |
| 97-C-3703 | S Indus. Inc. v. Tour Advanced Int'l | Trademark Infringement |
| 97-C-3704 | S Indus. Inc. v. NGA Disc Golf | Trademark Infringement |
| 97-C-3705 | S Indus. Inc. v. S E Golf | Trademark Infringement |
| 97-C-3706 | S Indus. Inc. v. Proclub Golfing Co. | Trademark Infringement |
| 97-C-3707 | S Indus. Inc. v. M & M Golf Inc. | Trademark Infringement |
| 99-C-1401 | Hartford Ins. Co. v. Diamond Computer, et al. | Non-Trademark Infringement |
| 00-C-6586 | Stealth Indus. Inc. v. Stealth Sec. Syst., Inc., et al. | Trademark Infringement |

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2005 WL 2445898 (N.D.Ill.), 78 U.S.P.Q.2d 1662
**(Cite as: Not Reported in F.Supp.2d)**

| Case Number | Case Name | Subject Matter |
| --- | --- | --- |
| 00-C-7867 | Centra Software Inc. v. Stoller, et al. | Trademark Infringement |
| 04-C-3049 | Stealth Indus. Inc. v. George Brett & Brett Bros. Sports Int'l, Inc. | Trademark Infringement |
| 05-C-725 | Central Mfg. Co., et al. v. Pure Fishing, Inc., et al. | Trademark Infringement |
| 05-C-2052 | Columbia Pictures Indus., Inc. v. Stoller et al. | Trademark Infringement |

Total Number of Cases: 49

N.D.Ill.,2005.
Central Mfg. Co. v. Brett
Not Reported in F.Supp.2d, 2005 WL 2445898 (N.D.Ill.),
78 U.S.P.Q.2d 1662

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.