In the United States District Court
For the Northern District of Illinois
Eastern Division

DIGISOUND-WIE, INC.,

      Plaintiff,

v.

BESTAR TECHNOLOGIES, INC., et al.,

      Defendants.

07 CV 6535

Judge Lindberg

Magistrate Judge Mason

# Plaintiff's Response to Motion to Dismiss Counts 2, 5, 6, and 10 of Amended Complaint

## 1. ITSA Does Not Preempt Counts 2, 5, 6, and 10

### A. Introduction:  Tort Claims Not Preempted Because They Do Not Allege or Depend on Proving Trade Secret Misappropriation

The Illinois Trade Secrets Act ("ITSA") does not preempt the Amended Complaint's Counts 2 (de Youngs' breach of duty of loyalty), 5 (tortious interference with contract), 6 (tortious interference with business expectancy), or 10 (civil conspiracy) because those counts neither allege nor depend on trade secret misappropriation. *Hecny Transp., Inc. v. Chu*, 430 F.3d 402, 404 (7th Cir. 2005) (ITSA does not preempt tort claims plaintiff could win without proving trade secret misappropriation).  The Amended Complaint's sole allegation of trade secret misappropriation is ¶ 46, which solely supports Count 9 (misappropriation of trade secrets). That paragraph is neither incorporated in nor relied on by any other count, which was done purposely to make clear that the tort claims are not based on trade secret misappropriation.

Defendants try to sow confusion by pointing to the term "misappropriate" in ¶¶ 14, 20, 35, and 51 of the Amended Complaint.  None of those paragraphs refer to trade secret misappropriation, but to defendants' other means to misappropriate Digisound-WIE's sales,

parts, customer relationships, and relationship with CC Electro Sales. None of those are or could

be called trade secret. "Misappropriate" also is not a term unique to trade secrets: It applies to

any wrongful taking property or protected relationships. *E.g., CardioNet, Inc. v. LifeWatch*

*Corp.*, 2008 U.S. Dist. LEXIS 15938, 2008 WL 567223, *3 (N.D. Ill. Feb. 27, 2008)

(misappropriation of medical device); *Clancy v. Coyne*, 244 F. Supp. 2d 894, 898 (N.D. Ill.

2002) (trustee's misappropriation of trust property). Defendants are liable for misappropriating

Digisound-WIE's sales, parts, and relationships regardless of whether they also misappropriated

trade secrets. *Hecny*, 430 F.3d at 404.

## B. The Counts' Specific Allegations of Tortious Conduct

The challenged counts do not allege misappropriation of a trade secret: They allege that

the defendants tortiously stole Digisound-WIE's sales, parts, and relationships. Their specific

allegations are that pursuant to their plan to misappropriate Digisound-WIE's sales and

relationships (¶ 14), the defendants did the following:

1.  While employed as Digisound-WIE's sole employees, the de Youngs competed directly with Digisound-WIE in violation of their duty of loyalty to it (¶ 15);

2.  Dirk de Young competed directly with Digisound-WIE in violation of his Employment Agreement's restriction during and for one year after his employment (¶ 15);

3.  While employed by Digisound-WIE, the de Youngs

    a.  stopped submitting Digisound-WIE orders for BeStar Acoustic (the joint venture) parts (¶ 17),

    b.  ordered, at Digisound-WIE's expense, 45,000 Digisound-trademarked parts from BeStar Acoustic, which were later diverted to BeStar Technologies for sale to Digisound-WIE's customers (¶ 18),

    c.  induced CC Electro Sales to breach its Digisound-WIE contract by

        i.  representing them in offering parts bearing a counterfeit Digisound trademark even though it was

2

> contractually obligated to solely represent Digisound-WIE in offering those parts (¶ 16), and
>
>     ii.    terminating its contract with Digisound-WIE without the contractual minimum 30 days' prior notice (¶ 16 and ¶ 22),
>
>   d.    formed BeStar Technologies with the Greilings and BeStar Electronics' Wu YiFie to carry out the misappropriation of Digisound-WIE's sales and relationships (¶ 19),
>
>   e.    met in China with BeStar Electronics and CC Electro to finalize the remaining steps to take over Digisound-WIE's customers and sales (¶ 20), and
>
>   f.    arranged for office and warehouse space for BeStar Technologies that had the same street address as Digisound-WIE's (¶ 22);

4. Deceived Digisound-WIE that it would continue to send it BeStar Acoustic parts while actually ignoring its orders and instead selling those parts to Digisound-WIE's customers through BeStar Technologies (¶ 23), and;

5. Falsely claimed that Digisound-WIE had failed to pay BeStar Electronics' invoices for BeStar Acoustic parts as an excuse to stop shipping parts and cause it to be unable to fulfill orders, which BeStar Technologies instead filled (¶¶ 24-25).

If Digisound-WIE proves the above, it can recover at trial for breach of the duty of loyalty, tortious interference, and civil conspiracy without also proving trade secret misappropriation.

## C. Since *Hecny*, ITSA Preemption Limited to Claims Dependent On Proving Trade Secret Misappropriation

The Seventh Circuit's decision in *Hecny* holds that ITSA does not preempt a tort claim if the plaintiff could win the tort claim without proving trade secret misappropriation. It implicitly overruled prior "liberal preemption" decisions under ITSA. In *Hecny*, an audit revealed that the company's Chicago manager, Chu, used its assets, personnel, and office for competing ventures. 430 F.3d at 403. The employer sued Chu for misusing trade secret customer information, breach of contract, breach of fiduciary duty, and related torts including theft of files. 430 F.3d at 404.

The district court granted judgment for Chu, reasoning that the tort claims were preempted by ITSA, while the ITSA claim lost because the customer information was not trade secret. *Id.*

The Seventh Circuit reversed, ruling that the tort claims were not preempted. Finding it "unimaginable that someone who steals property, business opportunities, and the labor of the firm's staff would get a free pass just because none of what he filched is a trade secret," the court illustrated why ITSA did not preempt the tort claims:

> If Hecny had put its customer list on its web site for the world to ogle, that would not have permitted its managers to go into covert competition using Hecny's own depot and staff, or to walk off with computers and fax machines, as Hecny alleges Chu did. Trade secrets just have nothing to do with Hecny's principal claims.

430 F.3d at 404.

The Seventh Circuit also cited The Uniform Law Commissioners' comment to the model act that: "The provision does not apply to duties imposed by law that are not *dependent* upon the existence of competitively significant secret information, like an agent's duty of loyalty to his or her principal." 430 F.3d at 405 (emphasis added). The court called it "not a close question. An assertion of trade secret in a customer list does not wipe out claims of theft, fraud, and breach of the duty of loyalty that would be sound even if the customer list were a public record." *Id.*

Court decisions within the Seventh Circuit have followed *Hecny's* departure from previous liberal preemption cases. In *Abanco Int'l, Inc. v. Guestlogix, Inc.*, 486 F. Supp. 2d 779, 781 (N.D. Ill. 2007), Judge Lefkow stated that under *Hecny* "ITSA does not preempt claims that are not dependent upon the existence of trade secrets." *See also Integrated Genomics, Inc. v. Kyrpides*, 2008 U.S. Dist. LEXIS 16838, 2008 WL 630605, *11 (N.D. Ill. March 4, 2008) (Judge Lefkow) (*Hecny* calls into "serious question" prior decisions that "if the operative facts are arguably cognizable under the ITSA, any common law claim that might have been available on those facts in the past now no longer exists in Illinois."). Judge Grady stated in *RTC Indus. v.*

*Haddon*, 2007 U.S. Dist. LEXIS 67008, 2007 WL 2743853, at *3 (N.D. Ill. Sept. 10, 2007), that "*Hecny* departs from the broad preemptive effect applied in … prior cases. After *Hecny*, the test for a non-ITSA claim is not whether the plaintiff arguably could have brought an ITSA claim. Rather, the test is whether the plaintiff's claim would lie if the information at issue were non-confidential." Judge Conlon followed *Hecny* in *CardioNet*, citing *Hecny* as holding that "claims are foreclosed by the ITSA only when they rest on conduct that allegedly misappropriates trade secrets." 2008 WL 567223, *2. *See also Stafford Trading, Inc. v. Lovely*, 2007 U.S. Dist. LEXIS 37140, 2007 WL 1512417, *8 (N.D. Ill. May 21, 2007) (Judge Coar) (claim not preempted where proof of misappropriation of trade secrets unnecessary to its viability); *United States Gypsum Co. v. LaFarge N. Am., Inc.*, 508 F. Supp. 2d 601, 638  (N.D. Ill. 2007) (Judge Hart) (although claims were primarily based on appropriation of information, they were not preempted to the extent they are based on particular information that is not trade secret); *Dominion Nutrition, Inc. v. Cesca*, 2006 WL 560580, *4 (N.D. Ill. March 2, 2006) (Judge Hart) (interference with business opportunity not preempted where it need not be proven that defendant relied on any confidential information).

Because the Amended Complaint's tort claims neither explicitly nor implicitly depend on proving misappropriation of a trade secret, ITSA does not preempt them.

## 2. Count 10 Properly Pleads Civil Conspiracy

Defendants ignore that the parties to the conspiracy agreement were not merely BeStar Technologies and its officers, but included CC Electro Sales, Florian Greiling (who at least nominally is not a shareholder or officer of BeStar Technologies), Lilli Greiling (who acts as Florian Greiling's agent in carrying out the conspiracy) and BeStar Electronics (Amended Complaint, ¶¶ 9, 14, 51).  Because the conspiracy is broader than just the de Youngs and BeStar

Technologies, the intracorporate conspiracy doctrine does not bar their liability for civil conspiracy. *Hanania v. Loren-Maltese*, 319 F. Supp. 814, 834 (N.D. Ill. 2004) (intracorporate conspiracy doctrine did not apply where while most of the defendants were members of the same entity, two were not);  *Mehl v. Navistar Intern. Corp.*, 670 F. Supp. 239, 241 (N.D. Ill. 1987) (quoting 10 Fletcher Cyclopedia Corporations, § 4884 (1986) (corporation may be liable for a conspiracy where an independent third party conspired with the corporation); *Knorr Brake Corp. v. Harbil, Inc.*, 738 F.2d 223, 230 n. 10 (7th Cir. 1984) ("A civil conspiracy can exist among corporations."); *M&R Printing Equip., Inc. v. Anatol Equip. Mfg. Co.*, 321 F. Supp. 2d 949, 952-53 (N.D. Ill. 2004) (same); *Chen v. Mayflower Transit, Inc.*, 159 F. Supp. 2d 1103, 1112 (N.D. Ill. 2001) (intracorporate conspiracy doctrine did not bar RICO claim that two separately-owned corporate entities engaged from time to time to act as local agents for Mayflower conspired with Mayflower and other local agents to commit illegal acts to obtain additional monies from customers for their own benefit and for the benefit of the enterprise).

Further, the Amended Complaint alleges that the conspiracy agreement was formed and extensive acts in furtherance of it occurred *before* BeStar Technologies was formed.  (Amended Complaint, ¶¶ 14-18).  Forming a corporation to carry out a previously formed conspiracy cannot shield parties from conspiracy liability, especially when the corporation is used as an integral tool to accomplish the conspiracy.  (Amended Complaint, ¶¶ 19, 21, 23, 25.)

Digisound-WIE's civil conspiracy claim is similar to that in *Foodcomm Int'l v. Barry*, 463 F. Supp. 2d 818 (N.D. Ill. 2006).  There, Foodcomm sent two defendant sales employees to resolve problems in a contact with Empire Beef.  They instead arranged for Empire Beef to do business with a company they formed with Empire Beef for that purpose (and which was also a defendant).  463 F. Supp. at 822-23.  Foodcomm claimed that the two conspired to present

Empire Beef "with a business plan to create, Outback Imports, Inc., an Empire Beef-owned entity that would provide the same services as were already being provided by Foodcomm, and directly compete with Foodcomm." *Id.* Foodcomm sued them for breach of fiduciary duty and civil conspiracy. The fact that the two employees had joined together in a corporation to carry out their breach of fiduciary duty did not immunize them from liability for civil conspiracy. 463 F. Supp. at 831; *cf. Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271, 1281 (7th Cir. 1989) (corporation can conspire with its officers in violation of RICO).

As in *Foodcomm*, the intracorporate conspiracy doctrine does not apply here. Rather than carrying out their duties as officers of BeStar Technologies, the de Youngs and the other defendants were using BeStar Technologies to further their personal stakes in taking Digisound-WIE's sales and relationships. *See Greenville Pub. Co., Inc. v. Daily Reflector, Inc.*, 496 F.2d 391 (4th Cir. 1974) (exception to general rule that corporation cannot be guilty of conspiring with its officers may be justified when officer has an independent personal stake in achieving corporation's illegal objective).

# Conclusion

ITSA does not preempt the Amended Complaint's tort claims. First, the tort claims purposely do not allege that the defendants misappropriated trade secrets. Second, even if trade secret misappropriation is one of the defendants' various wrongdoings, the tort claims do not depend on proving that misappropriation for Digisound-WIE to prevail on them.

Count 10 properly pleads a civil conspiracy. First, the conspiracy is not merely between a corporation and its officers, but among all of the defendants. Each of the de Youngs and BeStar Technologies can be liable for civil conspiracy based on their agreements with the other defendants. Second, the intracorporate conspiracy doctrine does not apply because the de

Youngs were not carrying out their duties as officers for BeStar Technologies, but instead formed BeStar Technologies as a tool to accomplish the object of the conspiracy agreement previously formed with the other defendants.

DIGISOUND-WIE, INC.

By:  _s/ Arthur Sternberg_____
       One of Its Attorneys

Arthur Sternberg
Thompson Coburn LLP dba Thompson Coburn Fagel Haber
55 E. Monroe, 40th Floor
Chicago, IL 60603

4715575_1

Westlaw. Case 1:07-cv-06535    Document 89    Filed 04/10/2008    Page 9 of 39

Slip Copy                                                                                          Page 1
Slip Copy, 2008 WL 567223 (N.D.Ill.)
(Cite as: Slip Copy)

**H**
CardioNet, Inc. v. LifeWatch Corp.
N.D.Ill.,2008.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois,Eastern
Division.
CARDIONET, INC., Plaintiff,
v.
LIFEWATCH CORP., Hanna Konarzewska, M.D.,
Joel Lehman and Lisa Ament, Defendants.
Civil Action No. 07 C 6625.

Feb. 27, 2008.

Thomas L. Duston, Alisa Colleen Simmons,
Gregory James Chinlund, Julianne Marie Hartzell,
Marshall, Gerstein & Borun, Chicago, IL, Amy L.
Kashiwabara, Julie L. Fieber, Richard Keenan, Fol-
ger Levin & Kahn LLP, San Francisco, CA, for
Plaintiff.
Sean W. Gallagher, Bartlit Beck Herman Palenchar
& Scott LLP, Chicago, IL, Alexander Kaplan, Julie
A. McCane, Kevin J. Perra, Proskauer Rose LLP,
New York, NY, Michael P. Kelleher, Folger Levin
& Kahn LLP, San Francisco, CA, for Defendants.

*MEMORANDUM OPINION AND ORDER*

SUZANNE B. CONLON, District Judge.
*1 CardioNet, Inc. ("CardioNet") sues LifeWatch
Corp. ("LifeWatch"), Hanna Konarzewska, M.D.,
Joel Lehman and Lisa Ament (collectively,
"defendants") for violation of the Computer Fraud
and Abuse Act, 18 U.S.C. § 1030 (the "CFAA";
Count I), conversion (Count II), fraud (Count III),
breach of contract (Lehman and Ament only; Count
IV), intentional interference with contract
(LifeWatch only; Count V), misappropriation of
trade secrets (Count VI), and unfair competition
(Count VII). Defendants move to dismiss Counts II,
III, V, and VII because they are preempted by the
Illinois Trade Secrets Act ("ITSA"). Defendants
also move to dismiss Count I because CardioNet
fails to allege "damage" under the CFAA. For the

reasons stated below, defendants' motion is granted
in part.

## I. MOTION TO DISMISS STANDARD

A motion to dismiss under Rule 12(b)(6) challenges
the complaint on the basis of a failure to state a
claim on which relief can be granted. In ruling on
the motion, the court accepts as true all well-
pleaded facts alleged in the complaint and draws all
reasonable inferences from those facts in CardioN-
et's favor. *Jackson v. E.J. Brach Corp.,* 176 F.3d
971, 977 (7th Cir.1999), The complaint must allege
"enough facts to state a claim to relief that is plaus-
ible on its face."*Bell Atlantic Corp. v. Twombly,* ---
U.S. ----, ----, 127 S.Ct. 1955, 1974, 167 L.Ed.2d
929 (2007). CardioNet need only provide enough
detail to give defendants fair notice of its claims,
show that the claims are plausible, rather than
merely speculative, and that relief is warranted.
*EEOC v. Concentra Health Care Servs., Inc.,* 496
F.3d 773, 776 (7th Cir., 2007) (quoting *Twombly,*
127 S.Ct. at 1964 (further citations omitted)). The
purpose of a motion to dismiss is to test the suffi-
ciency of the complaint, not to decide the merits.
*Weiler v. Household Fin. Corp.,* 101 F.3d 519, 524
n. 1 (7th Cir.1996) (citations omitted).

## II. BACKGROUND

The following is taken from CardioNet's second
amended complaint.[FN1]CardioNet and Life Watch
are competitors in the heart monitoring business.
CardioNet developed a medical device-the "Mobile
Cardiac Outpatient Telemetry" ("MCOT")-that
monitors a patient's heart throughout the day. The
device is composed of sensors and a small mobile
monitor that can easily be carried. When a patient
experiences cardiac events, the MCOT automatic-
ally sends a signal to CardioNet's monitoring cen- ter.

FN1. Both parties improperly refer to ma-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

terials beyond pleadings. These materials are not considered on defendants' Rule 12(b)(6) motion. *See Loeb Indus., Inc. v. Sumitomo Corp.,* 306 F.3d 469, 479 (7th Cir.2002)

The MCOT is not sold to patients. Physicians prescribe the device for short-term periods up to 21 days. As a condition to activate the device, patients must agree to (1) return the device to CardioNet immediately after the short-term period (when monitoring is completed); (2) solely use the MCOT for heart monitoring; and (3) refrain from tampering or reverse engineering the device or transferring it to third-parties.

Life Watch acquired two CardioNet MCOTs by obtaining false prescriptions for Life Watch employees Lehman and Ament. On or about September 11, 2007, Life Watch employee/contractor Dr. Konarzewska prescribed the MCOT for Lehman and Ament. CardioNet provided devices to Lehman and Ament for diagnostic tests. Lehman and Ament paid cash for the tests, and agreed that they would return the MCOTs to CardioNet immediately after monitoring was completed.

*2 On October 26, 2007, while using the MCOT, Lehman faked a heart attack using a cardiac simulator. The MCOT sent a signal to CardioNet's monitoring center, which contacted emergency rescue personnel to visit Lehman's home. However, there was no emergency-the cardiac event was merely staged.

Lehman and Ament failed to timely return their MCOT kits. Lehman returned the MCOT on November 15, 2007. Ament, however, repeatedly claimed she lost her MCOT. As a result, **CardioNet's** counsel issued cease and desist letters to **Life Watch** and Dr. Konarzewska to demand return of the MCOT kit. **LifeWatch's** counsel admitted that the company had the MCOT kit. Counsel stated that it was investigating whether **CardioNet** infringed on **LifeWatch's** proprietary rights, **LifeWatch** eventually allowed a **CardioNet** representative to

pick up the MCOT. **CardioNet** claims defendants improperly acquired the MCOT kits to obtain confidential, proprietary, and trade secret information. Defendants do not dispute that the **data** contained in the MCOT kits are allegedly protectable trade secrets, but argue that the alleged "confidential or proprietary" information also rises to the level of a trade secret.

## III. DISCUSSION

### A. Preemption Under the ITSA

Defendants argue CardioNet's conversion (Count II), fraud (Count III), intentional interference with contract (Count V), and unfair competition (Count VII) claims are subject to dismissal under ITSA preemption. They assert that each of those claims rests on the same conduct giving rise to CardioNet's trade secret misappropriation claim.

The ITSA abolishes claims arising from misappropriated trade secrets, other than those based on contract. 765 ILCS 1065/8; [FN2] *Hecny Tramp., Inc. v. Chu,* 430 F.3d 402, 404 (7th Cir.2005). Illinois courts have had very little to say about ITSA preemption. *See Hecny,* 430 F.3d at 404. The parties cite to non-binding federal district cases applying ITSA preemption, but fail to identify any Illinois authority. Based on a review of other states' decisions interpreting the Uniform Trade Secrets Act of 1985 (on which the ITSA is based), the Seventh Circuit counseled in *Hecny* that claims are foreclosed by the ITSA only when they rest on conduct that allegedly misappropriates trade secrets. *Id.* at 405.In other words, ITSA preemption "does not apply to duties imposed by law that are not dependent upon the existence of competitively significant secret information."*Id.* (citation omitted). Claims not based on trade secret misappropriation are permissible. *See Charles Schwab & Co., Inc. v. Carter, et al.,* No. 04 C 7071, 2005 WL 2369815, at *4 (N.D.Ill. Sept.27, 2005) (St.Eve., J.) (citation omitted).

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN2. The ITSA preemption provision provides: "(a) Except as provided in subsection (b), this Act is intended to displace conflicting tort, restitutionary, unfair competition, and other laws of this State providing civil remedies for misappropriation of a trade secret, (b) This Act does not affect: (1) contractual remedies, whether or not based upon misappropriation of a trade secret ... [or]; (2) other civil remedies that are not based upon misappropriation of a trade secret."765 ILCS 1065/8

### 1. Conversion

To state a claim for conversion under Illinois law, CardioNet must allege: (1) it has a right to the property; (2) it has an absolute and unconditional right to the immediate possession of the property; (3) it made a demand for possession; and (4) defendants wrongfully and without authorization assumed control, dominion, or ownership over the property. *See Cirrincione v. Johnson,* 184 Ill.2d 109, 114, 703 N.E.2d 67, 70, 234 Ill.Dec. 455 (Ill.1998). Although defendants assert that CardioNet only pleads conversion of information, CardioNet alleges defendants converted two property items: the MCOT kits *and* trade secret information. Sec. Am. Compl. ¶¶ 28, 49.

**\*3** CardioNet's claim that defendants converted its MCOT kits is not subject to preemption because the conversion claim is not based on the misappropriation of trade secrets. *See, e.g., Dick Corp. v. SNC-Lavalin Constr., Inc.,* No, 04 C 1043, 2004 WL 2967556, at \*10-11 (N.D.Ill. Nov.24, 2004) (Aspen, J.) (conversion claim preempted only to extent it was premised on misuse of confidential information); *Charles Schwab,* 2005 WL 2369815, at \*4-5 (separate conversion claim not preempted). Rather, the claim is based on defendants' misappropriation of the MCOT kits themselves. The MCOT kits have intrinsic value apart from the information it contains. The kits are not for sale, are CardioNet's central product, and are available only through limited means. Sec. Am. Compl. ¶ 12; *compare Dick*

*Corp.,* 2004 WL 2967556, at \*11 (conversion of tangible items preempted under ITSA because they had little value outside of intrinsic ideas); *Thomas & Betts Corp. v. Panduit Corp.,* 108 F.Supp.2d 968, 973 (N.D.Ill.2000) (Moran, J.) (same). Accordingly, CardioNet's conversion claim with respect to the MCOT kits is not preempted.

However, CardioNet's conversion claim is preempted to the extent it alleges conversion of confidential, proprietary, and trade secret information derived from the contents of the MCOT kits. This aspect of CardioNet's claim is merely a restatement of its trade secret misappropriation claim. CardioNet argues it is premature to preempt its conversion claim because the claim encompasses converted trade secrets *and* non-trade secrets. Beyond CardioNet's bare-bones allegation that defendants converted "confidential and proprietary" information, CardioNet fails to allege any non-trade secrets at issue with respect to the contents of the kits.

CardioNet alleges defendants converted information contained in the MCOT device. Sec. Am. Compl. ¶¶ 18-19, 25, 33. The information was comprised of technical engineering data that CardioNet expended significant resources developing and protecting from its competitors. *Id.* ¶¶ 18-19.This data falls squarely in the ITSA's definition of a trade secret:

information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality,

765 LLCS 1065/2(d); [FN3]*see also Universal Imagine Print Group, LLC v. Mullen,* No. 07 C 6720, 2008 WL 62205, at \*2 (N.D.Ill. Jan.4, 2008) (Kocoras, J.). To the extent CardioNet claims de-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

fendants converted its trade secrets in MCOT data, the claim is subject to ITSA preemption. *See, e.g., Sys. Am., Inc. v. Providential Bancorp, LTD.,* No. 05 C 2161, 2006 WL 463314, at *6-7 (N.D.Ill. Feb.24, 2006) (St.Eve, J.) (preempting conversion claim); *AutoMed Tech., Inc. v. Eller,* 160 F.Supp.2d 915, 921-22 (N.D.Ill.2001) (Moran, J.) (same).

> FN3. Additional common law factors are significant in determining whether a trade secret exists: (1) the extent to which the information is known outside of CardioNet's business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by CardioNet to guard the secrecy of the information; (4) the value of the information to CardioNet and to its competitors; (5) the amount of effort or money expended by CardioNet in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Delta Med. Sys. v. Mid-Am. Med. Sys.,* 331 Ill.App.3d 777, 791, 772 N.E.2d 768, 780, 265 Ill.Dec. 397, 409 (Ill.App.Ct.2002) (internal citations and quotations omitted).

## 2. Fraud

***4** To state a claim for fraud, CardioNet must allege: (1) a false statement of material fact; (2) defendants' knowledge that the statement was false; (3) defendants' intent that the statement induce CardioNet to act; (4) CardioNet's reliance upon the truth of the statement; and (5) CardioNet's damages resulting from reliance on the statement. *Connick v. Suzuki Motor Co., Ltd.,* 174 D1.2d 482, 497, 174 Ill.2d 482, 221 Ill.Dec. 389, 675 N.E.2d 584, 591 (Ill.1996).

CardioNet alleges two types of harm in its fraud claim. First, it alleges fraud with respect to defendants' improper acquisition of the MCOT kits. CardioNet claims defendants crafted a plan to falsely prescribe the kits to Lehman and Ament in order to

obtain and retain the kits beyond the allotted time. Because the harm of fraudulently obtaining the kits is separate and independent from the harm of obtaining trade secrets, the fraud claim with respect to the MCOT kits is not preempted. *Cf. J.D.Chapman Group, Ltc. v. Chapman, et al.,* No. 95 C 7716, 1996 WL 89075, at *3 (N.D.Ill. Feb.28, 1996) (Conlon, 1) (dismissing breach of fiduciary duty claim only to extent it was based on allegedly misappropriated trade secrets).

Second, CardioNet alleges defendants fraudulently appropriated trade secret information contained *in* the MCOT kits. These allegations rest on the same conduct that is essentially misappropriation of trade secrets and are preempted by the ITSA. *See, e.g., C.H. Robinson Worldwide, Inc. v. Command Tramp., LLC,* No. 05 C 3401, 2005 WL 3077998, at *7 (N.D.Ill. Nov.16, 2005) (St.Eve, J.) (preempting fraud claim based on misappropriation of trade secrets); *Do It Best Corp. v. Passport Software, Inc.,* No. 01 C 7674, 2004 WL 1660814, at *9-10 (N.D.Ill. July 23, 2004) (Pallmeyer, J.) (same). Accordingly, Count III is dismissed to the extent it alleges defendants committed fraud by misappropriating **CardioNet's** trade secrets involving the information contained in the MCOT kits.

## 3. Intentional Interference with Contract

In order to state a cause of action for tortious interference with a contract, **CardioNet** must allege: (1) the existence of a valid and enforceable contract between **CardioNet** and a third party; (2) **LifeWatch's** awareness of the contract; (3) **LifeWatch's** intentional and unjustified inducement of a breach; (4) **LifeWatch's** wrongful conduct caused a subsequent breach of the contract by the third party; and (5) damages. *Kehoe v. Saltarelli,* 337 Ill.App.3d 669, 676-77, 272 Ill.Dec. 66, 786 N.E.2d 605, 612 (Ill.App.Ct.2003).**CardioNet** claims **LifeWatch** intentionally interfered with an "Assignment of Benefits and Services Agreement" it entered with Lehman and Ament. The agreement provided that all users of the MCOT device would

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

not "provide access to, tamper with, modify, distribute ... transfer, disassemble, or reverse engineer or create a derivative work of the System or Service."Sec. Am. Compl. ¶ 16. **CardioNet** alleges that Lehman and Ament breached this provision at the behest of their employer, **LifeWatch**. Defendants argue, however, that this interference of contract claim fails because it is also based on trade secret misappropriation.

**\*5** CardioNet's interference with contract claim is not subject to ITSA preemption. *See, e.g., IDX Sys. Corp.v. Epic Sys. Corp.,* 285 F.3d 581, 586-87 (7th Cir.2002) (Indiana Uniform Trade Secret Act did not preempt plaintiff's claim that competitor tortiously induced customer to breach confidentiality agreement). The tort alleged here is not the misappropriation of a trade secret, but rather the interference with Lehman and Ament's underlying contract with CardioNet. CardioNet's interference of contract claim does not depend on the existence of a trade secret. *Hecny,* 430 F.3d at 405. Accordingly, dismissal of CardioNet's interference of contract claim is unwarranted.

### 4. Unfair Competition

CardioNet's unfair competition claim is preempted because it is based on the trade secrets misappropriation claim. Construing the complaint in CardioNet's favor, its unfair competition claim inextricably depends on the allegation that defendants "possess[ed] and use[d] ... information obtained from examination and testing of the two MCOT kits."Sec. Am. Compl. ¶ 77. Accordingly, CardioNet's unfair competition claim is preempted under the ITSA. *See, e.g., C.H. Robinson,* 2005 WL 3077998, at \*7 (preempting unfair competition claim); *Seaga Mfg., v. Fortune Metal, Inc.,* No. 99 C 50332, 2001 WL 1196184, at \*2 (N.D.Ill. Oct.10, 2001) (Reinhard, J.) (same).

### B. Computer Fraud and Abuse Act

Defendants argue CardioNet's CFAA claim should

be dismissed because CardioNet merely parrots the CFAA language without alleging "damage." as required by the CFAA. 18 U.S.C. Sec. 1030(a)(5)(A). The CFAA defines damage as "any impairment to the integrity or availability of data, a system, or information."18 U.S.C. § 1030(e)(8). CardioNet must allege facts indicating that the "completeness, useability, or availability of [the plaintiff's] data was impaired."*Garelli Wong & Assocs., Inc. v. Nichols,* No. 07 C 6227, 2008 WL 161790, at \*6 (N.D.Ill. Jan.16, 2008) (Kocoras, J.) (citing *Worldspan, L.P. v. Orbitz, LLC,* No. 05 C 5386, 2006 WL 1069128, at \*5 (N.D.Ill. Apr.19, 2006) (Grady, J.).

Contrary to defendants' characterization, CardioNet has set forth sufficient allegations to withstand dismissal. CardioNet alleges that data on its monitor and the monitoring center were compromised when defendants transmitted simulated cardiac signals to the CardioNet monitoring center. Sec. Am. Compl. ¶ ¶ 35-36. As a result of this improper use, CardioNet claims its system of monitoring legitimate patients was impaired, and required CardioNet to undertalce "investigative and remedial measures." *Id.* ¶¶ 38-39.Broadly construing CardioNet's allegations, dismissal of the CFAA claim is unwarranted. *See, e.g., IMS. Inquiry Mgmt. Sys., Ltd. v. Berkshire Info. Sys., Inc.,* 307 F.Supp.2d 521, 525 (S.D.N.Y.2004) (plaintiffs sufficiently pleaded damage to evade dismissal).

### IV. CONCLUSION

For the foregoing reasons, defendants' motion to dismiss is granted in part. Count VII is dismissed in its entirety. Counts II and III are dismissed to the extent they allege defendants converted and fraudulently misappropriated information contained in the MCOT kits.

N.D.Ill.,2008.
CardioNet, Inc. v. LifeWatch Corp.
Slip Copy, 2008 WL 567223 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2008 WL 630605 (N.D.Ill.)
(Cite as: Slip Copy)

Integrated Genomics, Inc. v. Kyrpides
N.D.Ill.,2008.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois,Eastern
Division.
INTEGRATED GENOMICS, INC., Plaintiff,
v.
Nikos KYRPIDES and Natalia Ivanova, Defend-
ants.
**No. 06 C 6706.**

March 4, 2008.

Annette Michele McGarry, Marianne C. Holzhall,
Patrick M. McGarry, McGarry & McGarry, LLC,
Chicago, IL, for Plaintiff.
Glenn R. Gaffney, Gaffney & Associates, Justin R.
Gaffney, Gaffney & Gaffney, Glendale Heights, IL,
for Defendants.

### *MEMORANDUM OPINION AND ORDER*

JOAN HUMPHREY LEFKOW, District Judge.
**\*1** Plaintiff, Integrated Genomics, Inc. ("Integrated
Genomics") filed a four-count amended complaint
against defendants Nikos Kyrpides ("Kyrpides")
and Natalia Ivanova ("Ivanova") (together,
"defendants") alleging (1) breach of a covenant not
to compete, (2) breach of a duty of loyalty, (3) tor-
tious interference with prospective economic ad-
vantage, and (4) common law unfair competition.
Defendants have moved to dismiss the amended
complaint on the basis of a lack of subject matter
jurisdiction under Fed.R.Civ.P. 12(b)(1) and for
failure to state a claim upon which relief may be
granted under Fed.R.Civ.P. 12(b)(6). For the fol-
lowing reasons, their motions [# 31, # 33] are gran-
ted in part and denied in part.

## I. Facts

The following facts are taken from Integrated Gen-
omics' amended complaint.Dkt. No. 30.Integrated

Genomics is a company that develops software for
analyzing genomes. Amended Complaint, at ¶ 12.
A genome is an organism's full set of chromo-
somes: all of its inheritable traits. American Herit-
age Dictionary (4th Ed.2006), *available at* http://
dictionary.reference.com/browse/genome. Kyrpides
was hired by Integrated Genomics in 1999 as an an-
notator of its ERGO™ bioinformatics software.
Amended Complaint, at ¶¶ 13, 20. Over the course
of his employment with Integrated Genomics,
Kyrpides was ultimately promoted to Director of
Bioinformatics. Amended Complaint, at ¶ 14.
"Bioinformatics" means "[t]he use of computer sci-
ence, mathematics, and information theory to model
and analyze biological systems, especially systems
involving genetic material."American Heritage Sci-
ence Dictionary (2002), *available at* htt p:// diction-
ary.reference.com/browse/bioinformatics. Ivanova
was hired by Integrated Genomics in 1999 as a re-
search scientist. Amended Complaint, at ¶ 27. She
eventually became a principal assistant to Kyrpides.
Amended Complaint, at ¶ 33.

By virtue of their employment with Integrated Gen-
omics, Kyrpides and Ivanova both had access to
and worked to develop confidential information and
trade secrets for Integrated Genomics. Amended
Complaint, at ¶¶ 15, 28. They both signed employ-
ment agreements, which contained identical coven-
ants not to compete and not to disclose proprietary
information:

6. Non-Compete.
(a) During the Employment Period and for a peri-
od of two years after the termination or expira-
tion thereof, the Employee will not directly or in-
directly:
(i) As an individual proprietor, partner, stock-
holder, officer, employee, director, joint venturer,
investor, lender, or in any other capacity whatso-
ever (other than as the holder of not more than
one percent (1%) of the total outstanding stock of
a publicly held company), engage in the business
of developing, producing, marketing or selling

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

products or services which would compete with products or services of the kind or type developed or being developed, produced, marketed or sold by the Company, or planned to be produced, marketed, or sold as described in any business plan of the Company or as set forth in any notes or minutes of internal Company meetings, while the Employee was employed by the Company; or

*2 (ii) recruit, solicit or induce, or attempt to induce, any employee or employees of the Company to terminate their employment with, or otherwise cease their relationship with, the Company; or

(iii) solicit, divert, or take away, or attempt to divert or to take away, the business or patronage of any of the clients, customers or accounts, or prospective clients, customers or accounts, of the Company which were contacted, solicited or served by the Employee while employed by the Company.

(b) If any restriction set forth in this Section 6 is found by any court of competent jurisdiction to be unenforceable because it extends for too long a period of time or over too great a range of activities or in too broad a geographic area, it shall be interpreted to extend only over the maximum period of time, range of activities or geographic area as to which it may be enforceable.

(c) The restrictions contained in this Section 6 are necessary for the protection of the business and goodwill of the Company and are considered by the Employee to be reasonable for such purpose. The Employee agrees that any breach of this Section 6 will cause the Company substantial and irrevocable damage and therefore, in the event of any such breach, in addition to such other remedies which may be available, the Company shall have the right to seek specific performance and injunctive relief.

7. Proprietary Information and Developments.

7.1 Proprietary Information.

(a) Employee agrees that all information and know-how, whether or not in writing, of a private, secret or confidential nature concerning the Company's business or financial affairs (collectively, "Proprietary Information") is and shall be the exclusive property of the Company. By way of illustration, but not limitation, Proprietary Information may include inventions, products, processes, methods, techniques, formulas, compositions, compounds, projects, developments, plans, research data, clinical data, financial data, personnel data, computer programs, and customer and supplier lists. Employee will not disclose any Proprietary Information to others outside the Company or use the same for any unauthorized purposes without written approval by an officer of the Company, either during or after his employment, unless and until such Proprietary Information has become public knowledge without fault by the Employee.

Exs. A and C to Amended Complaint.

**Kyrpides** worked for **Integrated Genomics** from 1999 until he resigned in April of 2004. Amended Complaint, at ¶¶ 21-23. During that time he received a salary and benefits worth between $84,000 and $120,000 per year. *Id.* Ivanova worked for **Integrated Genomics** from 1999 until her resignation in May of 2004. Amended Complaint, at ¶¶ 34, 36. During that time she received a salary and benefits worth between $50,000 and $75,000 per year. *Id.* Both **Kyrpides** and Ivanova then went to work for the Joint **Genome** Institute in its Microbial **Genome** Analysis Program. Amended Complaint, at ¶¶ 24, 38. There, **Kyrpides** oversaw development of the Joint Genome Institute's IMG software product, which directly competes with **Integrated Genomics'** ERGO™ software. Amended Complaint, at ¶ 26. Ivanova "played a role" in the development of the IMG software. Amended Complaint, at ¶ 39. **Integrated Genomics** alleges on information and belief that before leaving their positions at **Integrated Genomics**, both **Kyrpides** and Ivanova solicited numerous colleagues to leave the company and to accept positions at the Joint **Genome** Institute. Amended Complaint, at ¶¶ 25, 37.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## II. Subject Matter Jurisdiction

**\*3** This is the second time that the court has been required to examine the adequacy of **Integrated Genomics'** jurisdictional allegations. On January 13, 2007, Ivanova moved to dismiss the original complaint for failure to state a claim upon which relief may be granted. **Kyrpides** filed a similar motion on April 12, 2007. On June 13, 2007, this court undertook a *sua sponte* inquiry to determine if subject matter jurisdiction in this case was proper and determined that **Integrated Genomics** had not properly alleged the citizenship of **Kyrpides** or Ivanova. Dkt. No. 29.The case was therefore dismissed without prejudice with leave to replead.

**Integrated Genomics** now alleges that **Kyrpides** is a Greek citizen, currently residing in California, and that Ivanova is a Russian citizen, also currently residing in California. Amended Complaint, at ¶¶ 2-3. **Integrated Genomics** is a Delaware corporation that has its principal place of business in Chicago, Illinois. Amended Complaint, at ¶ 1.

In the defendants' current motions to dismiss, they argue first that **Integrated Genomics'** allegations are insufficient because it did not properly plead that neither **Kyrpides** nor Ivanova is a permanent resident alien (in which case citizenship is determined differently than it is for non-permanent resident aliens), and that it should be required to amend its complaint again. This is incorrect, because courts "indulge the assumption that an alien is domiciled outside the United States, and leave it to the challenger to allege otherwise if there is reason to believe that the foreigner is a permanent resident who would destroy diversity."*Karazanos v. Madison Two Assocs.,* 147 F.3d 624, 628 (7th Cir.1998). Failure to allege that Kyrpides and Ivanova are not permanent resident aliens therefore does not render Integrated Genomics' jurisdictional allegations defective. *Id.* Furthermore, Kyrpides and Ivanova admit in their motions that they are not permanent residents. Therefore, this is not a basis for dis- missal.

Kyrpides and Ivanova also challenge Integrated Genomics' allegation that the amount in controversy in this case exceeds \$75,000. In its order of July 26, 2007, the court ordered Integrated Genomics to supplement its pleadings with an affidavit that supports its allegation that the amount in controversy exceeds \$75,000. Dkt. No. 35.

Integrated Genomics filed the declaration of John W. Elling, "a CEO of Integrated Genomics," along with its response to the defendants' motions to dismiss. Declaration, Exhibit 1 to Integrated Genomics' Response, Dkt. No. 36, at ¶ 1. Elling declares that "as a result of defendants' actions, IG [Integrated Genomics] has lost a substantial number of customers. For example, at least 7 former customers of IG have switched to the JGI (the defendants' employer).... [r]esulting in a loss to IG of approximately \$150,000."Declaration, at ¶ 3. Elling also discusses the company's lost academic customers:

> **\*4** Next, from a review of the 2006 JGI Progress Report, which is available online, the JGI has listed their academic gene sequencing program customers. At least, 8 researchers on 18 projects with whom IG used to work are now working with the JGI. They would not have been able to do this if the defendants did not develop the competing software for the JGI in breach of their Employment Agreements. This has damaged IG in the amount of at least \$20,000 in lost subscriptions and the lost revenue from annotating 18 microbial genomes is approximately, at least \$180,000.

Declaration, at ¶ 5. In support of these statements, Elling attaches an email that Kyrpides sent to an Integrated Genomics employee after he had already left the company:

> please do not distribut this email
> or try to contact them as it will be as I am trying to advertise IG.
> I just want to show you that you guys have indeed LOST what I would predict to be a very large number of contracts from academics if we

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

would have used ergo.
...
Now of course this is over, as we ll pursue our own analysis and our own system, and the academics will have to go with us.
of course money lost is one things here, the worst is the fame that would have been associated with that.
...
Mistakes like these make all the difference.
Anyway, I am in greece enjoying the weather and listening to Peer Bork, Ari Patrinos and Venter talks
Best,
Nikos

Declaration, Exhibit A.

Elling also discusses Integrated Genomics' loss as a result of Kyrpides's alleged solicitation of Ivanova's departure:

IG lost an employee capable of performing commercial genome annotation when Natalia Ivanova joined Nikos Kyrpides. IG also lost revenue in being unable to pursue annotation work with the manpower to get the work done in a reasonable time frame. It would cost at least $30,000-$40,000 in employee time and recruiter fees to hire someone to fill her position. Also, it would cost approximately $75,000-$100,000 in salaried time for a new annotator to become profitable in their job.

Declaration, at ¶ 7.

If diversity jurisdiction is uncontested, federal courts will accept an allegation of a sufficient amount in controversy unless it "appears to a legal certainty that the claim is really for less than the jurisdictional amount."*Target Market Pub., Inc. v. ADVO, Inc.*, 136 F.3d 1139, 1142 (7th Cir.1998) (citing, *inter alia, St. Paul Mercury Indemnity Co. v. Red Cab Co.*, 303 U.S. 283, 289, 58 S.Ct. 586, 590, 82 L.Ed. 845 (1938)). If the amount in controversy is contested, the party invoking federal jurisdiction must provide "competent proof" of facts that determine that the amount is at least $75,000, meaning that it must prove them by a preponderance of the evidence.*Meridian Sec. Ins. Co. v. Sadowski*, 441 F.3d 536, 540, 543 (7th Cir.2006); *see also Oshana v. Coca-Cola Co.*, 472 F.3d 506, 511 (7th Cir.2006)."Once the facts have been established, uncertainty about whether the plaintiff can prove its substantive claim, and whether damages (if the plaintiff prevails on the merits) will exceed the threshold, does not justify dismissal."*Id.* The party invoking federal jurisdiction need not show that the plaintiff will prevail or that he is certain to collect more than $75,000 if he does.*Rising-Moore v. Red Roof Inns, Inc.*, 435 F.3d 813, 816 (7th Cir.2006)."The burden, rather, is to show what the plaintiff hopes to get out of the litigation; if this exceeds the jurisdictional amount, then the case proceeds in federal court unless a rule of law will keep the award under the threshold."*Id; see also Brill v. Countrywide Home Loans, Inc.*, 427 F.3d 446, 449 (7th Cir.2005). This may be done through submission of affidavits or other evidence outside of the pleadings. *Meridian,* at 541-42.Subject matter jurisdiction is to be determined as of the time when jurisdiction is invoked.*Cook v. Winfrey*, 141 F.3d 322, 326 (7th Cir.1998).[FN1]

FN1. For cases applying this standard, *see Jansen v. Am. Exp. Corp.*, 2007 WL 4293635, at *2 (N.D.Ill.Dec.6, 2007); *Ganjavi v. Smith*, 2007 WL 2298375, at *4 (N.D.Ill. July 31, 2007); *Hannenberg v. Baker*, 2004 WL 2700490, at *1 (N.D.Ill. Feb.2, 2004) (Lefkow, J.); *Selway Group, Inc. v. Globalnet Int'l, Inc.*, 2001 WL 755232, at *1 (N.D.Ill. July 2, 2001) (Lefkow, J.)

*5 In this case, the defendants argue that Elling's statements are speculative, conclusional, and inadmissible as lacking personal knowledge and as unhelpful lay opinion testimony. They say that Elling's declaration merely states that after they left Integrated Genomics, it lost customers to their new employer, the Joint Genome Institute. Defendants

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

argue that Elling has not provided a foundation for making a connection between their alleged breach and Integrated Genomics' alleged losses and that his statements are therefore insufficient to establish the requisite competent proof.

The court agrees that standing alone, the Elling declaration does not provide the requisite foundation for its statements about the customers and money that Integrated Genomics has lost as a result of defendants' actions. It does not discuss, among other things, whether the lost customers were Kyrpides's or Ivanova's customers, whether Kyrpides or Ivanova had any contact with those customers while at Integrated Genomics, or what the circumstances were of the customers' decisions to switch to the Joint Genome Institute. Without this information, although the circumstances certainly look suspicious, Integrated Genomics has not proven by a preponderance of the evidence that it sustained over $75,000 in damages as a result of the defendants' departure.

With respect to Kyrpides, however, the court has an additional piece of evidence: the email that Kyrpides sent to someone at Integrated Genomics after his departure bragging that "I just want to show you that you guys have indeed LOST what I would predict to be a very large number of contracts from academics"Kyrpides does not dispute the authenticity of this email and it would be admissible at trial as a party admission. Furthermore, Kyrpides is alleged to have been the Director of Bioinformatics at Integrated Genomics in charge of developing the ERGO™ bioinformatics software. He went to Integrated Genomics' direct competitor, the Joint Genome Institute, to oversee the development of software that competes directly with ERGO™, and a substantial number of Integrated Genomics' customers followed close behind. These circumstances, together with Elling's declaration and Kyrpides's own statement regarding the relationship between his departure and Integrated Genomics' loss of customers, provides the necessary competent proof that Integrated Genomics

lost customer accounts worth more than $75,000 as a result of Kyrpides's departure. Because it does not appear to a legal certainty that Integrated Genomics could not recover this amount, the court finds that Integrated has established that the amount in controversy against Kyrpides exceeds the jurisdictional minimum.

The court will consider two additional arguments regarding the amount in controversy for Ivanova. First, the parties dispute the relevance of a settlement offer that Integrated Genomics made to Ivanova: $10,000 plus an agreement that for a period of 24 months she would be "enjoined pursuant to FRCP 65 from being employed in the field of microbial genomics ...." Settlement offers are admissible to show what the amount in controversy is. *Rising-Moore v. Red Roof Inns, Inc.,* 435 F.3d 813, 816 (7th Cir.2006). In order to determine the value of the settlement offer here, the court would need to determine the value of the injunction to Integrated Genomics (or the cost of enforcing it to Ivanova).*Meridian,* 441 F.3d at 542;*see also Milwaukee Mailing, Shipment and Equipment, Inc. v. Neopost, Inc.,* 259 F.Supp.2d 769, 773 (E.D.Wis.2003) (discussing the proper way to show the value of an injunction in a covenant not to compete case). It is Integrated Genomics' burden to show what this value is, however, and all it has said on the subject is, "Injunctive relief is requested in this action, and Defendants would surely have some costs involved in implementing it."Response, at 4.

*6 Finally, Elling's estimation of how much it would cost the company to hire and train someone to replace Ivanova cannot establish the amount in controversy against Ivanova. It has the potential to provide an alternative basis for establishing the amount in controversy for Integrated Genomics' claims against Kyrpides because these damages are allegedly a result of Kyrpides's violation of the non-solicitation clause. With respect to Ivanova, however, while the covenant prohibited her from engaging in the business of competing against Integrated Genomics, it did not prohibit her from

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

leaving the company at all. Therefore, damages that would have resulted from her departure to work at McDonald's cannot establish the amount in controversy against her for the claims at issue in this case. Furthermore, "[i]n diversity cases, when there are two or more defendants, plaintiff may aggregate the amount against the defendants to satisfy the amount in controversy requirement *only* if the defendants are jointly liable."*Middle Tennessee News Co., Inc. v. Charnel of Cincinnati, Inc.,* 250 F.3d 1077, 1081 (7th Cir.2001) (emphasis added). Although Integrated Genomics alleges that Kyrpides and Ivanova are jointly liable for its damages in this case, it has suggested no basis for joint liability with respect to this specific loss.

For these reasons, the court has subject matter jurisdiction over Integrated Genomics' claims against Kyrpides, but not against Ivanova. She will therefore be dismissed from this case.

### III. Discussion

A motion to dismiss under Federal Rule of Civil Procedure 12(b) (6) challenges the complaint on the basis of a failure to state a claim upon which relief may be granted. In ruling on the motion, the court accepts as true all well-pleaded facts alleged in the complaint and draws all reasonable inferences from those facts in favor of the plaintiff. *Jackson v. E.J. Brach Corp.,* 176 F.3d 971, 977 (7th Cir.1999). Dismissal is proper only when it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *McCready v. eBay, Inc.,* 453 F.3d 882, 888 (7th Cir.2006). The complaint must, however, allege "enough facts to state a claim to relief that is plausible on its face."*Bell Atlantic Corp. v. Twombly,* --- U.S. ----, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007).

### A. Enforceability of the covenants not to com- pete

Covenants not to compete are restraints on trade and, as such, are closely scrutinized by Illinois courts. *Cambridge Eng'g, Inc. v. Mercury Partners 90 BI, Inc.,* 879 N.E.2d 512, 522, 316 Ill.Dec. 445 (Ill.App.Ct. 1st Dist.2007); *Agency, Inc. v. Grove,* 839 N.E.2d 606, 613-14, 362 Ill.App.3d 206, 214, 298 Ill.Dec. 283 (Ill.App.Ct. 2nd Dist.2005); *Roberge v. Qualitek Int'l, Inc.,* 2002 WL 109360, at *4 (N.D.Ill. Jan.28, 2002).[FN2]"For a restrictive covenant to be valid and enforceable in Illinois, the terms must be 'reasonable and necessary to protect a legitimate business interest of the employer.'"*Cambridge Eng'g,* 316 Ill.Dec. 445, 879 N.E.2d at 522 (citation omitted); *Agency,* 298 Ill.Dec. 283, 839 N.E.2d at 614. The terms (1) must not be greater than necessary to protect the employer; (2) must not be oppressive to the employee; and (3) must not injure the general public. *Liautaud v. Liautaud,* 221 F.3d 981, 987 (7th Cir.2000) (citing Illinois state court cases); *House of Vision, Inc. v. Hiyane,* 225 N.E.2d 21, 24, 37 Ill.2d 32 (1967); *Bauer v. Sawyer,* 134 N.E.2d 329, 331, 8 Ill.2d 351 (1956). This analysis requires the court to consider the propriety of the restrictions in terms of their length in time, their territorial scope, and the activities that they restrict. *Cambridge Eng'g,* 316 Ill.Dec. 445, 879 N.E.2d at 522.

> FN2. The parties agree that the employment agreement should be construed, interpreted, and enforced according to Illinois law, as is provided in the agreement. *See* Exs. A and C to Amended Complaint.

*7 The question of whether a restrictive covenant is reasonable or not is one of law that is to be decided by the court. *Liautaud,* 221 F.3d at 986 (citing Illinois state court cases). Reasonableness cannot be determined in the abstract, however, and it necessarily depends on the unique facts and circumstances of each case. *Liautaud,* 221 F.3d at 987 (citing Illinois state court cases); *Bus. Records Corp. v. Lueth,* 981 F.2d 957, 959 (7th Cir.1992); *Cambridge Eng'g,* 316 Ill.Dec. 445, 879 N.E.2d at 522.

As noted above, Kyrpides signed a covenant not to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

compete that provided that he would not "engage in the business of developing, producing, marketing or selling products or services which would compete with products or services of the kind or type developed or being developed, produced, marketed or sold by the Company...." In his motion to dismiss, he argues that this covenant must be deemed unenforceable as a matter of law because, as a blanket prohibition on competition unlimited in scope or geography and not limited enough in time, it is beyond what is necessary to protect Integrated Genomics. Integrated Genomics' response is that this issue cannot be decided on a motion to dismiss.

Under Illinois state law, there appears to be a split among the appellate districts regarding whether the reasonableness of a restrictive covenant may be determined on a motion to dismiss. *Compare Dryvit System, Inc. v. Rushing,* 477 N.E.2d 35, 38-39, 132 Ill.App.3d 9, 87 Ill.Dec. 434 (Ill.App.Ct. 1st Dist.1985) (granting judgment on the pleadings to the defendant because the covenant was patently unreasonable), *with Smith v. Burkitt,* 795 N.E.2d 385, 373, 342 Ill.App.3d 365, 277 Ill.Dec. 18 (Ill.App.Ct. 5th Dist.2003) (reversing the circuit court's grant of a motion to dismiss and stating, "because the agreement itself does not reveal the precise nature of the business purchased by the plaintiffs and what specific business activity the noncompetition clause sought to prohibit, we believe that this issue should not be determined by a motion to dismiss."). This court need not attempt to predict how the Illinois Supreme Court will resolve the split, however, because "[i]n a diversity action, the adequacy of the pleadings is assessed in accordance with the federal, not state, rules of civil procedure." *Franklin Capital Corp. v. Baker & Taylor Entertainment, Inc.,* 2000 WL 1222043, at *6 (N.D.Ill. Aug.22, 2000); *see also Zurich American Ins. Co. v. Pillsbury Co.,* 264 F.Supp.2d 710, 711 (N.D.Ill.2003) ("As its lawyers must surely have been taught in Civil Procedure, a federal court sitting in diversity applies state substantive law, *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), but federal pro-

cedural law. *See* Fed.R.Civ.P. 1 ('These rules govern the procedure in the United States district courts in all suits of a civil nature.')").

Because the court is required, under Illinois substantive law, to consider all of the facts and circumstances surrounding the covenant not to compete in this case, it would be inappropriate to determine its reasonableness on this Rule 12(b)(6) motion to dismiss. Among many other potentially relevant facts, the court has no information thus far regarding the number and size of companies that compete with Integrated Genomics, the general size of the genome annotating industry, the existence of other jobs in defendants' field of expertise, or the nature of the relationships between Integrated Genomics and its clients. Furthermore, because the facts of the case are of such importance to the issue of reasonableness, the court could not find (as it would be required to in order to grant a motion to dismiss) that even making all reasonable inferences in favor of Integrated Genomics, it has not stated a claim for relief. In *Automed Tech., Inc. v. Eller,* 160 F.Supp.2d 915, 923 (N.D.Ill.2001), Judge Moran reached the same conclusion:

**\*8** Although Illinois views some restrictive covenants suspiciously as restraints on trade, it will enforce them to protect trade secrets. *Lawrence & Allen, Inc. v. Cambridge Human Resource Group, Inc.,* 685 N.E.2d 434, 443, 292 Ill.App.3d 131, 226 Ill.Dec. 331 (Ill.App.Ct. 2nd Dist.1997). The clauses must be limited, both in duration and geographic range. *Id.* But these arguments go to the merits. They require the court to assess the restrictions' reasonableness, including the legitimacy of the employer's interests, what is necessary to protect them, and the employees' ability to still earn a living in their field. This is an inherently fact-based determination that is not appropriate at the motion to dismiss stage.[FN3]

> FN3. Defendants' attempt to distinguish *Automated Tech* is not persuasive.

Also in agreement was then-District Judge Willi-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ams in *Dunning v. Chemical Waste Management, Inc.,* 1993 WL 291842 (N.D.Ill. July 30, 1993) ("Thus, the court can only determine the hardship on the seller as well as the necessity of the restrictions based upon all of the facts and circumstances attendant to the sale of the business. Therefore, the reasonableness of the restrictive covenant in this case cannot be determined on the basis of the pleadings.").[FN4]

> FN4. In *Learning Curve Int'l, L.L.C. v. Chansons Du Kakawi, Inc.,* 1998 WL 565149, at \*3 (N.D.Ill. Aug.31, 1998), Judge Plunkett did grant a rule 12(b)(6) motion to dismiss on the basis that a covenant not to compete was unenforceable, but that case may be distinguished because the court focused not on the reasonableness of the covenant, but on whether the covenantee had a protectible "legitimate business interest."

For these reasons, the court will deny the defendants' motion to dismiss as to the enforceability of the covenant not to compete. It does note, however, that Integrated Genomics will face an uphill battle on the merits because of how heavily the law weighs against covenants that are not limited in their geographical reach or their scope of prohibited activities. *See Telxon Corp. v. Hoffman,* 720 F.Supp. 657 (N.D.Ill.1989); *Roberge v. Qualitek Int'l,* 2002 WL 109360 (N.D.Ill. Jan.28, 2002); *Arcor v. Haas,* 842 N.E.2d 265, 363 Ill.App.3d 396, 299 Ill.Dec. 526 (Ill.App.Ct. 1st Dist.2005); *N. Am. Paper Co. v. Unterberger,* 526 N.E.2d 621, 172 Ill.App.3d 410, 122 Ill.Dec. 362 (Ill.App.Ct. 1st Dist.1988); *Dryvit System, Inc. v. Rushing,* 477 N.E.2d 35, 132 Ill.App.3d 9, 87 Ill.Dec. 434 (Ill.App.Ct. 1st Dist.1985). Although a lack of certain restrictions does not constitute *per se* unenforceability, this court has found no cases in its research that have enforced a covenant as broad as the one contained in Integrated Genomics' employment contract.[FN5][FN6]

> FN5. All of these considerations will also

be relevant to the court's discretionary decision of whether or not to "blue-line" the covenant at issue here in order to enforce it in part. *See, e.g., Cambridge Eng'g,* 316 Ill.Dec. 445, 879 N.E.2d at 529;*Dryvit System,* 87 Ill.Dec. 434, 477 N.E.2d at 37-38.

> FN6. The parties also argue about whether Integrated Genomics' claim that Ivanova "solicit[ed] employees with whom she worked during her employment to work with her at the Joint Genome Institute," Amended Complaint, at ¶ 39, should be dismissed. Because this argument appears equally relevant to Kyrpides, the court addresses it here despite the fact that Ivanova will be dismissed from the case. Ivanova contends that it should be because under the terms of the employment agreement, the agreement was to expire on August 25, 2000 unless "extended by mutual agreement," and the activities that form the basis of the allegation occurred in 2004. She argues that because Integrated Genomics did not allege in its amended complaint that the agreement was so extended, its claim that she solicited employees during her term of employment fails as a matter of law. Integrated Genomics responds that "obviously the term was extended if Defendants continued to work [at Integrated Genomics] and accept paychecks and benefits, as is pled."Response, at 6. The court agrees that at the motion to dismiss stage, these allegations are sufficient. Whether or not the agreement was extended by mutual agreement is a question of fact that cannot be resolved against Integrated Genomics at this juncture.

**B. Viability of Integrated Genomics' claims for breach of a duty of loyalty, tortious interference with prospective economic advantage, and common law unfair competition**

Integrated Genomics makes three claims in addition

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to its breach of contract claim: breach of a duty of loyalty, tortious interference with prospective economic advantage, and common law unfair competition. Each are based on allegations that Kyrpides was privy to Integrated Genomics' proprietary information and that he left the company to work for its competitor, where he helped to develop a competing product and offered that product to Integrated Genomics' customers. Kyrpides challenges each of these claims, arguing that Integrated Genomics fails to state its claims, the allegations are duplicative, and the claims are preempted by the Illinois Trade Secrets Act ("ITSA"), 765 Ill. Comp. Stat. 1065 *et seq.*

1. Count II-Breach of a duty of loyalty

**\*9 Integrated Genomics** alleges that **Kyrpides** "obtained extensive knowledge regarding the proprietary information, products, customer base and employee base of **Integrated Genomics** through the course of his employment with **Integrated Genomics** .... Upon information and belief, **Kyrpides** breached this duty [of loyalty] when in breach of his employment agreement he accepted a position at the Joint **Genome** Institute and took part in developing the IMG software which directly competes with **Integrated Genomics'** ERGO™ software."Amended Complaint, at ¶¶ 55, 57. It continues, "**Kyrpides** further breached this duty when he solicited **Integrated Genomics** employees to come work at The Joint **Genome** Institute while they were still **Integrated Genomics** employees."Amended Complaint, at ¶ 58. **Integrated Genomics** also incorporates all previous paragraphs of its amended complaint into Count II.

"During the course of employment, an employee owes an undivided duty of fidelity and loyalty to his employer."*RKI, Inc. v. Grimes,* 177 F.Supp.2d 859, 877 (N.D.Ill.2001) (citation omitted)."An employee breaches a duty of loyalty to his employer when he takes advantage of knowledge and/or property acquired in the employer's business to make a profit for [himself] at the employer's ex-

pense."*Ladenberger v. General Signal Pump Group/Aurora Pump,* 2001 WL 709488, at \*5 (N.D.Ill. June 22, 2001) (citation omitted).

Kyrpides argues that Count II should be dismissed for several reasons. First, he says, any fiduciary duty owed by an employee to an employer ceases with the termination of the employment relationship. This argument would not affect Integrated Genomics' allegation that Kyrpides solicited its employees to leave the company, because that may have occurred while Kyrpides was still employed by Integrated Genomics (as Integrated Genomics argues that it did).*See Automed,* 160 F.Supp.2d at 925 ("Defendants move to dismiss the remaining fiduciary duty claims because those duties ceased when the employment relationship terminated. But the complaint includes allegations of wrongdoing while defendants still worked for AutoMed.... This adequately alleges disloyal action while the duty still applied."); *see also Riad v. 520 S. Michigan Ave. Assoc. Ltd.,* 78 F.Supp.2d 748, 763 (N.D.Ill.1999) ("[I]n some circumstances, one under a fiduciary duty breaches the trust if he solicits his employer's customers or entices co-workers away from his employer.").Kyrpides seems to admit that Integrated Genomics' claim should survive to at least this extent when he states, "The only way in which IG's breach of fiduciary responsibility claim survives a Motion to Dismiss is to the extent IG is alleging (which is not stated) that Kyrpides solicited other IG employees while still employed at IG."Motion, at 8. Although Integrated Genomics did not explicitly allege the timing of the solicitation in its complaint, on this motion to dismiss, the court must make all possible factual inferences in favor of Kyrpides. Therefore, the breach of duty of loyalty claim will survive at least to the extent of the solicitation allegations in paragraph 58.

**\*10** As noted, **Integrated Genomics** also alleges that **Kyrpides** breached his duty of loyalty when he accepted a position at the Joint **Genome** Institute and took part in the development of IMG software. **Integrated Genomics** does not address **Kyrpides's**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

argument that any duty ceased to exist upon his departure. The court notes, however, that a restrictive covenant may create an ongoing fiduciary duty even after an employee leaves a company. *Jostens, Inc. v. Kauffman,* 842 F.Supp. 352, 354 (C.D.Ill.1994) (citing, *inter alia, Composite Marine Propellers v. Van Der Woude,* 962 F.2d 1263, 1265 (7th Cir.1992)). Here, Kyrpides's employment agreement included a provision prohibiting him from disclosing Integrated Genomics' proprietary information "either during or after his employment."Complaint, Ex. A, at 4. Therefore, it is possible that Kyrpides had a continuing duty to protect Integrated Genomics' proprietary information even after he left the company.

Kyrpides argues that the allegation that he breached a duty of loyalty after leaving Integrated Genomics must be dismissed according to Judge Zagel's rationale in *Teradyne, Inc. v. Clear Communications Corp.,* 707 F.Supp. 353 (N.D.Ill.1989). In that case, the plaintiffs claimed misappropriation of trade secrets under the Illinois Trade Secrets Act. *Id.* at 353, 355.The defendants were former employees of the plaintiff who allegedly had knowledge of its trade secrets. *Id.* at 354-55.They started a new company that would be in direct competition with the plaintiff, and the plaintiff feared that the defendants were likely to disclose its secrets. *Id.* at 355.The plaintiff did not, however, allege that the defendants had threatened to disclose its secrets or that the operation of their new business would require that they do so. *Id.* at 356-57.The court therefore concluded that the complaint had to be dismissed, explaining, "The defendants' claimed acts, working for [plaintiff], knowing its business, leaving its business, hiring employees from [plaintiff] and entering the same field ... do not state a claim of threatened misappropriation. All that is alleged, at bottom, is that defendants could misuse plaintiff's secrets, and plaintiffs fear they will. This is not enough."*Id.* at 357.

Integrated Genomics has two responses to Kyrpides's citation of *Teradyne.*First, it contends

that *Teradyne* has been "negatively treated" and "substantially overruled," Response, at 7, by a later decision: *Strata Marketing, Inc. v. Murphy,* 740 N.E.2d 1166, 317 Ill.App.3d 1054, 251 Ill.Dec. 595 (Ill.App.Ct. 1st Dist.2000).*Strata,* however, did *not* overrule *Teradyne,* but merely distinguished it; the court there said, "Strata's allegations are not like those in *Teradyne* where the plaintiff simply alleged that the defendant had information and Teradyne was fearful that the defendant would use it."740 N.E.2d at 1179.Integrated Genomics' second argument is that "trade secret theft has not currently been pled in the present action."Response, at 7. This leads the court to Kyrpides's argument that the Illinois Trade Secret Act ("ITSA"), 765 Ill. Comp. Stat. 1065 *et seq.,* preempts Integrated Genomics's breach of duty claim to the extent that it alleges misuse of proprietary information. Integrated Genomics does not address this argument at all, so the court is left with its own research and the few citations provided by Kyrpides.

**\*11** ITSA says that it is "intended to displace competing tort, restitutionary, unfair competition, and other laws of this state providing civil remedies for misappropriation of a trade secret."765 Ill. Comp. Stat. 1065/8. It defines a "trade secret" as follows:
"Trade secret" means information, including but not limited to, technical or non-technical data, a formula, pattern, compilation, program, device, method, technique, drawing, process, financial data, or list of actual or potential customers or suppliers, that: (1) is sufficiently secret to derive economic value, actual or potential, from not being generally known to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy or confidentiality.[FN7]

> FN7. Illinois courts typically consider six factors in applying the statute: "(1) the extent to which the information is known outside the employer's business; (2) the extent to which it is known to employees and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

others involved in the employer's business; (3) the extent of the measures taken by the employer to guard the secrecy of the information; (4) the value of the information to the employer and its competitors; (5) the money or effort expended by the employer in developing the information; and (6) the ease or difficulty with which others might properly acquire or duplicate the information."*Lawson Prods., Inc. v. Chromate Indus. Corp.,* 158 F.Supp.2d 860, 864 (N.D.Ill.2001).

765 Ill. Comp. Stat. 1065/2. It defines "misappropriation" as follows:

"Misappropriation" means: ... disclosure or use of a trade secret of a person without express or implied consent by another person who ... at the time of disclosure or use, knew or had reason to know that knowledge of the trade secret was ... acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use...." FN8

> FN8."To state a claim for misappropriation of a trade secret, the complaint must allege that information was (1) a trade secret, (2) misappropriated and (3) used by defendant."*Lawson,* 158 F.Supp.2d at 863-64 (citing *Composite Marine Propellers, Inc. v. Van Der Woude,* 962 F.2d 1263, 1265-66 (7th Cir.1992)).

In support of his argument for ITSA preemption of Integrated Genomics' duty of loyalty claim, Kyrpides relies exclusively on Northern District of Illinois cases issued before the more recent and important case of *Hecny Transportation, Inc. v. Chu,* 430 F.3d 402 (7th Cir.2005). As Judge Grady said in *RTC Indus. v. Haddon,* 2007 WL 2743853, at *3 (N.D.Ill. Sept. 10, 2007), "*Hecny* departs from the broad preemptive effect applied in ... prior cases. After *Hecny,* the test for a non-ITSA claim is not whether the plaintiff arguably could have brought an ITSA claim. Rather, the test is whether the plaintiff's claim would lie if the information at issue were non-confidential."Therefore, the liberal preemption doctrines stated in cases like *Fox Controls, Inc. v. Honeywell, Inc.,* 2002 WL 1949723, a *3 (N.D.Ill. Aug. 22, 2002) ("if the operative facts are arguably cognizable under the ITSA, any common law claim that might have been available on those facts in the past now no longer exists in Illinois"), have been called into serious question by *Hecny* and can no longer be cited as the unequivocal law in this circuit. FN9

> FN9. The Seventh Circuit explained that the more liberal preemption rules lead to an unreasonable result in cases where the allegedly proprietary information might ultimately be determined not to be a trade secret. *Hecny,* 430 F.3d at 404-05. It discussed with approval the Uniform Law Commissioners' comment to the Uniform Trade Secrets Act of 1985, on which ITSA is based: " 'The [preemption provision] does not apply to duties imposed by law that are not dependent upon the existence of competitively significant secret information, like an agent's duty of loyalty to his or her principal.' "*Id.* at 405.It continued with an example, "An assertion of a trade secret in a customer list does not wipe out claims of theft, fraud, and breach of the duty of loyalty that would be sound even if the customer list were a public record."*Id.*

All of this is not necessarily to say that a duty of loyalty claim could never be preempted by ITSA, however. As the court noted in *RTC Indus.,* 2007 WL 2743583, at *3, claims will still be foreclosed when they rest on the conduct that is said to misappropriate trade secrets. "Accordingly, there are still some situations where the ITSA will preempt a fiduciary-duty claim."*Id.*

Integrated Genomics has not yet identified exactly what proprietary information it alleges that Kyrpides has disclosed, but it is not necessary for it

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to do so in its complaint. *Automed,* 160 F.Supp.2d at 921. Its definition of "proprietary information" is very similar to ITSA's definition of a "trade secret." While Integrated Genomics cannot protect confidential information to the extreme of preventing its employees from being able to function after leaving its employ, *Delta Med. Sys. v. Mid-Am. Med. Sys., Inc.,* 331 Ill.App.3d 777, 265 Ill.Dec. 397, 772 N.E.2d 768, 793 (Ill.App.Ct. 1st Dist.2002), it may be able to protect more than what would fit into the strict definition of a trade secret. For these reasons, the court cannot determine on this motion to dismiss whether Integrated Genomics' breach of duty of loyalty claim based on disclosure of proprietary information would be preempted by ITSA. *See Universal Imagine Print Group, LLC, v. Mullen,* 2008 WL 62205, at *2 (N.D.Ill. Jan.4, 2008) (holding that 12(b)(6) dismissal was not appropriate where a company's contractual definition of confidential information was broader than the statutory definition of trade secrets and stating, "If the information does not qualify as a trade secret, the availability of civil remedies designed to address unlawful disclosure or use would be unaffected by ITSA [preemption].").

**\*12** This allegation of breach of a duty of loyalty is arguably duplicative of Integrated Genomics' breach of contract claim. At this point, however, the court declines to strike the duty of loyalty claim on that basis. It is possible that the breach of contract claim may be challenged again at a later point, such as on a motion for summary judgment, at which point the court can reevaluate the issue of duplicity. Count II will therefore not be dismissed at this juncture.

### 2. Count III-Tortious interference with prospective economic advantage

**Integrated Genomics'** tortious interference with prospective economic advantage claim alleges as follows:

65. **Integrated Genomics** hereby repeats and realleges the allegations of paragraphs 1-64

above, as though fully set forth herein.

66. **Kyrpides** and Ivanova obtained extensive knowledge regarding the customers and employee base of **Integrated Genomics** through the course of their employment with **Integrated Genomics.**

67. With this knowledge, **Kyrpides** and Ivanova were able to offer **Integrated Genomics** customers a competing product which had been developed in violation of **Kyrpides** and Ivanova's Employment Agreements.

68. As a result of **Kyrpides** and Ivanova's actions, **Integrated Genomics** has suffered money damages in the form of lost business, lost goodwill, and lost profits.

Amended Complaint, at ¶¶ 65-68.

**Kyrpides** argues that this count must be dismissed because it is preempted by ITSA, because it is duplicative of the breach of contract claim, and because **Integrated Genomics** has failed to state a claim for tortious interference with prospective economic advantage. ITSA does not warrant dismissal of this count for similar reasons as those stated above with respect to Count II. The court will not dismiss this count as duplicative at this time because of the possibility that the breach of contract claim will be challenged again in the future. Therefore, the court will move on to consider the argument that Integrated Genomics has failed to state a claim.

"Under Illinois law, to state a claim for tortious interference with prospective economic advantage, plaintiffs must allege that: (1) the plaintiff had a reasonable expectation of entering into a valid business relationship; (2) the defendants knew of this expectancy; (3) the defendants intentionally and unjustifiably interfered to prevent the expectancy from being fulfilled; and (4) damages." *Kim v. Kim,* 360 F.Supp.2d 897, 904 (N.D.Ill.2005); *see also Conditioned Ocular Enhancement, Inc. v. Bonaventura,* 458 F.Supp.2d 704, 712 (N.D.Ill.2006); *Russian Media Group, LLC v. Cable America, Inc.,* 2008 WL 360692, at *5 (N.D.Ill. Feb.7, 2008). Integrated

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Genomics points out that it alleged "that Defendants obtained extensive knowledge regarding the customers and employee base of Integrated Genomics through the course of their employment with Integrated Genomics. They violated their employment Agreements by developing a competing product, and then they went and offered it to IG's customers. IG was then damaged by losing customers and potential customers.... [C]ustomers are obviously valid business relationships."Response, at 8.

*13 Integrated Genomics alleges that it has generally lost customers as a result of Kyrpides offering those customers a competing product, which is sufficient to survive a motion to dismiss. *Russian Media Group,* 2008 WL 360692, at *5 (finding it sufficient that plaintiff had alleged that "certain customers have terminated their contractual relationships with Plaintiff to subscribe to Defendants' service"); *see also Kim v. Kim,* 360 F.Supp.2d at 904-05 (same). Because Integrated Genomics has alleged elsewhere in the amended complaint that it was wrongful for Kyrpides to leave the company to work for the Joint Genome Institute and use Integrated Genomics' proprietary information to develop a competitive product, it has also satisfactorily alleged that his actions were intentional and unjustifiable. Therefore, this claim will not be dismissed.

3. Count IV-Unfair Competition

Integrated Genomics' unfair competition claim repeats verbatim the allegations of its tortious interference with prospective economic advantage claim. Kyrpides argues that it should be dismissed because it is preempted by ITSA and because Integrated Genomics has failed to state a claim for unfair competition. As with the previous claims, ITSA does not warrant dismissal of Count IV at this point.

Kyrpides cites *Day-Bright Lighting, Inc. v. Sandee Mfg. Co.,* 286 F.2d 596 (7th Cir.1960), for the proposition that "[i]n order to make a claim for unfair competition, the plaintiff must prove that defendant

represented goods as those of the plaintiff or that the public has been deceived into the belief that the defendant's design emanated from the same source as plaintiff."Motion, at 11. The court has reviewed *Day-Bright,* however, and it is clear that the Seventh Circuit was not attempting to state the requirements for a general unfair competition claim under Illinois common law. Instead, the court was discussing unfair competition in the context of a federal patent infringement lawsuit and did not discuss Illinois state law at all.

Kyrpides cited only *Day-Bright* on this point and Integrated Genomics did not cite any cases at all.FN10But according to the court's research, it would be inappropriate to dismiss Count IV. In Illinois, the common law tort of unfair competition encompasses a "broad spectrum of law" and it is difficult to determine exactly what elements are required in order to prove such a claim.*Zenith Elec. Corp. v. Exzec, Inc.,* 1997 WL 223067, at *6 (N.D.Ill. March 27, 1997) (adopting the report and recommendation of Magistrate Judge Lefkow). The principal form of the tort "as it applies to circumstances arising from alleged interference with third party relations[ ] apparently falls under the rubric of tortious interference with prospective economic advantage."*Id; see also Hycor Corp. v. Dontech, Inc., et al.,* 1985 WL 3604, at *2 (N.D.Ill. Oct.31, 1985) ("Defendants' contention that a likelihood of confusion as to source must be pled to state a claim for unfair competition is erroneous."). Furthermore, a plaintiff may plead both tortious interference with prospective economic advantage and unfair competition. *Gorgonz Group, Inc. v. Gray Matter Holdings, LLC,* 2001 WL 103406, at *4 (N.D.Ill. Jan.30, 2001). Therefore, Count IV will not be dismissed.

FN10. In fact, the entirety of Integrated Genomics' response to Kyrpides's motion to dismiss Count IV was as follows:
Finally, Defendants argue that they do not understand, Count IV, relating to Common Law Unfair Competition. They go on to describe the allegations contained in the Complaint as

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

"point[ing] to the Defendants' Employment Agreements and say[ing] virtually nothing more."(Deft. Brf. At 11). Once again, Defendants characterization of the Amended Complaint is incorrect. The Amended Complaint states at ¶ 71, that Defendants developed a competing product in violation of their Employment Agreements, with the knowledge they had acquired from their employment at IG. Defendants go on to state that nothing suggests defendants have marketed or sold anything. (Deft. Br. At 12). Again, this is incorrect. Paragraph 68 of the Amended Complaint, realleges and incorporates the previous paragraphs. Paragraph 67 contains the allegations that Defendants offered the competing product which was developed in violation of their Employment Agreements.

Response, at 9.

**IV. Conclusion and Order**

**\*14** For the foregoing reasons, defendants' motions to dismiss [# 31, # 33] are granted in part and denied in part, in that Ivanova is dismissed from this case, but defendants' motions to dismiss Counts I-IV of the complaint are denied.

N.D.Ill.,2008.
Integrated Genomics, Inc. v. Kyrpides
Slip Copy, 2008 WL 630605 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.
Case 1:07-cv-06535    Document 89    Filed 04/10/2008    Page 28 of 39
                                                                        Page 1
Slip Copy
Slip Copy, 2007 WL 1512417 (N.D.Ill.)
(Cite as: Slip Copy)

**H**
**Stafford Trading**, Inc. v. **Lovely**
N.D.Ill.,2007.
Only the Westlaw citation is currently available.
    United States District Court,N.D. Illinois,Eastern
                        Division.
        **STAFFORD TRADING**, INC. and John S.
            **Stafford**, Jr., Plaintiffs,
                        v.
    Frederick J. **LOVELY** and Charles Pokoski, De-
                    fendants.
                **No. 05 C 4868.**

                  May 21, 2007.

Gary M. Miller, Claudia Mercedes Laurens, John
R. McCambridge, Sarah D. McTurnan, Grippo &
Elden, LLC, Jacob Warren Harrell, DLA Piper US
LLP, Chicago, IL, for Plaintiffs.
Edwin L. Durham, Michael Rachlis, Kevin Buckley
Duff, Marion B. Adler, Rachlis, Durham, Duff &
Adler, Kay Levi Pick, Krasnow, Saunders, Corn-
blath, LLP, Chicago, IL, Michael R. Fox, Randall
B. Gold, Fox & Fox, S.C., Monona, WI, for De-
fendants.

          *MEMORANDUM OPINION AND ORDER*

DAVID H. COAR, United States District Judge.
*1 Before this Court are two motions brought by
Plaintiffs and Counter-Defendants **Stafford Trad-
ing**, Inc. and John S. **Stafford**, Jr. ("**Stafford**")
against Defendants and Counter-Plaintiffs Freder-
ick    J.    **Lovely**    and    Charles    Pokoski
("Defendants").**Stafford** filed a Motion for Sum-
mary Judgment on Count I of the Compliant and
Counts I through VIII of the Counterclaim pursuant
to Rule 56 of the Federal Rules of Civil Procedure.
**Stafford** also filed a Motion to Dismiss the Coun-
terclaim    pursuant    to    Rules    12b(6)    and
12(b)(7).**Stafford** has incorporated its previous
Motion to Dismiss into its Motion for Summary
Judgment. For the reasons stated below, **Stafford's**
Motion for Summary Judgment is DENIED and its

Motion to Dismiss is partially DENIED and par-
tially GRANTED.

                **FACTUAL BACKGROUND**

*Undisputed Facts Taken from the Parties' State-
ments' of Fact*

A. Development of RIVAS

This dispute involves the ownership of RIVAS, a
system of pricing models that consists of several in-
terconnected software applications used to price
and trade equity derivatives and manage trading
risk. Defendants worked with Stafford to develop
and trade with RIVAS. Defendant Lovely began
working with Stafford in 1996 as a trader. Defend-
ant Pokoski began working with Stafford in 1997.

"RIVAS" stands for Realtime Integrated Volatility
Arbitrage System. It is an electronic options trading
platform consisting of numerous software applica-
tions written primarily in the computer language
C++ computer programming language. Defendant
Lovely did not write any code for any part of
RIVAS; he simply provided ideas and methodolo-
gies for RIVAS. Defendant Pokoski also provided
ideas and mathematical formulas or algorithms used
in RIVAS, especially with respect to the GUTS
model, which is one of several models that make up
RIVAS.[FN1]Although Stafford asserts that Pokoski
did not write any of the code used in RIVAS, it is
undisputed that Pokoski wrote algorithms for
GUTS in the C computer programming language
and provided that pseudocode to a software de-
veloper, Thomas Vonderhaar, who translated the C
code into C++ programming language and then ad-
ded more code in the C++ language for GUTS and
RIVAS. Linda Doloc also contributed substantially
to the finalized C++ code that was actually used in
the finalized GUTS model and RIVAS system. An
expert in computer languages, Stuart Okorofsky,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

declares on behalf of the Defendants that one cannot properly assume that the translation of C into C++ necessarily changes the underlying expression and that the C language is a subset of the C++ language.

> FN1. Despite their frequent use of the term "model", neither party has offered a precise definition of it.

B. Confidentiality

Numerous Stafford employees worked on different portions of RIVAS and several employees exchanged e-mails and documents discussing RIVAS and the GUTS model. Most of these documents were not labeled "Confidential." Of the documents that were labeled "confidential," they were clearly labeled confidential as to **Stafford**, not to any partnership between **Stafford** and the Defendants. The Defendants also provided documents related to RIVAS to numerous **Stafford** employees, and later to TD Bank representatives (before the sale), without asking any of those persons to sign a confidentiality agreement.

C. Sale to TD Bank

*2 At the end of February 2002, **Stafford** sold a portion of its **trading** operations and all of its technology, including RIVAS, to The Toronto-Dominion Bank ("TD Bank"). At that time **Lovely** and Pokoski took jobs with an affiliate of TD Bank, TD Options, LLC ("TDO"). Three and one-half years later, **Lovely** stopped working at TDO. Soon thereafter, in August, 2005, **Lovely** and Pokoski approached **Stafford** Jr. and claimed that they were entitled to further proceeds that **Stafford** had received from the sale of RIVAS, based on an oral partnership agreement with **Stafford** Jr. **Stafford** filed the instant action for a declaration that **Lovely** and Pokoski had no rights in RIVAS and no right to any proceeds attributable to the sale of RIVAS. In Count I of the Complaint, **Stafford** alleges that RIVAS is copyright subject matter governed by the

Copyright Act and that defendants own no intellectual property rights in RIVAS.

At the time of the transaction between TD Bank and **Stafford**, Defendants accepted employment with TDO. In June or July of 2005, **Lovely** stopped working at TDO. A few weeks later, they approached **Stafford** and informed **Stafford**, Jr. of their beliefs of entitlement to 50% of the proceeds from the sale of RIVAS to TD Bank. **Stafford** then filed this action, seeking, inter alia, a declaration that Defendants owned no rights to RIVAS and are not entitled to any of proceeds from the sale of RIVAS to TD Bank. Defendants filed a Counterclaim, which alleges, among other things, that **Stafford** Jr. breached an oral partnership agreement with them, that he misappropriated their **trade** secrets, that they are entitled to a declaration that they own all copyrights in RIVAS, and that **Stafford** violated several non-federal rights arising from state common law fro which they are entitled damages and restitution.

Defendants allege that in 1998, they entered into a partnership agreement with **Stafford** for the purpose of developing a proprietary and confidential **trading** system to eventually be licensed or sold. No written partnership agreement was ever drafted. Defendants show that **Stafford** has a history of entering into oral agreements in regard to options **trading** but they do not offer any evidence that **Stafford** has ever entered into oral agreements to develop, license or sell computer software. Defendants allege that the terms of the oral partnership agreement are as follows: 1) Defendant **Lovely** agreed to contribute his **trading** methodologies and strategies to the partnership in exchange for 50% of the profits of the partnership and **Stafford's** agreement to fund the activities of the partnership; 2) Defendant **Lovely** later agreed with Defendant Pokoski to share 50% of his partnership interest with **Stafford** if Pokoski would contribute his **trading** methodologies to the partnership; 3) the parties used RIVAS to **trade**; and 4) a **Stafford** controlled limited liability company called JSS Investments,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

LLC, was utilized to generate and distributed profits of the partnership. Defendants also allege that from 1998 through 2002, Defendant Pokoski directed the development of several server components of RIVAS.

**\*3** Defendants allege further that Stafford made false material statements of fact and omitted material facts in the effort of fraudulently inducing Defendants to not enforce the terms of their alleged partnership as relates to the splitting of profits from RIVAS. They also allege that RIVAS is a methodology made of trade secrets and that Stafford misappropriated the trade secrets by denying the existence of the trade secrets, by claiming ownership of the trade secrets and by claiming the right to sell the trade secrets without giving Defendants their proper share from the sale of RIVAS.

D. Computer Program or Methodology?

Stafford and TD Bank executed a Master Purchase Agreement as part of the sale transaction. In it, Stafford did not disclose therein any copyright registrations and applications as required by section xxv of the Amended and Restated Master Purchase Agreement. Instead, Stafford listed RIVAS as a planned method patent application in the intellectual property schedule to the Master Purchase Agreement. Furthermore, in a purported assignment of RIVAS from Jerome Nelligan, Jr. to Stafford Trading, Inc., RIVAS is described as "an invention comprising certain new, useful, and nonobvious improvements in the system and method for real-time options contract price calculations and manipulations."In the assignment, Nelligan, Jr., states that RIVAS has been described or will be described in a patent application that will be filed with the United States Patent and Trademark Office. In a selling memorandum drafted by Stafford to give prospective transaction partners necessary information about Stafford's assets, RIVAS is described as a methodology made up of various models and applications (such as Monstor) that combine sophisticated algorithms with server infrastructure.

## STANDARD OF REVIEW FOR MOTION FOR SUMMARY JUDGMENT

Summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."Fed.R.Civ.P. 56(c). A genuine issue of material fact exists only if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material if it can affect the outcome of the case under the applicable substantive law. *Id.* When reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Schuster v. Lucent Technologies, Inc.,* 327 F.3d 569, 573 (7th Cir.2003).

The movant bears the burden of establishing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the movant meets this burden, the non-movant must set forth specific facts demonstrating that there is a genuine issue for trial.Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324. To successfully oppose the motion, the non-movant must designate these facts in affidavits, depositions, answers to interrogatories, or admissions; the non-movant cannot rest on the pleadings alone. *Celotex,* 477 U.S. at 324.

### ANALYSIS

#### I. Count I of the Complaint

**\*4** The parties dispute the characterization of RIVAS. On one hand, Stafford claims RIVAS is a computer program that is made up of numerous software applications written primarily in the C++ computer language. "A 'computer program' is a set of statements or instructions to be used directly or

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

indirectly in a computer in order to bring about a certain result."17 U.S.C. § 101. Computer programs are subject to copyright protection as they are capable of embodying original works of authorship. *Syntek Semiconductor Co., Ltd. v. Microchip Technology Inc.,* 307 F.3d 775, 779 (9th Cir.2002). On the other hand, Defendants claim RIVAS is only a methodology mad up of trade secrets consisting of mathematical algorithms and sophisticated pricing models. Unlike computer programs, methodologies are not subject to protection under the Copyright Act. *See*17 U.S.C. § 102(b) ("In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.").

Whether RIVAS is a "computer program" or a "methodology" is a question of fact. Thus, for this Court to define RIVAS on this motion for summary judgment, the Court must first determine whether there is sufficient evidence for a reasonable jury to find RIVAS is a methodology or a computer program.

Defendants point to Stafford's failure to disclose any copyright registrations and applications as required by the Master Purchase Agreement entered into between TD Bank and Stafford, as evidence of Stafford's treatment of RIVAS as a noncopyrightable methodology. Defendants also show that Stafford listed RIVAS as a planned method patent application in the intellectual property schedule to the Master Purchase Agreement. Furthermore, in a purported assignment of RIVAS from Jerome Nelligan, Jr. to Stafford Trading, Inc., RIVAS is described as "an invention comprising certain new, useful, and nonobvious improvements in the system and method for real-time options contract price calculations and manipulations."In the assignment, Nelligan, Jr., states that RIVAS has been described or will be described in a patent application that will be filed with the United States Patent and Trademark Office. Lastly, Defendants offer the descrip-

tion of RIVAS that appears in a selling memorandum drafted by Stafford to give prospective transaction partners necessary information about Stafford's assets. RIVAS is described in the selling memorandum as a methodology made up of various models and applications (such as Monstor) that combine sophisticated algorithms with server infrastructure. In sum, there is evidence that RIVAS is a methodology, as the Defendants argue.

But there is also evidence that RIVAS is in fact made up of several computer programs. One of the components of RIVAS is the so-called GUTS pricing model. Stafford concedes that Charles Pokoski wrote some initial code for the GUTS model in C language. The C language is a computer language. Computer languages are also known as programming languages because programmers write code in specific languages to direct a computer to perform certain tasks and operations to achieve certain results. The undisputed facts demonstrate that Charles Pokoski wrote an initial computer program in the C language for the GUTS pricing model. Stafford states that Pokoski does not know if any of the initial code that he wrote in C language was written into C++ language and included in the final RIVAS system sold to TD Bank. That may be so. But it is nonetheless clear that Charles Pokoski was the author of an initial code written in the C programming language. As such, he was also the owner of that code. Title 17 U.S.C. § 201(a) states that "[c]opyright ... vests initially in the author or authors of the work."

*5 It is undisputed that Pokoski wrote certain mathematical algorithms into code in the C language for the GUTS system and then provided that code to a software developer, Thomas Vonderhaar, who translated it into the C++ programming language with the assistance of Pokoski. Therefore, although some describe RIVAS using the terms "model" and "system" it is clear that RIVAS contains a computer program written in C++ programming language, with some language possibly in C. Whether that expression in the GUTS system is copyright-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

able depends on the extent of the merger of the ideas and the expression. *See Lexmark International, Inc. v. Static Control Components, Inc.,* 387 F.3d 522, 535 (2004). The merger doctrine states that in those computer programs where the specific words utilized in the expression are essential to the statement of the idea or where there is only one or a few ways to express the idea, copyright protection does not exist. *Id.* There is no evidence of the extent to which the Defendants' ideas are merged with the expression of the ultimate code contained in the GUTS model of the RIVAS system. Furthermore, the question of differentiating idea from expression is a question of fact. *See eScholar, LLC v. Otis Educational Systems, Inc.,* 2005 WL 2977569 at *18 (S.D.N.Y.2005) (citation omitted).

This Court finds that there is insufficient evidence from which it can conclude that RIVAS in toto, is a computer program or a trade secret methodology. Neither party has even briefed the issue of what effect a dichotomous characterization of RIVAS would have on the ownership of RIVAS prior to the sale. Whatever RIVAS is, it is undisputed that one of its components is the so-called GUTS model and that Pokoski played some part in its creation. Based on the facts presented, this Court also cannot find that Pokoski had no authorship (and thus ownership) in the GUTS model of the RIVAS system. Title 17 U.S.C. § 201 states in relevant part that "[c]opyright in a work protected under this title vests initially in the author or authors of the work. The authors of a joint work are co-owners of copyright in the work."

Stafford asserts that Defendants only contributed ideas and algorithms to the development of RIVAS, and specifically the GUTS model. Ideas are not afforded copyright protection, only the expression of those ideas are copyrightable.*Lexmark International, Inc.,* 387 F.3d at 534 (2004) (citing *Mazer v. Stein,* 347 U.S. 210, 217 (1954)). Algorithms, sets of procedures for solving problems, are not afforded copyright protection either. *CCC Info. Servs. v. MacLean Hunter Mkt. Reports,* 44 F.3d 61, 72 n.

22 (2nd Cir.1994). But Pokoski did not merely provide ideas and algorithms, he expressed those algorithms into a code written in the C programming language. Vonderhaar then translated that code into C++ programming language. A computer program's object code and source code are subject to copyright protection. *Lexmark International, Inc.,* 387 F.3d at 534. Defendants offer the declaration of Stuart Okorofsky, an independent computer programmer who holds a bachelor's degree in computer science and has fourteen years of experience with various computer languages, for his opinion that one cannot assume that the translation of C into C++ necessarily changes the underlying expression and that the C language is a subset of the C++ language. Stafford has not offered anything to refute Okorofsky's assertion.

*6 Title 17 U.S.C. § 201(b) states in relevant part that"[i]n the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright." Whether Pokoski was an employee of Stafford or his partner is another disputed question of fact that is much more fit for a jury to decide than this Court.

On the employment issue, Lovely and Pokoski claim they are not employees. Instead, they view themselves as partners to Stafford and they argue that they had an oral partnership agreement. In the excerpts of the deposition testimony of Lovely and Pokoski provided by both parties, both Defendants concede to working with Stafford in various capacities but they do not admit to being employees. While it is extremely strange that Lovely and Pokoski would accept employment with TDO as a condition for the closing of the TD transaction, if they were indeed partners to Stafford, based upon the facts included in the Local Rule 56 Statements of Facts and the evidence presented in support of those facts, this Court is unwilling to find as a mat-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

ter of fact that Defendants were employees of Stafford's rather than partners.

In conclusion, this Court cannot find that ownership of RIVAS is governed by the Copyright Act because there are insufficient facts for this Court to find that RIVAS, in whole, is a computer program. Moreover, based on the facts presented in the various declarations of Stafford employees, this Court declines to find that Pokoski did not author any part of the GUTS model of RIVAS. This Court also declines to make a finding as to the employment status of the Defendants.[FN2] Stafford's motion for summary judgment is therefore denied on the issue of whether Defendants owned any rights in RIVAS prior to the sale to TD Bank.[FN3]

> FN2. In the Complaint (¶ 31), Plaintiffs make mention of an Employee Confidentiality Agreement in which Defendants agreed that all rights in any developments and inventions belonged to Stafford and that Defendants assigned to Stafford all rights in intellectual property they may have had during their employment. This Court has not found a copy of any such agreements or assignments signed by the Defendants in any of the exhibits referred to in Stafford's Appendix of Exhibits accompanying its Local Rule 56 Statement of Facts and therefore, declines to consider it now.

> FN3. Defendant Lovely conceded that he did not write any of the code for the GUTS model. Thus he cannot be deemed an author (or owner of that computer program). However, because this Court declines to find RIVAS is subject to copyright protection under the Copyright Act based on the facts presented, Lovely may still have had an ownership interest in RIVAS prior to the sale to TD Bank based on a theory of ownership not related to copyright.

**II. The Counterclaim**

### A. Counts I, II and VII

Summary judgment is also denied as to Count I, II and VII of the Defendant's Counterclaim. Count I is entitled "Breach of Partnership Agreement" and is premised upon the existence of a partnership agreement. This Court has declined to find there was or was not a partnership agreement on this record. Count II is entitled "Promissory Estoppel" and is premised upon Stafford's alleged statements to Defendants regarding the existence of a partnership and the compensation they would receive in exchange for their parts in developing and refining RIVAS. This Court expresses no opinion on whether such statements were ever made as this is a disputed fact. Count VII is entitled "Copyright Declaration" and is premised upon a finding that RIVAS is copyrightable. If RIVAS is copyrightable, then the Copyright Act would apply and its provisions on ownership and transfer of ownership would obviate Defendants' ownership claims. Since all of Stafford's arguments that these claims be dismissed all hinge, in one way or another, upon this Court finding that RIVAS was subject to copyright protection under the Copyright Act and this Court has found that there is insufficient evidence form which it can determine whether RIVAS is copyrightable, dismissal of Defendants' claims at this point would be inappropriate.

### B. Count III

*7 Count III is based on the theory that Stafford misappropriated Defendants' trade secrets under Illinois statutory law. The Illinois Trade Secrets Act forbids the misappropriation of trade secrets. 765 Ill. Comp. Stat. 1065/2. Stafford argues that Defendants have not established that their ideas and algorithms are even subject to protection under this law because they cannot show that they took any affirmative measures to keep their information secret.

It is a statutory requirement that one claiming the misappropriation of a trade secret must demonstrate

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

that the information at issue was subject to efforts that were reasonable under the circumstances to maintain its secrecy or confidentiality.[FN4] 765 Ill. Comp. Stat. 1065/2(d); *Arcor, Inc. v. Haas,* 363 Ill.App.3d 396, 299 Ill.Dec. 526, 842 N.E.2d 265, 269 (Ill.App.Ct.2005). Stafford contends that Defendants failed to take any affirmative reasonable steps to protect the secrecy of their information. In support of that contention, Stafford points to Defendants' sharing of their ideas and algorithms with outsiders of the alleged partnership, namely Stafford's employees. Defendants argue that they understood Stafford to be maintaining the confidentiality of the information amongst his employees. Pokoski states that he personally limited exposure of the information to those Stafford employees whose input was necessary to development of the ultimate product.

> FN4. Stafford does not address the other statutory requirement that one asserting a trade secret must demonstrate that the information was sufficiently secret to confer an economic competitive advantage over those not in possession of the information. Therefore, the Court will assume Defendants have done so for purposes of adjudicating this motion.

It is illogical to conclude that the Defendants failed to take reasonable steps to maintain secrecy by sharing the relevant information with Stafford's employees when they allege that Stafford was their business partner and Stafford acknowledges that it required its employees to sign confidentiality agreements. Stafford states that in *Leibert Corp. v. Mazur,* an Illinois appellate court supposedly held that restricting access to information on a need-to-know basis was insufficient to satisfy the demonstration of reasonable affirmative steps. 357 Ill.App.3d 265, 293 Ill.Dec. 28, 827 N.E.2d 909, 923 (2005). Stafford is incorrect. What troubled the Court in *Mazur,* was the fact that none of the employees who received the confidential information were required to sign confidentiality agreements.

Here, Stafford required its employees and prospective purchasers, including TD Bank, to sign confidentiality agreements and Defendants relied, perhaps naively, on this.

Stafford also argues to this Court that reliance on an oral partnership agreement is insufficient to constitute a reasonable step in the absence of an express restrictive covenant when there is no indication of the duration of the partnership. *See Southwest Whey, Inc. v. Nutrition 101, Inc.,* 117 F.Supp.2d 770, 779 (C.D.Ill.2000). Defendants counter that the alleged partnership implies that Stafford had a duty not to share confidential information with those outside the partnership and employees of a partner are not considered outside the partnership. Regardless of what either party states is a reasonable step to protect secrecy, the Seventh Circuit has explained that "[w]hether the measures taken by a trade secret owner are sufficient to satisfy the Act's reasonableness standard ordinarily is a question of fact for the jury."*Learning Curve Toys, Inc. v. PlayWood Toys, Inc.,* 342 F.3d 714, 725 (7th Cir.2003). Stafford concedes that the Defendants identified at least one affirmative reasonable step, therefore there is a genuine issue of material fact from which a jury will determine the reasonableness under the circumstances and summary judgment is inappropriate.

### C. Preemption of Counts II, IV, V, VI and VII

***8** Chapter 725 Ill. Comp. Stat. 1065/8 explicitly states that the Illinois Trade Secrets Act "is intended to displace conflicting tort, restitutionary, unfair competition, and other laws of [Illinois] providing civil remedies for misappropriation of a trade secret."In *Hecny Transp., Inc. v. Chu,* the Seventh Circuit explained that "claims are foreclosed only when they rest on the conduct that is said to misappropriate trade secrets."430 F.3d 402, 404-05 (2005) (citation omitted). Thus, preemption does not apply to "duties imposed by law that are not dependent upon the existence of competitively significant secret information."*Id.* at 405 (quotation

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

omitted).

### Count II-Promissory Estoppel

In Illinois, a proper claim of promissory estoppel generally consists of factual assertions that the defendant made an unambiguous promise to the plaintiff; the plaintiff relied on this promise; the plaintiff's reliance was expected and foreseeable by the defendant; and lastly, the plaintiff relied on the defendant's promise to his detriment. *Jago v. Miller Fluid Power Corp.,* 245 Ill.App.3d 876, 185 Ill.Dec. 785, 615 N.E.2d 80, 83 (Ill.1993). Here, Defendants' claim is premised upon the existence of Stafford's alleged promise to pay them one-half of the value of any ultimate sale or licensing of RIVAS, in exchange for access to their trade secrets, *as well as their acquiescence in the sale of RIVAS to TD Bank.*(Counterclaim, ¶¶ 78-81.)

In *Hecny Transportation, Inc.,* the Seventh Circuit explained that assertion of a trade secret did not "wipe out claims of theft, fraud, and breach of the duty of loyalty that would have been sound" even if the object claimed to be a trade secret was not in fact a trade secret. 430 F.3d at 405. Thus, even though this Promissory estoppel claim contains the assertion of trade secrets, the characterization of the information provided to Stafford by the Defendants as trade secrets is absolutely unnecessary to the viability of the Promissory estoppel claim itself. In other words, had the Defendants simply pleaded that "Stafford promised us to pay half of any money he received for using our information" the claim would still be valid. Thus, this claim is not preempted by the ITSA.

### Count IV-Breach of Fiduciary Duty

This claim is premised upon Stafford violating a fiduciary duty he owed the Defendants as an alleged partner. In Illinois, a fiduciary relationship exists between the partners and embraces all matters relating to the partnership business; each partner is bound to exercise the utmost good faith and hon-

esty in all dealings and transactions relating to the partnership. *Couri v. Couri,* 95 Ill.2d 91, 69 Ill.Dec. 117, 447 N.E.2d 334, 337 (Ill.1983) (citation omitted). Defendants claim that Stafford violated his fiduciary duty to the alleged partnership by misrepresenting and concealing the value of RIVAS and the amounts TD Bank paid to Stafford. Therefore, this claim is not dependant upon the existence of a trade secret and is not preempted by the ITSA.

### Count V-Fraud

*9 Defendants claim that Stafford committed fraud by intentionally making false material statements to them upon which they relied. After listing out specific statements that contain the basis of the alleged fraud, Defendants make the following statement:
Stafford made the representations and omissions set forth in the preceding paragraphs to induce Lovely's and Pokoski's reliance thereon and to induce Lovely and Pokoski into a false sense of security about the details of *the sale of the trade secrets* and other assets of the partnership to the TD Bank.

(Counterclaim, ¶ 96 (emphasis added).) Stafford contends that when the facts relating to the breach of the common law claims are inextricably linked to the trade secret claim, such common law claims are preempted by ITSA. *Lucini Italia Co. v. Grappolini,* 2003 WL 1989605 at *22 (N.D.Ill.2003)."Decisions of federal district courts on issues of state law have neither authoritative nor precedential force ...,"*Hecny Transp., Inc.,* 430 F.3d at 404-05. But the Court's discussion of inextricable linkage is really just another way to state that when a common law claim rests on the same facts that support the misappropriations claim, it is preempted. *Id.* at 405.In paragraph 87 of the misappropriations claim, Defendants state that Stafford misappropriated trade secrets by claiming ownership of them and by claiming the right to sell them without paying them their one-half share. In Count V of the Counterclaim, paragraph 94, Defendants pleaded that Stafford (the individual) made the fol-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

lowing statement (amongst other statements): "(a) That, if Lovely and Pokoski would contribute their RIVAS trade secrets and software to a partnership with Stafford, Stafford would pay them one-half of the value received by Stafford for RIVAS; ...". Thus, it is clear that the facts upon which Defendants base their fraud claim are the same facts upon which the rest their misappropriations claim. It is therefore preempted by the ITSA.

Stafford also argues that Defendants have failed to state a fraud claim because they have failed to plead with particularity as required by Federal Rule of Civil Procedure 9(b). According to the Seventh Circuit's explanation of the particularity requirement, to properly plead fraud, the Defendants must include in the allegations factual assertions relating to "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 683 (7th Cir.1992) (citations omitted). Essentially this means that Defendants were required to plead the 'who, what, when, where, and how' of the alleged fraud. *Uni*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir.1992); *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.1990).

In Count V of the Counterclaim, Defendants pleaded that **Stafford** (the individual) made the following statements:
**\*10** (a) That, if **Lovely** and Pokoski would contribute their RIVAS **trade** secrets and software to a partnership with **Stafford, Stafford** would pay them one-half of the value received by **Stafford** for RIVAS;
(b) That, if **Lovely** and Pokoski continued to work regarding the development and implementation of RIVAS-including bypassing guaranteed offers of several million dollars (to **Lovely**)-they would receive 50 percent of the proceeds of the sale of RIVAS;
(c) That, if **Lovely** and Pokoski worked with

**Stafford** in conjunction with marketing and explaining RIVAS to potential buyers such as the TD Bank, they would receive 50 percent of the proceeds of the sale of RIVAS;
(d) That, if **Lovely** and Pokoski would sign on as TDO employees at a salary rate substantially below what they had been earning so that the TD Transaction could close, **Stafford** would pay to **Lovely** and Pokoski one-half of the amount he received for RIVAS from the TD Bank;
(e) That, if **Lovely** and Pokoski would accept forgivable loans from TD well below the value of their half interest in RIVAS, **Stafford** would pay the balance of their half of the amount he received for RIVAS from the TD Bank to **Lovely** and Pokoski following the closing of the TD Transaction;
(f) That the forgivable loans provided by TDO were part of the proceeds they would receive for payment for their one-half interest in RIVAS;
(g) That, if **Lovely** and Pokoski would allow him to take care of all of the details associated with transferring RIVAS to the TD Bank (including procurement of legal counsel to represent them at closing), **Stafford** would pay to **Lovely** and Pokoski one-half the amount he received for RIVAS from the TD Bank;
They also pleaded that **Stafford** intentionally concealed several material facts, including, but not limited to:
(a) **Stafford** had only hired counsel to look out after his individual interests rather than that of **Stafford's, Lovely's** and Pokoski's partnership or the individual interests of **Lovely** or Pokoski;
(b) **Stafford** had negotiated a payment in excess of $125 million associated with sale and purchase of RIVAS rather than the $7.0 million **Stafford** falsely represented to **Lovely** and Pokoski following the closing.

Therefore, Defendants pleaded the "who" and "what" elements of the fraudulent circumstances. As to the rest of the requirements, after parsing through the seventy paragraphs of the Counterclaim that were incorporated and realleged in the first paragraph of this count, the Court is still left

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

without an understanding of when Stafford made these statements, where he made them, and how he made them. Such pleading is much too vague to satisfy the heightened pleading requirements of Rule 9(b). Therefore, Count V could also be dismissed for failure to comply with the requirements of Rule 9(b).

*Count VI-Fraudulent Concealment*

Generally a claim of fraudulent concealment requires (amongst other things) a plaintiff to plead that a defendant concealed material facts under circumstances that created a duty to speak; the defendant intended to induce a false belief; the plaintiff could not have discovered the truth through reasonable inquiry or inspection, or was prevented from making a reasonable inquiry or inspection, and justifiably relied upon the defendant's omission as a representation that the fact did not exist; the concealed information was such that the plaintiff would have acted differently had he or she been aware of it; and lastly, the plaintiff's reliance resulted in damages. *Bauer v. Giannis,* 359 Ill.App.3d 897, 296 Ill.Dec. 147, 834 N.E.2d 952, 957-58 (Ill.App.Ct.2005). Defendants allege that due to the partnership relationship, Stafford had a duty to disclose to them his belief that he alone owned RIVAS. They do not allege that they were harmed because Stafford believed RIVAS consisted of trade secrets or that Stafford believed he owned their trade secrets. Thus, this claim is not preempted by the ITSA.

*11 However, Defendants plead that the material fact that Stafford unduly withheld from them is his belief that he owned RIVAS. (Counterclaim, ¶¶ 100-102.) Nowhere in this entire Count VI do the Defendants assert when this supposed duty to inform them allegedly arose. Throughout Count VI, Defendants make mention of "material facts" but they fail to mention what those facts are (other than Stafford's belief that he owned RIVAS). An allegation of fraudulent concealment must be pled with specificity. *See Jones v. Hoosman,* 2006 WL

1302524 at *2 (N.D.Ill.2006) (collecting cases). A fact is material if it would have induced the other party to act differently had she been aware of it.*Perlman v. Time, Inc.,* 64 Ill.App.3d 190, 20 Ill.Dec. 831, 380 N.E.2d 1040, 1046 (Ill.App.Ct.1978).

Another problem with this claim is that it is unclear whether an omitted expression of belief or opinion can ever constitute an "omission of material fact" in a fraudulent concealment action under Illinois law. In the context of pure fraud, a belief or opinion generally cannot constitute a "material representation" such that one who makes that representation can be found liable. *Peterson Industries, Inc. v. Lake View Trust and Sav. Bank,* 584 F.2d 166, 169 (7th Cir.1978) (citing *Metropolitan Bank and Trust Co. v. Oliver,* 4 Ill.App.3d 975, 283 N.E.2d 62, 64 (Ill.App.Ct.1972)). An exception to this rule is where the circumstances suggest that the plaintiff may have justifiably relied on the opinion as though it was a statement of fact. *Perlman,* 20 Ill.Dec. 831, 380 N.E.2d at 1046. Further complicating this action is the fact that Defendants do not state when Stafford's duty to disclose his belief arose. Perhaps it arose in 1998 when the alleged partnership was supposedly formed. But RIVAS did not exist at that point, so it is unclear whether Stafford would have expressed an opinion as to who owned it.

In conclusion, this claim is could be dismissed because the Defendants have not pled it with the specificity required by Rule 9(b). However, the Defendants based this claim upon Stafford's alleged failure to disclose his opinion. Statements of opinion or belief are not equivalent to statements of fact. Fraudulent concealment claims are based upon failures to disclose material facts. Therefore, Count VI is dismissed because the Defendants have failed to state a legally cognizable claim.

*Count VIII-Unjust Enrichment*

This claim is based upon the theory that Stafford has been unjustly enriched by its incorporation of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Defendant's trade secrets into RIVAS, even if Stafford has a copyright in any RIVAS software. Here, it is clear from what Defendants have pleaded that the conduct for which they complain rests on the misappropriation of the trade secrets. Thus, there is no need to await the finding of a trade secret because Defendants have explicitly mentioned the inclusion of their trade secrets as the source of Stafford's alleged unjust enrichment in this claim (Counterclaim, ¶ 110) and the misappropriation of trade secrets under ITSA in Count III. This claim is preempted by the ITSA.

### III. Failure to Join a Necessary Party

**\*12** Stafford argues in its motion for summary judgment (as well as its motion to dismiss) that the Defendants' counterclaim must be dismissed, pursuant to Federal Rules 12(b)(7) and 19(b), because they failed to join TD Bank and TDO, who, according to Stafford, are necessary and indispensable parties to this action because they currently own RIVAS. Defendants respond that neither TD Bank or TDO are necessary or indispensable parties. Federal Rule of Civil Procedure 19 provides a two-step analysis in deciding whether to dismiss an action for failure to join an absent party.

First, Rule 19(a) provides a framework for deciding whether a given person or party should be joined. This question has been commonly analyzed as whether the unjoined party is "necessary." Second, if joinder is called for, then Rule 19(b) guides a court in deciding whether the suit should be dismissed if that person cannot be joined. This question has been commonly analyzed as whether this necessary party is "indispensable." *Darush v. Northern Trust Company,* 1996 WL 99903, \*1 (N.D.Ill.Feb.29, 1996) (citing *Pasco International (London) Ltd. v. Stenograph Corp.,* 637 F.2d 496, 507 n. 13 (7th Cir.1980); *Krueger v. Cartwright,* 996 F.2d 928, 933 (7th Cir.1993)). Specifically, Rule 19(a) provides that a party must be joined in an action if:
(1) in the person's absence complete relief cannot

be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (I) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reasons of the claimed interest.

Fed.R.Civ.P. 19(a).

Both Stafford and Defendants concede that TD Bank and TDO bought, own and are currently using RIVAS. Defendants specifically ask this Court for a declaration that they "are the owners of any copyrights obtainable relating to RIVAS" and "the rightful owners of copyrights in the RIVAS technology."Such a declaration would obviously affect TD Bank's and TDO's interests in RIVAS.

If a court determines that a party is necessary under Rule 19(a), it must next examine whether, under Rule 19(b), "in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as being indispensable."Fed.R.Civ.P. 19(b).Rule 19(b) sets forth four factors to consider in deciding whether an absent party is "indispensable": (1) the extent to which a judgment entered without the absent party might be prejudicial to him or those already parties; (2) the extent to which protective measures might be employed to lessen or avoid the prejudice; (3) whether a judgment rendered in the absence of the party will be adequate; and, (4) whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder. *Id.*

**\*13** TD Bank and TDO would be manifestly prejudiced if this Court or a jury were to rule or find that Defendants are the owners of any copyrights obtainable relating to RIVAS and the rightful owners of copyrights in the RIVAS technology. Defendants respond that they only seek one-half of the proceeds Stafford received from TD from the sale of

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

RIVAS. Then Defendants must amend the Counter-claim accordingly or this action will be dismissed because this Court will not declare Defendants the owners of RIVAS or any copyrights existing in RIVAS in the absence of TD Bank or TDO.[FN5]

> FN5. Defendants argue in their Response that joinder is not necessary because they concede that title to RIVAS has passed to TD Bank and TDO and that they will execute whatever assignments are necessary to effectuate TD Bank's and TDO's ownership of RIVAS. However, Defendants' concession does not ameliorate the relevant language of the Complaint, nor can one amend a complaint through responsive pleadings.

## CONCLUSION

In conclusion, Stafford's Motion for Summary Judgment is DENIED. Stafford's Motion to Dismiss is partially GRANTED and partially DENIED. Counts V (Fraud) and VIII (Unjust Enrichment) of Defendants' Counterclaim are dismissed because they are preempted by the Illinois Trade Secrets Act. Count VI is dismissed for failure to state a claim upon which relief can be granted. Defendants are hereby ordered to amend their Counterclaim to omit requests for declarations to the effect that they are the rightful owners of any copyrights in RIVAS or to join TD Bank and/or TDO to this action.

N.D.Ill.,2007.
Stafford Trading, Inc. v. Lovely
Slip Copy, 2007 WL 1512417 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.